No. 19-20797

---

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

---

**UNITED STATES OF AMERICA,**
Plaintiff–Appellee

vs.

**DAYAKAR MOPARTY; HARCHARAN SINGH NARANG**
Defendants-Appellants

---

**On Appeal From The United States District Court
For The Southern District Of Texas
Houston Division
No. 17-CR-00290**

---

**BRIEF OF DEFENDANT-APPELLANT
DAYAKAR MOPARTY**

---

**MICHAEL MCCRUM**       **STEVEN J. LIEBERMAN**
**404 E RAMSEY RD STE 102**    **712 MAIN STREET, SUITE 2400**
**SAN ANTONIO, TX 78216-4665**  **HOUSTON, TEXAS 77002**
**(210) 225-2285 (PHONE)**     **(713) 228-8500 (PHONE)**
**(210) 225-7045 (FAX)**        **(713) 228-0034 (FAX)**

**Counsel for Defendant-Appellant,
DAYAKAR MOPARTY**

## CERTIFICATE OF INTERESTED PERSONS

*United States of America v. Dayakar Moparty; Harcharan Singh Narang*

No. 19-20797

Counsel of record certifies that the persons and entities having an interest in the outcome of this case are those listed below:

1.   Honorable Sim Lake, United States District Judge, Southern District of Texas, Houston Division

2.   Dayakar Moparty, Defendant-Appellant

3.   Harcharan Singh Narang, Defendant-Appellant

4.   United States Government, Plaintiff-Appellee

5.   Counsel for Plaintiff-Appellee:

Tina Ansari (trial counsel)
Andrew D. Pennebaker (trial counsel)
Lauretta Drake Bahry (appellate counsel)

United States Attorney's Office
Houston, Texas

6.   Counsel for Defendant-Appellant:

Federico Andino Reynal (trial counsel)
Charles Medlin (trial counsel)
Nathan Mays (sentencing and appellate counsel)
Steven J. Lieberman (appellate counsel)
Michael McCrum (appellate counsel)

7.    Counsel for Defendant-Appellant Harcharan Singh Narang:

Michael Clark (trial counsel)
Seth Kretzer (appellate counsel)

Respectfully submitted,


__/s/ Michael McCrum_____
MICHAEL MCCRUM

Counsel for Defendant–Appellant,
Dayakar Moparty

# <u>REQUEST FOR ORAL ARGUMENT</u>

Dayakar Moparty requests oral argument. The 8-day trial in this case involved a complex factual scenario in which Dayakar Moparty was a non-medical administrator working at one location and codefendants Drs. Harcharan Narang and Gurnaib Sidhu providing medical services at a different location. One issue is whether there was sufficient evidence to prove Moparty "knowingly" and "willfully" agreed to, or participated in, a scheme to commit health care fraud through alleged medically unnecessary procedures or procedures rendered improperly or not at all, or "knowingly" and "willfully" violated insurance provider agreements that he was not a party to.

Moparty challenges the introduction of prejudicial information to the jury by the prosecutor and two witnesses, where the government struck many "foul blows" in order to obtain a conviction. The government twice informed the jury that codefendant Sidhu, who was neither on trial nor testified, had already pled guilty, and a non-testifying associate of Dr. Narang had been convicted of health care fraud. This misconduct, particularly when considered in the context of other improper, inflammatory and prejudicial information introduced by the prosecution, tainted the jury's perspective to a degree not curable by the trial court's instructions. Oral argument would assist the Court in understanding the dynamics of the case which show Moparty was denied a fair trial.

iv

# TABLE OF CONTENTS

**PAGE**

CERTIFICATE OF INTERESTED PERSONS ....................................................... ii

REQUEST FOR ORAL ARGUMENT .................................................................. iv

TABLE OF CONTENTS ....................................................................................... v

INDEX OF AUTHORITIES ................................................................................ vii

STATEMENT OF JURISDICTION .................................................................... xiii

ISSUES PRESENTED ............................................................................................1

STATEMENT OF THE CASE ................................................................................2

    A. Course of Proceedings and Disposition in the Court Below ......................2

    B. Statement of Facts .....................................................................................2

SUMMARY OF ARGUMENT..............................................................................14

ARGUMENTS AND AUTHORITIES ..................................................................18

    I.  Evidence is Legally Insufficient to Support the Convictions for Conspiracy, Health Care Fraud & Money Laundering ................................18

        A. Standard of Review ......................................................................18

        B. There is no evidence that Moparty knowingly participated in the administration of unnecessary medical procedures or knowingly overbilled for medical procedures......................................................19

    II. District Court Erred in Denying Moparty's Motion for New Trial Based on the Misconduct of the Government .........................................................30

        A. Factual Background ......................................................................30

B. Standard of Review ........................................................35

C. Application of Law to Facts ...........................................36

III. Government's Law Enforcement Agent Improperly Opined on the Ultimate Issue of Criminal Intent.................................................44

IV. District Court Erred in Permitting Government to Introduce Expert Opinions from Lay Witnesses .......................................................49

V. The Totality of the Government's Misconduct Denied Moparty a Fair Trial ................................................................................................52

VI. District Court Committed Reversible Error in Increasing the Offense Level for Abuse of Position of Trust Pursuant to U.S.S.G. §3B1.3 ..............57

CONCLUSION ................................................................................61

CERTIFICATE OF SERVICE .............................................................63

CERTIFICATE OF COMPLIANCE......................................................64

# INDEX OF AUTHORITIES

## CASES                                                          PAGE

*Arizona v. Fulminante,*
    499 U.S. 279 (1991).  ........................................................................42

*Berger v. United States,*
    29 U.S. 78 (1935) ...........................................................................36

*Burton v. United States,*
    391 U.S. 123 (1968) .........................................................................36

*Campbell v. United States,*
    373 U.S. 487 (1963). .................................................................36, 42

*Greer v. Miller,*
    483 U.S. 756 (1987) .........................................................................41

*Jackson v. Virginia,*
    443 U.S. 307 (1979) .........................................................................21

*Kotteakos v. United States,*
    328 U.S. 750 (1948) .........................................................................43

*Yates v. Evatt,*
    500 U.S. 391 (1991) ..................................................................42, 43

*Babb v. United States,*
    218 F.2d 538 (5th Cir. 1955) ...........................................................37

*United States v. Alaniz,*
    726 F.3d 586 (5th Cir. 2013) ...........................................................29

*United States v. Alfaro,*
    919 F.2d 962 (5th Cir. 1990) ...........................................................58

*United States v. Baete,*
    414 F.2d 782 (5th Cir. 1969) .....................................................41, 42

*United States v. Ballard,*
   663 F.2d 534 (5th Cir. 1981) ...............................................................27

*United States v. Conner,*
   537 F.3d 480 (5th Cir. 2008) ...............................................................58

*United States v. Corona,*
   551 F.2d 1386 (5th Cir. 1977) .............................................................39

*United States v. Delgado,*
   672 F.3d 320 (5th Cir. 2012) ...............................................................52

*United States v. Eghobor,*
   812 F.3d 352 (5th Cir. 2015) ........................................................18, 20

*United States v. Fleetwood,*
   528 F.2d 528 (5th Cir. 1976) ..................................................... *passim*

*United States v. Fitzharris,*
   633 F.2d 416 (5th Cir. 1980) ........................................................19, 21

*United States v. Francis,*
   170 F.3d 546 (6th Cir. 1999) ...............................................................44

*United States v. Garcia,*
   530 F.3d 348 (5th Cir. 2008) ...............................................................49

*United States v. Garcia,*
   413 F.3d 201 (2d Cir. 2007) ................................................................51

*United States v. Gomez,*
   617 F.3d 88 (2d Cir. 2010) ..................................................................41

*United States v. Gomez,*
   776 F.2d 542 (5th Cir. 1985) ...............................................................21

*United States v. Gracia,*
   522 F.3d 597 (5th Cir. 2008) ...............................................................57

*United States v. Griffin,*
    324 F.3d 330 (5th Cir. 2003) ...............................................................51

*United States v. Harris,*
    597 F.3d 242 (5th Cir. 2010) ...............................................................58

*United States v. Herrera-Solorzano,*
    114 F.3d 48 (5th Cir. 1997) .................................................................58

*United States v. Holcomb,*
    797 F.2d 1320 (5th Cir. 1986) .............................................................20

*United States v. Houston,*
    481 Fed. Appx. 188 (5th Cir. 2012) .....................................................57

*United States v. Jackson,*
    220 Fed. Appx. 317 (5th Cir. 2007) ...............................................18, 19

*United States v. Jackson,*
    700 F.3d 181 (5th Cir. 1983) ...............................................................19

*United States v. Lake,*
    472 F.3d 1247 (10th Cir. 2007) ...........................................................29

*United States v. Leach,*
    918 F.2d 464 (5th Cir. 1990) ........................................................ *passim*

*United States v. Lewis,*
    476 F.3d 369 (5th Cir. 2007) .........................................................18, 36

*United States v. Lopez-Urbina,*
    434 F.3d 750 (5th Cir. 2005) ...............................................................61

*United States v. Medina-Arellano,*
    569 F.2d 349 (5th Cir. 1978) ...............................................................39

*United States v. Menesses,*
    962 F.2d 420 (5th Cir. 1992) ........................................................ *passim*

*United States v. Miranda,*
   593 F.2d 590 (5th Cir. 1979) ..............................................................37

*United States v. Mitchell,*
   166 F.3d 748 (5th Cir. 1999) ..............................................................35

*United States v. Mitchell,*
   484 F.3d 762 (5th Cir.2007) ...............................................................36

*United States v. Morena,*
   547 F.3d 191 (3rd Cir. 2008) ..............................................................41

*United States v. Moses,*
   94 F.3d 182 (5th Cir. 1996) ................................................................18

*United States v. Murray,*
   988 F.2d 518 (5th Cir. 1993) ..............................................................37

*United States v. Ollison,*
   555 F.3d 152 (5th Cir. 2009) ..............................................................59

*United States v. Parker,*
   839 F.2d 1473 (11th Cir. 1988) .....................................................21, 22

*United States v. Polasek,*
   162 F.3d 878 (5th Cir. 1998) ..............................................................43

*United States v. Rich*,
   145 Fed. Appx. 486 (5th Cir. 2005) ...................................................48

*United States v. Riddle,*
   103 F.3d 423 (5th Cir. 1997) ................................................43, 44, 56

*United States v. Robertson,*
   110 F.3d 1113 (5th Cir. 1997) ............................................................21

*United States v. Rothenberg,*
   328 Fed. Appx. 897 (5th Cir. 2009) ...................................................51

x

*United States v. Setser*,
568 F.3d 482 (5th Cir. 2009) ........................................................39, 47

*United States v. Thomas*,
627 F.3d 146 (5th Cir. 2010) ................................................................35

*United States v. Tyson*,
653 F.3d 192 (3d Cir. 2011) .................................................................21

*United States v. Vinalay*,
694 Fed. Appx. 278 (5th Cir. 2017) ....................................................60

*United States v. White*,
492 F.3d 380 (6th Cir. 2007) ..........................................................48, 51

*United States v. White*,
569 F.2d 263 (5th Cir. 1978) ................................................................21

*United States v. Williams*,
343 F.3d 423 (5th Cir. 2003) ................................................................47

*United States v. Willner*,
795 F.3d 1297 (11th Cir. 2015) ......................................................19, 22

*United States v. Wilson*,
249 F.3d 366 (5th Cir. 2001) ................................................................29

*United States v. Wilson*,
322 F.3d 353 (5th Cir. 2003) ................................................................29

## CONSTITUTIONS, STATUTES AND TREATISES                PAGE

18 U.S.C. § 1347 ....................................................................................2

18 U.S.C. § 1349 .................................................................................2, 20

18 U.S.C. § 1957 ...............................................................................28, 29

18 U.S.C. § 3742 .................................................................... xiii

28 U.S.C. § 1291 .................................................................... xiii

Fed. R. App. P. 4 .................................................................... xiii

Fed. R. App. P. 28 .....................................................................61

Fed. R. Crim. P. 16 ................................................................50, 51

Fed. R. Evid. 403 ..................................................................55, 56

Fed. R. Evid. 702 ..................................................................50, 51

Fed. R. Evid. 704 .......................................................................48

U.S.S.G. § 3B1.3 ................................................................ *passim*

U.S.S.G. § 6A1.3 .......................................................................58

## **STATEMENT OF JURISDICTION**

Jurisdiction of this Court is invoked pursuant to 18 U.S.C. §3742(a) and 28 U.S.C. §1291 as an appeal from a final judgment of conviction and sentence in the United States District Court for the Southern District of Texas, Houston Division, after timely notice of appeal was given in accordance with Rule 4(b) of the Federal Rules of Appellate Procedure.

## ISSUES PRESENTED

1. Whether there was sufficient evidence to support convictions for health care fraud and money laundering.

2. Whether the district judge reversibly erred by denying Moparty's motion for new trial based upon prosecutorial misconduct through the introduction of information that a non-testifying, non-present codefendant had pled guilty and that a non-testifying, non-party physician associate of a codefendant had been convicted of health care fraud.

3. Whether a government agent witness improperly opined on the ultimate issue of criminal intent by opining that Moparty's conduct was "money laundering."

4. Whether the district court reversibly erred in permitting the government to introduce expert opinions from lay witnesses, including an opinion that the defendants' conduct was "fraudulent" and "illegal."

5. Whether the totality of the government's repeated acts of misconduct denied Moparty a fair trial.

6. Whether the district court reversibly erred by imposing a two-level upward adjustment of guidelines for Abuse of Position of Trust under Sentencing Guidelines Section 3B1.3.

1

## STATEMENT OF THE CASE

### A. Course of Proceedings and Disposition in the Court Below

Dayakar Moparty, Defendant-Appellant, hereinafter referred to as "Moparty," was charged by indictment on May 17, 2017, with the offenses of conspiracy to commit health care fraud (Count 1), in violation of 18 U.S.C. §1349; health care fraud (Counts 2-18), in violation of 18 U.S.C. § 1347; and money laundering (Counts 19-21), in violation of 18 U.S.C. § 1347. ROA.19-40). Harcharan Singh Narang was a co-defendant charged with the same crimes. Jury trial commenced before the Honorable Sim Lake, United States District Judge for the Southern District of Texas, Houston Division, on February 11, 2019, and concluded with guilty verdicts on all twenty-one counts on February 22, 2019. ROA.808, 7802). On November 14, 2019, Moparty was sentenced to a term of confinement of one hundred and eight (108) months. Restitution in the amount of $2,621,999.04 was ordered along with a special assessment of $ 2,100.00. ROA.702). Judgment was entered on November 18, 2019. ROA.697). On November 19, 2019, Moparty timely gave written notice of appeal. ROA.704.

### B. Statement of the Facts

Dayakar Moparty was the administrator of Spring Klein Surgical Hospital DBA Trinity Health Network (hereafter "Trinity"), a corporation that was originally

2

created to build a hospital, but later became a business that provided staffing and administrative management services for other independent, medically related companies. ROA.2270-71. Trinity's management services included the hiring of all levels of staff, dealing with private insurance companies (submitting bills, negotiating reimbursement amounts, collection of monies paid by insurance companies), and disbursement of insurance monies to Trinity's client companies. ROA.2272-77. A high-level accounting firm provided accounting and audit services for Trinity, and the law firm of Strasburger & Price provided legal services in connection with drafting of agreements. ROA.2277, 2283-84.

Through research, Moparty verified an authorized procedure in the State of Texas by which a hospital could operate off-site outpatient facilities under the authority of the hospital's license and could bill for such outpatient services under rates applicable to the hospital. ROA.1353-54. In order to qualify, the hospital's outpatient department must meet certain criteria, including being situated within 75 miles of the hospital; having signage giving notice of its affiliation with the hospital; as well as other requirements. ROA.2285-86. The outpatient facilities were given the acronym "HOPD" which stood for Hospital OutPatient Department. ROA.1905. Moparty's research included verbal and written email communication with representatives of the Texas Department of State Health Services ("TDSHS"),

including its assistant general counsel Charles Homer, who confirmed the legality of an HOPD, and Michelle Harborth regarding hospital mobile services; analysis of major hospitals in Texas operating off-site satellite outpatient facilities, including Baylor Hospital ROA.1353-54, 2282, 2285-86, 2288; review of written materials published by the TDSHS; and consultation with a reputable health-care compliance law firm (Strasburger & Price). ROA.1353-54, 2281-84. TDSHS's website indicated that a hospital can provide services at locations not on premises. ROA.2288. Moparty believed that it was proper and legal to operate HOPD facilities within 75 miles of a hospital, and bill for services rendered at such facilities at the same rate as that billed by the hospital. ROA.2282-83.

Trinity provided staffing and administrative management services to Cleveland Regional Medical Center (a facility with 300 employees), 2920 ER (a medical emergency facility with approximately 100 employees), 2920 Open MRI Digital Imaging, Red Oak Hospital (a hospital with approximately 100 employees), and Cleveland Imaging and Surgical Hospital DBA Doctor's Diagnostic Hospital (hereafter "DDH"). ROA.2272-74, 2278, 2289. Trinity's business relationship with DDH was approved by the U.S. Bankruptcy Court. ROA.2278. Moparty did not own any interest in any of the companies serviced by Trinity, nor did Moparty have any training in the field of medicine. ROA.2260-67, 2273. Rather, he earned a degree in

4

computer science and engineering in 1992 from the University of Houston. ROA.2266.

Moparty's strategic plan for future business development focused on a new Exxon facility that was scheduled to open in Spring, Texas. ROA.2279-80. Moparty's plan was for Trinity to manage the creation of new outpatient medical facilities to serve Exxon's 20,000 employees and their families who would be moving soon to the area. ROA.2279-80. In that context, Moparty met Dr. Harcharan Narang, who owned property in Exxon's area of development and who ultimately was named as a co-defendant in the instant case. Moparty agreed to purchase three tracts of property from Dr. Narang: one on the south side of the Exxon facility, another on the east side, and the third on the southwest side. ROA.2290-93. An attorney testified that three sales agreements documenting the sale of these tracts of property were drafted to memorialize these agreements and drafted in a manner common of people of Indian descent. ROA.2063, 2193-97. The agreements were signed by Moparty and Narang.

### *The HOPD*

Dr. Narang, the codefendant in the instant case, was a medical doctor who practiced internal medicine and owned and operated a diagnostic medical office called North Cypress Clinical Associates ("NCCA"), situated within 75 miles of Red

Oak Hospital and therefore within the 75-mile permissible area for HOPDs. ROA.1054, 2012. During negotiations for the sale of real estate, Dr. Narang and his wife, Ranjit Kaur, asked Moparty about creating an HOPD for diagnostic services within the office of NCCA. ROA.2291, 2297. Moparty inspected Dr. Narang's office, and ultimately Red Oak Hospital agreed to lease a portion of Dr. Narang's North Cypress office space in order to operate a hospital outpatient diagnostic center (an HOPD) under Red Oak's license. ROA.2298-99.

Evidence revealed several steps initiated by Moparty to meet the criteria of an HOPD at this site. He consulted with a law firm. ROA.2282-83. Senior counsel for Strasburger & Price prepared a contract that was executed between North Cypress and Red Oak Hospital. ROA.1962, 2284, 2299. Moparty personally delivered employee badges and signs to the North Cypress location and sent an email to personnel which provided instructions as to meeting the required criteria. ROA.2299-2300. Ranjit Kaur had experience as an office manager, and therefore was hired to function as a program site manager for the HOPD. ROA.2336. An attorney retained by Ranjit prepared a Program Management Agreement to document Ranjit being hired by Trinity and arranged for 2920 ER to function as an independent contractor to provide services as a site manager for the North Cypress HOPD location. ROA.2306. Ranjit's duties were to assist in business development,

6

billing and other business processes. ROA.2051-52, 2306-07, 2335. She was paid by checks written on Trinity's account. ROA.2054, 2056-57. Ranjit oversaw billing procedures whereby the outpatient facility would transmit to Trinity all documentation of services rendered by the HOPD. ROA.1909, 2058, 2311. All resources needed at the North Cypress HOPD location were paid by the different entities responsible for managing the HOPD (initially Doctor's Diagnostics or 2920 ER, and later Red Oak Hospital through Trinity, its administrative management company). ROA.1919, 2058-59, 2336. Trinity's billing manager was told by Moparty that it was the intent to establish the North Cypress location as an HOPD. ROA.1905, 1920, 1922. Another physician, Dr. Sidhu, was later hired as the medical director for non-radioactive outpatient services, verified by an employment contract signed in January 2013. ROA.2307-08, 2314. Trinity provided compliance training at the Red Oak Hospital for its employees as well as employees of the North Cypress location. ROA.1180-81. It was undisputed that Moparty did not have any ownership interest in the North Cypress medical office, did not office there, and went to the North Cypress HOPD site only twice: once to conduct the initial inspection of the premises and then to deliver employee badges and signs. ROA.2317. His involvement in overseeing the billing was only on an as-needed basis. ROA.1981. He was not involved in the daily activities of his billing manager. ROA.1982. The

billing manager testified that he had completed a degree program and training for his job; he was never instructed by Moparty to hide anything; and he, the billing manager, did not believe any of the billing practices were illegal. ROA.1953-54, 1956. The bills were outsourced to and processed by a third-party billing company (the Kaiser Group) in India, and upon receipt of the bills from the third-party biller, Trinity's billing manager would review, approve and send the bills to the insurance company. ROA.1967-69.

The government sought to prove two basic theories: (1) procedures were conducted at the North Cypress medical facility that were medically unnecessary, improperly rendered and/or not rendered at all, and (2) procedures were conducted at an outpatient facility but were billed by a hospital at a much higher rate as if the procedures had been conducted at the hospital. ROA.24. To prove its case, the government presented the testimony of four medical experts (experts in medical procedures involving vertigo and balance, allergy, electrodiagnostic and nerve conduction studies, and cardiology, respectively), five former patients of Dr. Narang's medical office, three private insurance company representatives (Blue Cross Blue Shield, Aetna and Cigna), employees of Dr. Narang's office, Trinity's billing manager, and two law enforcement agents.

*Medical Experts*

None of the medical experts' testimony offered any fact relative to Moparty, a lay person who is not a physician nor has a medical background. ROA.1004, 1327, 1569, 1694. Indeed, one expert offered unrefuted testimony that a lay person cannot evaluate a medical file, cannot critically review a doctor's diagnosis or procedures, and cannot determine whether procedures were medically necessary or otherwise performed properly. ROA.1797-99. Similarly, the government's expert witness testified that it is common for a hospital administrator and billing specialist to rely on the physician's representation that tests and procedures were necessary and performed appropriately. ROA.1800. The medical experts' testimony appears to have been focused solely on defendant Narang and the first theory of the alleged conspiracy, that is, whether medical procedures performed by Dr. Narang or others at his medical office were medically unnecessary and/or performed improperly.

*The Patients*

The five patients testified about the medical treatment procedures they received at the North Cypress location, including (a) they did not recall receiving some of the procedures that appeared on billing records, and (b) they received medical treatment only at North Cypress, not Red Oak Hospital. ROA.896, 1192, 1265, 1805, 1846. None of the patients testified that Moparty was present during any

9

examination or otherwise had knowledge of the procedures that were provided to the patient. However, each patient acknowledged that while in the North Cypress office, they signed numerous documents that clearly identified "Trinity Health care Network" and/or "Red Oak Hospital" as the entity responsible for insurance purposes. ROA.986-87, 989, 1214-16, 1251-55, 1264, 1269-71, 1276, 1319-20, 1832, 1842-43, 1871-72.  More specifically, the documents signed by all of the patients gave them notice that their information would be given to Trinity Health care Network and Red Oak Hospital for purposes of billing insurance companies. ROA.1253-55. All patients agreed that these notices were prominently displayed on the top of numerous documents they signed relative to insurance issues and that it did not appear that there was any effort to hide the fact that Trinity and/or Red Oak would be involved in the billing process. ROA.986-91, 1319-20, 1842-43, 1856, 1872.

### *Insurance Company Representatives*

The insurance company representatives provided testimony that focused more specifically on the second theory of the charged conspiracy. They testified that (a) payment for the procedures noted on the billing records were based on the location where the actual services were provided, not some other location, and (b) it was material to the insurance company's decision to pay that the services were performed

10

at the actual site of the biller, not some other location. ROA.1385-87, 1403-06, 1494, 1512-14, 1254-58. Each representative acknowledged, however, that (a) a private insurance company has no authority to declare whether an outpatient facility is recognized as an HOPD under Texas law, and (b) the billing forms submitted to the insurance companies by Trinity (the "UB-04s") were all coded in such a manner so as to provide notice to the insurance companies that the services were provided at an outpatient facility. ROA.1440-42, 1444-48, 1480, 1539-43, 1668-69. Additionally, the insurance representatives agreed that a hospital's outpatient department can offer services away from the hospital's licensed premises through an HOPD, and violation of the company's "fraudulent billing" provisions do not equate to criminal fraud. ROA.1432-33, 1441, 1540. Trinity did not have a contract with these insurance companies, and therefore no agreement as to the billing rates. ROA.1436, 1500, 1534. The representatives agreed that the UB-04s submitted by Trinity did not indicate where the service was performed, did not define the terms "hospital" or "outpatient department" and only designated whether the service was performed at a hospital or outpatient. ROA.1668-69, 1675. Notably, none of the insurance company representatives offered evidence to demonstrate that Moparty had actual knowledge of the insurance company contracts that Dr. Narang had entered with each company nor the policy restrictions of each company relative to the actual place

11

of service.   ROA.1424, 1673. Government exhibit 109J was the only contract introduced into evidence which bore Moparty's signature -- a Facility Services Agreement between Aetna and 2920 Open MRI and Digital Imaging. ROA.1492-93. There was no proof, however, that the terms of this contract expressly addressed whether or not any medical facility could operate as an HOPD of a licensed hospital. Aetna's representative offered Aetna's general position that Aetna would not be "okay" with an out-of-network hospital under the concept of an HOPD, but failed to offer any evidence that Moparty was aware of Aetna's policy nor whether a contract policy that conflicts with Texas law can be the subject of fraud. ROA.1494.

### *The Billing*

Trinity submitted bills on behalf of its client companies to the three insurance companies using Forms UB-04 to reflect outpatient services performed at the North Cypress location. ROA.1443, 1445, 1667. Monies received from the insurance companies were paid to Trinity. ROA.2060. Per Trinity's management contract, monies would then be transferred to several accounts managed by Dr. Narang. ROA.2011, 2013-14, 2060. Monies exchanged between the parties were the result of the management contract between Trinity and Narang as well as the sale of real estate tracts which were the subject of contracts executed between Moparty and Narang. ROA.2063. Ultimately, payments for the real estate tracts were terminated

12

at the direction of an attorney upon the disclosure of the government's investigation. ROA.2065, 2199-2200. On advice of counsel, Moparty lost everything he paid on the real estate purchases. ROA.2309.

Moparty had no knowledge of the medical procedures being conducted at the North Cypress medical office, nor did he make money from such office. ROA.2304. In fact, insurance companies Cigna, Aetna and Blue Cross recouped $3.2 million from the Moparty-related entities prior to the indictment. ROA.2304.

## SUMMARY OF THE ARGUMENTS

### I. THE EVIDENCE IS LEGALLY INSUFFICIENT TO SUPPORT THE CONVICTIONS FOR HEALTH CARE FRAUD & MONEY LAUNDERING.

The government failed to prove that Moparty had knowledge of the nature of the medical procedures performed by Dr. Narang and others at the North Cypress facility nor any role in their administration of such procedures, much less knowledge that such procedures were inadequate, unnecessary nor not conducted at all. The evidence was unrefuted that Moparty's role as an administrator officing at a different location did not provide him with the opportunity nor expertise to know whether any procedure should or should not have been billed. Also, the government failed to offer any proof that Moparty had a contract with any of the insurance companies or that he had knowledge of the terms of their agreement with Dr. Narang relative to HOPD billing. It  failed to offer any evidence to refute that the North Cypress medical office was permissibly acting as an HOPD of a licensed hospital, or the significant evidence of Moparty's good-faith effort to learn and execute the criteria of an HOPD under Texas law. The government's intentional effort to blur the lines between a doctor's obligations under a provider agreement and the elements of criminal fraud was exacerbated by the lack of evidence of Moparty's knowledge of such terms and obligations.

14

## II. THE DISTRICT COURT ERRED IN DENYING MOPARTY'S MOTION FOR NEW TRIAL BASED ON THE MISCONDUCT OF THE GOVERNMENT.

The government repeatedly introduced evidence that non-witnesses had been convicted of health care fraud. First, it exposed to the jury twice (early and late in the trial) that codefendant Sidhu had pled guilty in the instant case, despite Sidhu not testifying. Also, it introduced testimony that a doctor not charged in the instant case (Dr. Ahmed) was an associate of codefendant Narang and was convicted for health care fraud in a separate non-related case. There is no evidence that Moparty knew Ahmed nor had any connection with the matters made the basis of Ahmed's case. The district court acknowledged that the introduction of these matters was not invited by Moparty or Narang and rejected the government's contention that the introduction of these facts served a legitimate purpose. The cumulative degree of prejudice that tainted the jurors' perceptions could not be overcome by the trial court's limiting instruction.

## III. THE GOVERNMENT'S LAW ENFORCEMENT AGENT IMPROPERLY OPINED ON THE ULTIMATE ISSUE OF CRIMINAL INTENT.

The government repeatedly elicited testimony from two law enforcement agents that Moparty's actions constituted money laundering. It was the jury's province to ultimately determine whether Moparty's conduct met the elements of

money laundering, including the element of criminal intent. The government's evidence improperly intruded upon the province of the jury.

## IV. THE DISTRICT COURT ERRED IN PERMITTING THE GOVERNMENT TO INTRODUCE EXPERT OPINIONS FROM LAY WITNESSES.

The government called three insurance company representatives to testify concerning billings submitted to each of their respective companies. No notice had been given by the government that such witnesses would offer expert opinions. Despite objection by defendants, the district court improperly permitted the government to elicit expert opinions from these lay witnesses, including an opinion that activities were "fraudulent" and "illegal."

## V. THE TOTALITY OF THE GOVERNMENT'S MISCONDUCT DENIED MOPARTY A FAIR TRIAL.

In addition to the multiple acts of government misconduct referenced above, the government repeatedly introduced prejudicial information, including unwarranted sidebar remarks by prosecutors. The cumulative prejudicial effect of these repeated acts of misconduct by prosecutors and government witnesses rendered impossible the jury's ability to fairly review the evidence and return a just verdict.

## VI. THE DISTRICT COURT COMMITTED REVERSIBLE ERROR IN INCREASING THE OFFENSE LEVEL FOR ABUSE OF POSITION OF TRUST PURSUANT TO U.S.S.G. §3B1.3.

The probation office recommended a 2-level upward adjustment under U.S.S.G. §3B1.3. The district court overruled Moparty's objection without comment. Neither the presentence report nor the evidence introduced at trial presented facts sufficient to support the government's burden to prove the application of this 2-level upward adjustment.

## ARGUMENT AND AUTHORITIES

### I. THE EVIDENCE IS LEGALLY INSUFFICIENT TO SUPPORT THE CONVICTIONS FOR CONSPIRACY, HEALTH CARE FRAUD & MONEY LAUNDERING.

Moparty was convicted of one count of Conspiracy to Commit Health Care Fraud (Count One), seventeen counts of Health Care Fraud (Counts 2-18), and three counts of Money Laundering (Counts 19-21). For the reasons expressed below, the evidence presented at trial is legally insufficient to support each of these convictions.

### A. Standard of review.

"Where, as here, a defendant objected to the sufficiency of the evidence at the trial level, the well-established standard of review is whether a reasonable jury could find that the evidence establishes the guilt of the defendant beyond a reasonable doubt." *United States v. Lewis*, 476 F.3d 369, 377 (5th Cir. 2007); *United States v. Menesses*, 962 F.2d 420, 426 (5th Cir. 1992). This Court reviews the sufficiency of the evidence *de novo. See United States v. Eghobor*, 812 F.3d 352, 361-62 (5th Cir. 2015); *United States v. Jackson*, 220 Fed. Appx. 317, 322 (5th Cir. 2007). "The evidence adduced at trial, whether it be direct, circumstantial or both, together with all inferences reasonably drawn from it, it is viewed in the light most favorable to the verdict." *United States v. Moses*, 94 F.3d 182, 184 (5th Cir. 1996), *quoting Menesses*, 962 F.2d at 426.

18

Although the evidence must be viewed in the light most favorable to the government, a conviction may not rest merely on suspicion, speculation, and conjecture. *Jackson*, 220 Fed. Appx. at 322 *Meneses*, 962 F.2d at 427; *United States v. Jackson*, 700 F.2d 181, 186 (5th Cir. 1983). "A conviction cannot rest on an unwarranted inference, the determination of which is a matter of law." *United States v. Fitzharris*, 633 F.2d 416, 422 (5th Cir. 1980). "If there is a lack of substantial evidence, viewed in the government's favor, from which a reasonable fact finder could find guilt beyond a reasonable doubt, the conviction must be reversed." *United States v. Willner*, 795 F.3d 1297, 1307 (11th Cir. 2015).

### B. There is no evidence that Moparty knowingly participated in the administration of unnecessary medical procedures or knowingly overbilled for medical procedures.

The government's theory of health care fraud was twofold: (1) procedures were conducted at the North Cypress medical facility that were medically unnecessary, improperly rendered and/or not rendered at all, and (2) inflated bills were submitted for procedures conducted at an outpatient facility as if the procedures had been conducted at a hospital. ROA.24, 869.

The government's first theory relative to medical procedures were medically unnecessary, improperly rendered and/or not rendered at all focused on medical procedures and decisions by Drs. Narang and Sidhu. The government completely

19

failed to introduce evidence that (a) Moparty participated in any act related to the ordering and/or administration of any medical procedure, or (b) Moparty knew that he was participating in the billing for procedures that were medically unnecessary, improperly rendered and/or not rendered. The absence of such proof is fatal to Moparty's convictions for health care fraud and money laundering. In fact, the government conceded two critical facts that separated Moparty from any fraudulent activity of Narang and Sidhu. First, Drs. Narang and Sidhu were improperly using CPT Codes for billing before they established any relationship with Moparty. ROA.2402. Second, Moparty had no knowledge of, nor role in, the medical services provided by Narang or Sidhu at the North Cypress Clinic. ROA.2406.

### 1. Alleged Conspiracy to Commit Health Care Fraud.

To prove a conspiracy health-care fraud in violation of 18 U.S.C. §1349, "the government must prove beyond a reasonable doubt that (1) two or more persons made an agreement to commit health care fraud; (2) that the defendant knew the unlawful purpose of the agreement; and (3) that the defendant joined in the agreement willfully, that is, with the intent to further the unlawful purpose." *Eghobor*, 812 F.3d at 362. Taking every bit of the government's evidence as true, there is no evidence of one of the critical elements of a conspiracy charge – an agreement between the alleged co-conspirators. *See United States v. Holcomb*, 797 F.2d 1320, 1327 (5th Cir. 1986)

20

(agreement between two or more people is essential element of conspiracy charge). An agreement between the defendant and another individual is "the essence of the conspiracy offence…It is, in other words, the *sine qua non* of the crime itself." *United States v. Tyson*, 653 F.3d 192, 206 (3d Cir. 2011) (internal quotations and citations omitted). Without evidence of an agreement as to the essence of the crime, there can be no conspiracy, even if each of the alleged conspirators individually acted to defraud the insurance carriers. *See Jackson v. Virginia*, 443 U.S. 307 (1979) (conviction must be based on evidence sufficient "to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense").

In order to convict Moparty of conspiracy to commit health care fraud, it is not enough that the government shows that he may have acted in a way similar to others, even to achieve the same criminal goal. "[M]ere association" is not sufficient to establish participation in a conspiracy. *Fitzharris*, 633 F.2d at 423; *see also United States v. Robertson*, 110 F.3d 1113, 1119 (5th Cir. 1997); *United States v. Gomez*, 776 F.2d 542, 549 (5th Cir. 1985) (evidence insufficient where it showed, at most, that defendant associated with others who were involved with a conspiracy). Similarly, "[m]ere similarity of conduct among various persons and the fact that they have associated with or are related to each other do not establish the existence of a conspiracy." *United States v. White*, 569 F.2d 263, 268 (5th Cir. 1978); *see also United*

*States v. Parker*, 839 F.2d 1473, 1478 (11th Cir. 1988). In *Parker,* the Court pointed out that association of two persons in a business transaction versus knowingly participating in illegal acts are distinguishable concepts:

> The appellants certainly directed their efforts toward the common goal of making money for themselves…While the evidence clearly shows that the law was violated, there is insufficient evidence of a common agreement. Without evidence showing or tending to show a meeting of the minds to commit an unlawful act, the convictions cannot stand.

*Parker, supra.*

The jury was instructed that in order to find Moparty guilty in the instant case, they must find he *"made an agreement to commit the crime of health care fraud as charged in the indictment,"* and *"[a] person who has no knowledge of a conspiracy but who happens to act in a way that advances some purpose of a conspiracy does not thereby become a conspirator."* ROA. 479-81. In this case, the government failed to show Moparty entered into any agreement to further either of the government's theories of fraudulent conduct. It failed to show that the alleged conspirators discussed unlawful common aims and interests, and it failed to show that the alleged conspirators stated between themselves a single detail of the alleged scheme. There is absolutely nothing that meet the minimum, sufficiency standard on this element of a conspiracy charge, particularly with respect to the first theory of prosecution focused on the actual medical procedures. *See Willner*, 795 F.3d at 1307 (reversing conviction due to insufficiency

22

of evidence, as there was no evidence that the defendant "actually knew of or joined in the conspiracy…No witness testified that he or she told Dr. Abreau about the conspiracy or witnessed someone else doing so. No witness testified that Dr. Abreu joined the conspiracy."). Conversely, the government's case as to the first theory rested on proof that Dr. Narang and Dr. Sidhu ordered medical tests without Moparty's knowledge or participation, and these procedures were unnecessary, improperly performed, or never performed. Not one of the five medical experts or five patients of Dr. Narang and Dr. Sidhu provided any evidence that Moparty, who was not a trained medical professional, had any connection to the medical basis behind the ordering or conducting of medical tests. Even if the evidence meets the minimum requirements to support the jury's conclusion that Narang unlawfully sent medical reports to Trinity's billing manager, there is an absence of evidence to support a finding that Moparty or anyone under his direction knew that Narang's representations concerning the information reflected on the records were not accurate. In fact, the government's medical expert Dr. Bungo testified that a person who is not a doctor or does not have specialized training would not be in a position to determine if a medical test was necessary nor comment on how it was conducted. ROA.1797-1798. Dr. Bungo acknowledged that is common in the practice of medicine for an administrator to rely

upon physicians to accurately indicate whether medical tests were necessary and conducted properly. ROA.1800.

The government presented the testimony of two employees, Rikesha Burton and Keon Warren, who were employees of Dr. Narang and Moparty respectively. However, neither of these two witnesses were intimately familiar with the operations of North Cypress and/or Red Oak Hospital. They provided no direct evidence that Moparty was part of a scheme to defraud any health care benefit program. Ms. Burton testified solely about Dr. Narang's clinic regarding the administering of medical tests to various patients. Burton's testimony in no way implicated Moparty in any way to health care fraud. Mr. Warren, the billing manager for various medical facilities including Red Oak Hospital, testified he received billing codes from the North Cypress medical office pertaining to medical procedures purportedly performed in the North Cypress location and utilized those codes when submitting claims for payment to the insurance companies. ROA.1907, 1919, 1930-31.

The government brought insurance company representatives to speak about their contract with the medical provider, Dr. Narang. The government, however, blurred the line between Dr. Narang's contractual obligations under his provider agreement and what was actually criminal fraud. Neither Red Oak Hospital nor Moparty had any contractual relationship with the insurance companies, and therefore

24

could not be said to have criminal intent with respect to application of provisions within the respective provider manuals. Because neither Moparty nor his company contracted with these insurance companies relative to Drs. Narang and Sidhu's patients, Moparty's company billed the procedures as an out-of-network facility. As stated by the representative for Blue Cross, Ms. Escoe, an out-of-network provider had no agreement with the insurance company on what rates to bill. ROA.1436. Instead, billing was based on an undefined "reasonable" rate. ROA.1436. Ms. Escoe acknowledged that the State of Texas, not Blue Cross, regulated hospitals such as Red Oak, and that a hospital outpatient department could offer services at a location other than its license premise. ROA.1441. Ms. Escoe further testified that Red Oak Hospital, through Trinity, submitted claims on Form UB-04, which was the proper claim form used in the industry, and Blue Cross had never contacted Red Oak about submitting an improper claim. ROA.1445, 1448-49.

Ms. Richer, Aetna Insurance Company's representative, agreed that it was reasonable for a hospital billing department to rely on documentation and billing codes provided by the physicians. ROA. 1533. Furthermore, Richer acknowledged that hospital outpatient departments are legitimate and can provide medical care to persons not actually admitted to the hospital. ROA.1540.

Finally, and most significantly, the government offered no evidence to refute that Moparty expended great effort to research whether setting up an HOPD at the North Cypress location would comport with Texas law and thus could be billed accordingly. Because of the absence of evidence that Moparty had knowledge of the alleged improprieties with respect to the actual medical procedures performed (i.e., the government's first prosecutorial theory), Moparty's convictions must rest, if at all, on the government's second theory of prosecution, the alleged inflated billing for services rendered at an outpatient facility based upon a hospital's billing rates. In that regard, the government's evidence again is wholly insufficient to prove criminal, willful intent.

The government's evidence as to this theory rested on the testimony of insurance company representatives, who stated that their contracts with providers specifically required that the billed services must have occurred at the provider's location. Several unsolvable flaws exist as to this evidence. First, there was no evidence presented to demonstrate that Moparty was aware of such contract provisions. His company was billing as an out-of-network entity, and there is no evidence he was made aware of such provisions. Second, the government offered no evidence to refute that Texas law permits a licensed hospital to bill for services rendered at an off-site location - - a Hospital OutPatient Department (HOPD). Indeed, the government's insurance representative witnesses conceded that Texas allows HOPDs which allow this type of

26

billing. ROA.1546. Third, the government offered no evidence to refute Moparty's evidence of his good-faith effort to investigate whether and under which criteria an HOPD could operate out of the North Cypress location. ROA.2285-86. Moparty introduced evidence of (a) his correspondence with Texas' licensing agency to show his repeated efforts to comply with all state laws and regulations; (b) his review of the agency's website concerning HOPDs; and (c) his consultation with experienced attorneys. The totality of evidence pointing to Moparty's good-faith effort was unrebutted by the government's insurance company representatives' testimony or any other evidence. The evidence of his good-faith efforts directly rebuts the government's claim that Moparty knowingly or willfully participated in a scheme to commit health care fraud.

It is true that evidence of an agreement can be circumstantial, "but the prosecution must still offer some evidence showing that an alleged conspirator knew 'the essential of the conspiracy.'" *United States v. Ballard*, 663 F.2d 534, 543 (5th Cir. 1981) (internal citation omitted). Here, there is no indirect or circumstantial evidence that Moparty was part of an agreement with Drs. Narang and/or Sidhu to conduct unnecessary medical tests, bill for medical tests not conducted, or knowingly use improper inflated billing codes. If Drs. Narang and Sidhu had an agreement to unlawfully administer tests or submit records requesting payment for procedures not

27

administered, there is no evidence Moparty had knowledge of such an agreement. A person who has no knowledge of a conspiracy but who happens to act in a way that advances some purpose of a conspiracy does not thereby become a conspirator. Also, a conviction for conspiracy cannot stand where it is based on "inference upon inference." *See United States v. Menesses*, 962 F.2d 420, 426 (5th Cir. 1992). Accordingly, the evidence is insufficient and the conviction for conspiracy to commit health care fraud should be vacated.

### *2. Alleged Health Care Fraud & Money Laundering.*

For the same reasons described above, there is insufficient evidence to support convictions for the substantive health care fraud counts charged in Counts 2-18 and the money laundering counts charged in Counts 19-21. Each of these substantive counts must rest on evidence of knowing intent to commit fraud. Similarly, the monetary transactions charged in the three money laundering counts are all based on the alleged health care fraud charged in Counts 1-18.

The money-laundering statute, 18 U.S.C §1957, forbids a person from "knowingly engag[ing] or attempt[ing] to engage in a monetary transaction in criminally derived property of a value greater than $10,000.00 and is derived from specified unlawful activity." *Id*. §1957(a). One element that the government must prove is "the defendant's knowledge that the property was derived from unlawful

activity." *See United States v. Alaniz,* 726 F.3d 586, 602 (5th Cir. 2013). "Unlawfully" activity involving "criminally derived property" refers to "property constituting, or derived from, proceeds obtained from a criminal offense," such as health care fraud. *See id.;* 18 U.S.C. §1957(f)(2). To sustain the convictions for money laundering in Counts 19-21, the government must have presented sufficient proof that Moparty committed health care fraud. Since the evidence was legally insufficient to prove Moparty's knowing participation in the "essential" of the alleged conspiracy and his knowing execution of a scheme to defraud a health care benefit program, the convictions for money laundering should be reversed. *See United States v. Lake*, 472 F.3d 1247, 1260-61 (10th Cir. 2007); *see also United States v. Wilson,* 249 F.3d 366, 379 (2001) rev'd on other grounds, 322 F.3d 353 (5th Cir. 2003) (if evidence is insufficient to demonstrate defendant's knowledge of underlying fraudulent scheme, evidence is likewise insufficient to support conviction for money laundering).

## II. The District Court Erred in Denying Moparty's Motion for New Trial Based on the Misconduct of the Government.

### A. Factual Background

On three different occasions, the government exposed the jury to information that two physicians had pled guilty to healthcare fraud: Dr. Sidhu, an alleged coconspirator of Moparty, and Dr. Ahmed, a physician associated with Dr. Narang, Moparty's codefendant. The cumulative effect of this rendered impossible the jury's opportunity to fairly evaluate the evidence and render a just verdict.

### *1. Dr. Sidhu.*

Gurnaib Sidhu was charged as a codefendant in the indictment. ROA.19. He pled guilty on December 11, 2018, two months prior to the start of trial. (Docket Minute Entry, 12/11/2018). Weeks before his plea, the government filed a motion to take Sidhu's deposition based on Sidhu's failing health. ROA.104. The court granted the government's motion, and later ruled on the parties' objections asserted at the deposition. (Docket No. 96; ROA.110. Nevertheless, the government did not seek to introduce Sidhu's deposition testimony at trial, nor did it call him as a witness.

In its opening statement, the government prosecutor linked Moparty with Sidhu through extensive factual statements:

> *"I'm going to take you back to 2012, where Dr. Narang and his business associate Dayakar Moparty had an*

30

> *agreement where Dr. Narang would send them these unnecessary tests that were done at the North Cypress office, Dr. Narang and Dr. Sidhu's office...You will hear in this case that Dr. Sidhu is kind of the Robin to Dr. Naran's Batman, meaning he just follows the orders of Dr. Narang. [Sidhu] has no incentive to order all these unnecessary tests, because he's on salary... [Sidhu] makes anywhere between 120 and 150,000.00 to just follow along ordering these unnecessary tests even though he knew it was the wrong thing to do. And that's why he is a co-conspirator in this case. **_You will also hear that Dr. Sidhu is not in this trial because he has already pled guilty._ "**... So, this time the scheme changes where the bills are still going to Dayakar Moparty, but they're being billed at a hospital rate, all under Dr. Sidhu's name instead of Dr. Narang.*

ROA.870 (emphasis added).

On the fourth day of trial, the topic of Sidhu's potential testimony came up. The court inquired as to whether Sidhu was going to testify. ROA.1683. The prosecutor's response was unequivocal:

> *Prosecutor Pennebaker:  At first we thought he was, your Honor, and now we don't think we're going to call him.*

> *The Court: Okay. So he's not coming?*

> *Prosecutor Pennebaker:  No, your Honor.*

ROA.1683-84.

Two days later, however, the government called FBI Agent Lammons as a witness. Despite the prosecutor's unequivocal statement two days earlier, he asked a direct question about Sidhu:

*Prosecutor Pennebaker:*    *Okay. And we haven't talked a lot about Dr. Sidhu yet. We've heard that he was working with Dr. Narang but haven't seen him in this trial.* ***Why is that?***

*FBI Agent Lammons:*    ***He's already pled guilty****.*

ROA.2031 (emphasis added).

The mere disclosure of this information was bad enough, as it corroborated the statement given in its opening. The prejudicial effect of the solicited disclosure on Moparty at this point in the trial, however, was enhanced by the agent's previous testimony that Moparty billed $20 million from different entities operated by Narang and Sidhu, even though Dr. Sidhu had never worked at Red Oak Hospital. ROA.2017. Moparty objected to the government's misconduct in introducing evidence of an alleged coconspirator's guilty plea, on the basis that it denied him his constitutional right to confront and cross-examine Sidhu. ROA.2031. The district court gave the jury a limiting instruction. ROA.2031-32. Despite (1) the government having told the court two days earlier that Sidhu was not going to testify, (2) eliciting from the FBI agent the fact that Sidhu pled guilty, (3) seeing the court sustaining Moparty's objection, and (4) seeing the court give a limiting instruction to the jury,

32

the government prosecutor then went on to elicit from the FBI agent hearsay information that Sidhu had conveyed to the agent. ROA.2032-33. The court again sustained Moparty's objection. ROA.2033. Later at the sentencing hearing, it became clear that the prosecutor never intended to call Dr. Sidhu as a trial witness, when the prosecutor stated that she was not going to call Dr. Sidhu as a sentencing witness because he was too sick. ROA. 2539. Indeed, the severity of Dr. Sidhu's illness at trial is evident from the notice of his death filed five months after trial. (Docket No. 250).

### 2. Dr. Ahmed.

The double disclosure of Sidhu's guilty plea was exacerbated by another improper disclosure. The government presented an expert witness, Dr. Peter Grant. ROA.1569. The government built up Dr. Grant's credibility by eliciting information that he was a leader of an organization of about 5,000 physicians and otherwise had extensive and impressive qualification as a physician. ROA.1570. Dr. Grant then proceeded to opine that the defendants' conduct was "illegal and unlawful" (an issue addressed further in this Brief). Worse, he then testified that he learned that Dr. Narang was associated with a person named Dr. Ahmed, and that Dr. Ahmed had been convicted for health care fraud in 2017, *"probably in this exact building is where that happened"* (referring to the U.S. Courthouse where the instant trial was

33

occurring). ROA.1580-81, 1583. Moparty and Narang immediately objected. The defendants complained to the court that Dr. Grant's information relative to Dr. Ahmed's conviction was not provided in the government's required expert witness disclosure, and that they would have objected to the introduction of such information had they have known. ROA.1581-82. The government had provided the expert witness' report to defense counsel prior to trial pursuant to Rule 16, Federal Rules of Criminal Procedure, but the information relative to Dr. Ahmed's 2017 conviction was not in the report and the government had not otherwise disclosed such fact to defendants. ROA.1582. The court inquired of the prosecutor whether the government knew that the witness had this information prior to the day of the witness' testimony, to which the prosecutor admitted that she knew. ROA.1582. The trial court stated that the government should have provided such information to the defendants prior to the witness' testimony. ROA.1582. The court sought to alleviate the damage by instructing the jury to disregard the fact of Dr. Ahmed's conviction. ROA.1582.

### *3. Motions for Mistrial.*

After the double disclosure of Sidhu's guilty plea, Narang and Moparty orally moved for a mistrial. ROA.2168-69. After trial, they filed jointly a written motion for mistrial, based on the disclosure of Dr. Sidhu's guilty plea and disclosure of Dr.

Ahmed's health care fraud conviction. ROA.534. The government filed a response, asserting the court's limiting instructions cured the errors, the errors of disclosure were "not improperly emphasized," and the errors were harmless. ROA.549. Narang filed a reply to the government's response, to which Moparty was permitted to adopt. (Docket No. 216, ROA.653. The court reserved ruling during trial, but later denied the written motion. ROA.668, 2168. The court found there was no legitimate purpose for the government introducing the information, in that defendants had not invited the government to expose the jury to information concerning these two doctors and it was not part of defendants' strategy to cast blame on Sidhu. ROA.675. Similarly, the court found that the government's introduction of evidence that Dr. Ahmed had been convicted of health care fraud was neither proper anticipation of impeachment evidence nor had a proper evidentiary purpose, and thus was error. ROA.681.

## B. Standard of Review

The denial of a motion for mistrial is reviewed for an abuse of discretion. *United States v. Thomas*, 627 F.3d 146 (5th Cir. 2010); *see also United States v. Mitchell*, 166 F.3d 748, 751 (5th Cir. 1999). To demonstrate an abuse of discretion, "the defendant bears the burden of showing specific and compelling prejudice that resulted in an unfair trial, and such prejudice must be of a type against which the trial court was unable to afford protection." *United States v. Mitchell*, 484 F.3d 762,

775 (5th Cir. 2007). The defendant is entitled to a reversal on this issue only if he identifies specific events during trial and demonstrates that these events caused him substantial prejudice. *United States v. Lewis*, 476 F.3d 369, 384 (5th Cir. 2007). A district court's finding that a party has not been prejudiced is reviewed for clear error. *See Campbell v. United States*, 373 U.S. 487, 495 (1963).

### C. Application of Law to Facts

The Supreme Court has long counselled prosecutors "to refrain from improper methods calculated to produce a wrongful conviction…" *Berger v. United* States, 29 U.S. 78 (1935). The government may strike hard blows, but it is not at liberty to strike foul ones. *Id.* at 88. This case presents the very example of the government repeatedly striking foul blows by engaging in deliberate conduct to win a case, while abandoning its obligation to see justice is done.

In addition to striking foul blows, the government's action directly infringed on Moparty's Sixth Amendment right to confront and cross-examine witnesses against him. *See Burton v. United States*, 391 U.S. 123 (1968). Evidence of a co-defendant's plea or conviction is not admissible as substantive proof of a defendant's guilt. *United States v. Fleetwood*, 528 F.2d 528, 532 (5th Cir. 1976); *United States v. Leach*, 918 F.2d 464, 467 (5th Cir. 1990). The Fifth Circuit "long ago determined that '[a] defendant is entitled to have the questions of his guilt determined upon the

evidence against him, not on whether [someone else] has pled guilty to the same charge.'" *Fleetwood*, 528 F.2d at 532 (quoting *Babb v. United States*, 218 F.2d 538, 542 (5th Cir. 1955)); *see also United States v. Miranda*, 593 F.2d 590, 594 (5th Cir. 1979) ("[A] defendant is entitled to have the question of his guilt determined upon the evidence against him, not on whether a codefendant or government witness has been convicted of the same charge.")."This principle is so firmly established as to be almost a maxim." *Id.* When evaluating the impact of a guilty plea of a co-conspirator or witness, this court considers four factors: "1) the presence or absence of a limiting instruction; (2) whether there was a proper evidentiary purpose for introduction of the guilty plea; (3) whether the plea was improperly emphasized or used as substantive evidence of guilt; and 4) whether the introduction of the plea was invited by defense counsel." *United States v. Murray*, 988 F.2d 518, 523 (5th Cir. 1993).

## *1. Introduction of Guilty Plea was Uninvited.*

The trial court found that it was undisputed that Moparty did not invite the government's repeated introduction of Sidhu's guilty plea. ROA.671. Likewise, there is nothing in the record to suggest that either defendant invited the testimony of government witness Peter Grant that an associate of Dr. Narang was a convicted felon for health care fraud, the same crime charged against Moparty.

37

## *2. No Proper Evidentiary Purpose for Introduction of Guilty Plea.*

In a deliberate manner, the government highlighted to the jury in the beginning portion of its opening statement that Sidhu was a co-conspirator and he had "already pled guilty". This served no purpose other than inviting the jury to consider his guilty plea as evidence showing Moparty was guilty. Two days later, the prosecutor stated Sidhu would not be called as a witness. Two days after that, the same prosecutor, in a deliberate and calculated fashion, elicited from an FBI Agent that Sidhu was not present for trial because he had pled guilty. Despite the government's assertions in its response to the motion for mistrial, these were not passing references to Sidhu's guilty plea. The calculation of introducing such prejudicial information is evident from the following sequence: on day four of trial, the government elicited information from a renowned medical expert that a doctor associated with one of these defendants had been convicted of health care fraud, to which the court admonished the prosecutor and gave a limiting instruction to the jury. Two days later, the introduction of Sidhu's guilty plea was not an accident: the same prosecutor who had told the court two days earlier that Sidhu would not be called as a witness posed a direct question to FBI Lammons why Sidhu was not in the courtroom, to which the agent answered, *"because he already pled guilty."* There was no probative value of "why" Sidhu was not there at that point in the trial.

38

Additionally, the prosecutor's question followed Lammons' testimony concerning Sidhu's alleged illegal collaboration with Moparty and Narang. No other conclusion can be made than the government's intent to emphasize and use Sidhu's guilty plea and Ahmed's conviction as substantive evidence to prove Moparty's guilt. A codefendant's guilty plea entered into the record is especially prejudicial if made in connection with a conspiracy in which the remaining defendants are charged. *United States v. Medina-Arellano*, 569 F.2d 349, 359 (5th Cir. 1978).

### 3. Plea was Improperly Emphasized & Used as Substantive Evidence.

A co-conspirator's conviction is admissible only if it serves a legitimate purpose. *United States v. Setser*, 568 F.3d 482, 494 (5th Cir. 2009). Clearly, the government may bring up a codefendant's guilty plea in direct examination to "blunt the sword" of anticipated impeachment. *Leach*, 918 F.2d at 467. However, absent a need to immunize its testifying witnesses from: "anticipated, damaging cross-examination," the government has no proper purpose to introduce its witnesses' convictions. *Fleetwood*, 528 F.2d at 533. Convictions "introduced under such circumstances [are] 'improperly emphasized, or used as substantive evidence of guilt.'" *Id.; see also United States v. Corona*, 551 F.2d 1386, 1388 (5th Cir. 1977) ("The prejudice to [defendants] who are charged with complicity in the acts of the self-confessed guilty participant is obvious."). Admission of the criminal history of

*non-testifying* third parties–here, Drs. Sidhu and Ahmed–is even more fraught with prejudice. *See id.* ("prejudicial effect of such [evidence] is great indeed"). In *Leach*, the prosecutor elicited testimony that the defendant's co-conspirator had "been found guilty in this case," but the co-conspirator never testified. 918 F.2d at 466. The Fifth Circuit reversed and very plainly held that "[t]here was no legitimate reason for offering this evidence." *Id.* at 468.

The district court rejected the government's position that the introduction of the guilty plea served a legitimate purpose to counter any effort by the defense to point Sidhu as the mastermind of the scheme and was needed to counteract any efforts to impeach Sidhu if called as a witness. The court correctly found that there was no indication from Moparty's opening statement, cross examination or otherwise to suspect such a trial strategy. Furthermore, the court noted that the agent's introduction of Sidhu's guilty plea occurred after the government knew Sidhu would not be called as a witness. The government engaged in *post-hac* rationalization to justify their misconduct, which was correctly rejected by the district court.

## *4. The Limiting Instructions.*

The court's limiting instructions relative to Sidhu and Ahmed could not cure the cumulative effect of the prejudice intentionally created by the government. This Court has found that "in some instances information pertaining to the [convictions] of others might so taint the trial of an individual that the error could not be cured despite a cautionary instruction." *United States v. Fleetwood*, 528 F.2d 528, 535 (5th Cir. 1976). Indeed, "[t]here may be aggravated circumstances in which the strongest corrective instruction would be insufficient, as, for example, when the guilty plea of one codefendant necessarily implicates another or others." *United States v. Baete*, 414 F.2d 782, 783-84 (5th Cir. 1969); *see also Greer v. Miller,* 483 U.S. 756, 766 (1987) (presumption that juries follow limiting instructions not controlling when there is overwhelming probability that jury is unable to follow the Court's instructions); *United States v. Gomez*, 617 F.3d 88 (2nd Cir. 2010) (conviction reversed upon finding overwhelming probability jury did not follow limiting instruction); *United States v. Morena*, 547 F.3d 191, 197 (3rd Cir. 2008) (Both limiting instruction and final instructions were inadequate to cure the prejudice from prosecutorial misconduct). The "aggravating circumstances" described by this Court in *Baete*, cited again in its *Fleetwood* decision mirror the situation at bar, particularly where multiple curative instructions were the result of multiple introductions of

improper evidence. *See Fleetwood,* 528 F.2d at 535, n.16, quoting *United States v. Baete.*

### 5. Totality of Government Misconduct
### Denied Moparty a Fair Trial.

The trial court concluded that the government's introduction of Dr. Sidhu's guilty plea and the misconduct related to Dr. Grant's testimony was error. These repeated acts of misconduct, particularly in the context of other acts of misconduct addressed in this Brief below, denied him due process of law and a fair trial. Accordingly, the error already found by the district court is constitutional error.[1] Therefore, the government must prove the error was harmless beyond a reasonable doubt. *See Arizona v. Fulminante*, 499 U.S. 279 (1991). The district court's finding that Moparty was not prejudiced is reviewed for clear error. *See Campbell v. United States*, 373 U.S 487, 495 (1963).

In *Yates v. Evatt*, the Supreme Court held that harmless error must be analyzed in terms of the "issue in question" at the trial, and to which the error relates. 500 U.S. 391, 403-05 (1991). The Court prescribed a two-step analysis, requiring the courts (1) to determine "what evidence the jury actually considered [on the issue in

---

[1] The district court's review whether the error was harmless beyond a reasonable doubt and whether Moparty was denied a fair trial is acknowledgment that the motion for mistrial raised constitutional error.

question]," and (2) to "weigh the probative force of that evidence against the probative force" of the inadmissible evidence, or the effect of an erroneous argument or instruction. *Id.* at 404. Although review of the strength of the case against the defendant is an important factor, the legal sufficiency of the evidence is irrelevant; what matters is the effect the error may have had on the jury's decision. *See Kotteakos v. United States*, 328 U.S. 750, 764 (1948). "The crucial thing is the impact of the thing done wrong on the minds of other men, not one's own, in the total setting." *Id.*

It was made clear to the jury from opening statement through the reading of the indictment that Moparty was alleged to be a coconspirator with Dr. Sidhu. The government misconduct impacted key contested issues in the trial regarding Dr. Sidhu's role and participation with Moparty. Specifically, the government needed to show that Sidhu was not independently engaging in fraudulent activity, but rather was acting in concert with Moparty and Narang. To compound the harm, another government witness bolstered his testimony by informing the jury that another doctor who Dr. Narang associated with had been convicted of health care fraud. *Cf. United States v. Polasek,* 162 F.3d 878, 887 (5th Cir. 1998) ("guilt by association" evidence is improper and "highly prejudicial"). These repeated acts were egregious and compounded the effect the error had on the jury's verdict. *Cf. United States v.*

43

*Riddle*, 103 F.3d 423 (5th Cir. 1997)(a series of errors may so prejudice the defendant as to amount to reversible error); *see also United States v. Francis,* 170 F.3d 546, 552 (6th Cir. 1999). (prosecutor's conduct in eliciting agent's testimony regarding guilty pleas of non-testifying individuals was flagrantly improper). The district court's finding that the error was harmless is clearly erroneous. Accordingly, it was an abuse of discretion to deny the motion for mistrial and the judgment of the district court should be reversed.

### III. The Government's Law Enforcement Agent Improperly Opined on the Ultimate Issue of Criminal Intent.

The government presented the testimony of FBI Forensic Accountant Kathleen Anderson. ROA.2124. Through this testimony, the government introduced multiple forms of improper remarks.

The FBI Forensic Accountant was not presented as an expert witness nor included in the government's list of expert witnesses provided to the defense, yet the government presented her as a person with 30 years' experience "tracing money in health care fraud" cases. ROA.2124. Also, the prosecutor repeatedly referred the witness and jury to indictment counts by calling them "money laundering counts." ROA.2125, 2129, 2132, *passim*. One question posed specifically included the prosecutor's own conclusory opinion that a crime occurred:

> *"Okay. And moving for -- again, to Count 21, you made a **chart showing the money laundering movement**; is that correct?"*

ROA.2132 (emphasis added).

Finally, after exhaustively going through bank records and referring to each "money laundering count," the prosecutor capped all of these suggestive and improper remarks by asking a question that went to the ultimate issue of law and fact that was to be determined by the jury:

*Prosecutor:*    *"Okay. In your experience of investigating and being a forensic analyst for 30 years and dealing with this, what does this kind of trickling of money show you?"*

*FBI Forensic Accountant:*    *"Money laundering."*

ROA.2148.

Not satisfied with securing one instance of opinion testimony as to the ultimate issue of law and fact, the prosecutor asked the question again in the context of the accountant's description of money flow on a chart. :

*FBI Forensic Accountant:*    *"And if you will compare this entire page, pretty much consistently whatever the deposit is, within a day or two afterwards, the exact amount is transferred out of that account to Spring Klein.*

*Prosecutor:*    *"In your experience, what is that"*

*FBI Forensic Accountant:*    *"Money laundering."*

ROA.2151.

The prosecutor then compounded the problem by asking the witness several more questions pointed to the ultimate issue to be determined by the jury and soliciting the agent's assumption of Moparty's criminal intent:

*Prosecutor*:  *"What is -- I mean, **why is that money laundering?**"*

*FBI Forensic Accountant*:  *"In this instance, **I would say they were trying** to keep arm's length between Cleveland Imaging, Doctor's Diagnostic, and Spring Klein Hospital."*

*Prosecutor*:  *"So they got a middle account in there to make it --*

*FBI Forensic Accountant*:  *"To run the money through."*

*Prosecutor*:  *"-- secret **-- and that's what money laundering is**?*

*FBI Forensic Accountant*:        *"Yes."*

ROA.2151 (emphasis added).

More than opining on the ultimate issue of "money laundering," the FBI Analyst gave her personal opinion as Moparty and others' criminal intent as to the reason certain transactions occurred: *"I would say they were trying to keep arm's length between [medical facilities]."* ROA.2151.

The government's calculated effort to extract opinion testimony from an agent relative to the ultimate issue of intent is evident also from the testimony of a different agent and the testimony of a physician. FBI Agent Lammons was asked about Trinity, the management company operated by Moparty, to which he opined, *"It's a*

46

*-- I don't know, shell company...It's just a corporation filed by Mr. Moparty...It seems to be an account that collects money from all sorts of different places."* ROA.2009-10. While the agent was certainly entitled to describe account activity relative to Trinity, his characterization of it as a "shell company" crossed the line as an impermissible opinion on Moparty's intent in creating the company.

To compound the error, the government elicited the same conclusory opinion of fraud from a physician. Dr. Grant, the same witness who testified about Dr. Ahmed's conviction for health care fraud, was asked about medical procedures conducted at the North Cypress location. In response to the prosecutor's question as to whether medical records can be sent to a neurologist in a different office, Dr. Grant testified,

> *"They can, **<u>but it's fraudulent...It is illegal</u>** by CMS, Medicare, and all private insurance guidelines to not have the test be done and interpreted on site and in real time."*

ROA.1583-84 (emphasis added). The trial court sustained the objection.

This Court has held that allowing a witness to testify that a certain fact scenario constitutes "fraud" is error. *See, e.g., United States v. Setser,* 568 F.3d 482, 494-95 (5th Cir. 2009) (government concedes witness testimony that operations constituted "security fraud" and a "Ponzi scheme" was error); *United States v. Williams,* 343 F.3d 423, 435 (5th Cir. 2003) (government agent offering his

47

conclusion that shooting was "not reasonable" improperly admitted legal conclusions and thus invaded province of jury); *United States v. Rich,* 145 Fed. Appx. 486, 488 (5th Cir. 2005) (IRS agent's use of the words "fraud," "fraudulent," and "money laundering," in addition to concluding that the defendant's conduct constituted "money laundering" involved legal conclusions and thus error). Even if the FBI Forensic Accountant was offered as an expert witness, which she was not, Federal Rule of Evidence 704(a) prohibits a witness from offering an opinion on a legal conclusion that the defendant has a mental state that constitutes an element of the offense. *United States v. White,* 492 F.3d 380, 394 (6th Cir. 2007) (question of intent considered to be one of fact for jury, not government witness, "and the determination thereof should not be lightly overturned").

It was the jury's province to ultimately determine whether Moparty's conduct met the elements of money laundering, including the element of criminal intent. The prosecutor, the law enforcement accountant, the FBI agent, and the expert witness all injected their personal opinions that the nature of the money transactions constituted "money laundering," and were "fraudulent" and "illegal." Moreover, the importance of the FBI's Forensic Accountant cannot be overstated. She was the last trial witness called by the government. On the final day of the government's case in chief, a law enforcement agent was called as a summary witness to offer evidence

relative to the flow of money. The prosecutor elicited testimony from the summary agent that the flow of money which involved Moparty was "money laundering." The government's evidence improperly intruded upon the province of the jury to such a degree that Moparty could not receive a fair determination of facts by the jury.

## IV. THE DISTRICT COURT ERRED IN PERMITTING THE GOVERNMENT TO INTRODUCE EXPERT OPINIONS FROM LAY WITNESSES.

The government called three insurance company representatives to testify concerning billings submitted to each of their respective companies. No notice had been given by the government that such witnesses would offer expert opinions. Despite objection by defendants, the district court improperly permitted the government to elicit expert opinions from the lay witnesses. District court's evidentiary rulings are reviewed under an abuse of discretion standard. *United States v. Garcia,* 530 F.3d 348, 351 (5th Cir. 2008).

The representative of Blue Cross Blue Shield was asked several questions that called for her to give an expert opinion: opinion as to meaning of contractual terms ROA.1391-92; her opinion whether a certain policy is an "exotic requirement" for insurance companies ROA.1394; whether she was aware of any other health insurance program in the world that had certain policies ROA.1394; her definition of "split billing" ROA.1402-03; the "normal" definition of an "outpatient" in the

context of billing ROA.1404; her opinion given certain hypotheticals ROA.1405, 1408-09; whether certain conduct "in a legitimate world" is "possible" ROA.1410.

Though the government had not previously listed any insurance company representative as an expert witness, it presented her to the jury in that light by eliciting information that she had testified as an expert witness in court before. ROA.1372-73. Moparty repeatedly objected to her expert opinions on the basis that the government had not provided the requisite notice under Rule 16 of the Federal Rules of Criminal Procedure. ROA.1372-73, 1382-83. The court overruled his objection.

This type of opinion evidence was elicited from the two other insurance company representatives, despite the government not having complied with Rule 702 of the Federal Rules of Evidence and Rule 16 of the Federal Rules of Criminal Procedure. The representative from Aetna Insurance Company was permitted to offer expert opinions over objection on several matters:  what are "trends about claim payment across the health care industry" ROA.1487; whether "place of service" "bears on claim payment pretty much universally" ROA.1487; what procedures a hospital "typically includes" ROA.1488-89; industry standards relative to types of billing that contracts prohibit ROA.1489, 1499. The representative of Cigna

Insurance Company, touted as a "fraud manager" for Cigna, also offered expert opinions: definition of terms "in the industry" ROA.1655-56.

This Court and other circuit courts have repeatedly held that lay witnesses should not be permitted to offer expert opinions. *See, e.g., United States v. Rothenberg,* 328 Fed. Appx. 897, 902-03 (5th Cir. 2009) (physicians' testimony concerning Texas medical regulations improper where not qualified as expert witnesses in the area); *United States v. Griffin,* 324 F.3d 330, 347-48 (5th Cir. 2003) (error for witness never qualified as an expert witness and thus cannot give his "own interpretation of the law"); *United States v. White,* 492 F.3d 380, 400 (6th Cir. 2007) (trial court erred in allowing insurance representatives to testify about "various Medicare concepts" including "reasonable costs" and other topics, as such testimony was not proper for a lay witness who had not qualified as an expert witness); *United States v. Garcia,* 413 F.3d 201, 215 (2d Cir. 2007) (error in "conflating expert and lay opinion testimony thereby conferring an aura of expertise on a witness without satisfying the reliability standard . . . in Rule 702 and the pre-trial disclosure requirements set forth in Fed. R. Crim. P. 16"). The government had not declared this witness as an expert nor provided documentation that is required under Rule 702 of the Federal Rules of Evidence and Rule 16 of the Federal Rules of Criminal Procedure if the government intends to offer expert testimony. Yet, the government

did an end run around these rules by eliciting testimony from the witness that she had testified as an expert in other trials. The intent clearly was to present this witness as an expert in the eyes of the jury. The conflation of testimony from each insurance company representative added to the cumulative presentation of improper evidence, thereby warranting a reversal of Moparty's conviction. .

### V. THE TOTALITY OF THE GOVERNMENT'S MISCONDUCT DENIED MOPARTY A FAIR TRIAL.

In addition to the acts described above, the government committed other acts of misconduct through the course of the trial. The acts mentioned above include the unwarranted and uninvited introduction of evidence of health care fraud convictions of two persons who did not testify; an FBI agent's testimony on the ultimate issue of law and fact of whether Moparty was guilty of money laundering; and lay witness insurance company representatives who were asked to provide expert opinions on whether certain acts were improper in the industry. Added to this was the repetitive, unwarranted introduction of prejudicial sidebar remarks by prosecutors described below. The cumulative error doctrine justifies reversal in the unusual case in which synergistic or repetitive error violates the defendant's right to a fair trial. *United States v. Delgado,* 672 F.3d 320, 344 (5th Cir. 2012) (en banc). The cumulative prejudicial effect of these repeated acts of misconduct by prosecutors and

government witnesses rendered impossible the jury's ability to fairly review the evidence and return a just verdict.

In addition to the acts addressed in sections above, the government repeatedly introduced improper, prejudicial remarks that were outside the scope of the indictment.

The prosecutor asked the following of a witness who was a patient of Dr. Narang who had signed billing consent forms:

> *"Did signing that form authorize Dr. Narang or whomever to sell your information on the dark web for money?"*

ROA.1256). There was no evidence to support the prosecutor's outlandish suggestion that personal information of patients was being sold illegally "on the dark web." The court sustained defendant's objection.

Also, the following exchange occurred between the prosecutor and an insurance company representative:

*Prosecutor*: *"How about if two in-network providers were talking to one another and one says, 'Hey, refer your patients over to me,' and the other one says, "Hey, what's the referral fee?'"*

*Ins. Co. Rep.*: *"No. We don't consider referral fees as appropriate."*

*Prosecutor*: *"Why not?"*

*Ins. Co. Rep.*: ***"Because it's considered a kickback****; so--"*

53

ROA.1498). The district court sustained Moparty's objection, finding that it was beyond the scope of the indictment and that there was no allegation in the indictment of kickbacks. Nevertheless, the government improperly created a suggestion for the jury to suspect that illegal kickbacks were involved.

In that same witness' testimony, the government objected to Moparty's effort to cross examine the insurance company representative's testimony relative to the operation of HOPDs in Texas. ROA.1541). The prosecutor asserted in the presence of the jury that *"this is not a Texas law case,"* sending a message to the jury that Moparty's theory of defense was inappropriate. ROA.1541. The court deferred ruling on the matter. The prosecutor later made the same speaking objection during Moparty's attempt to cross examine the billing manager: *"I'm going to object, your Honor, again, to Texas state law. It's not relevant to this case."* ROA.1958.

From a different witness, the prosecutor elicited testimony from Trinity's billing manager that medical records were sent electronically to a third-party billing company located in India. ROA.1926-27. Despite the fact that the operation of this type of company is accepted across the industry and there being no law against such procedure, the following exchange occurred:

> *Prosecutor:* "And -- okay. Great. And, also, on these emails that you send to India, you're sending all these people's private information all the way to India?"

*Billing Manager*:  "Uh-huh. Private servers."

*Prosecutor*:  "I mean, and it's -- is it not violating the HIPAA laws?"

*Billing Manager*:  "Because it's considered a kickback, so --"

ROA.1927.  The court sustained the objection based on Rule 403 of the Rules of Evidence.  Nevertheless, the prosecutor persisted in creating an atmosphere of illegality in the transmission of personal data to the country of India where there was none:

*Prosecutor*:  "But you're sending information all the way, like people's medical information or --"

*Billing Manager*:  "Right."

*Prosecutor*:  "-- their insurance, Social Security numbers, correct?"

*Billing Manager*:  "Yeah."

ROA.1927-28.

The government is fully aware that the transmission of this type of personal information in this manner is acceptable, is not a HIPAA violation, and is not a basis of the charges in the indictment. Yet, it intentionally created an aura of illegality where there should not have been. Moreover, the prosecutor's inclusion of India in referring to the transmittal of information in this scenario is particularly troublesome, as Moparty and Narang are of Indian descent.

55

Finally, the government improperly elicited from the FBI case agent his "theories" of investigation in looking into Moparty's activities, and his "understanding" as to "why" monies were being transferred from Moparty-related entities to Narang-related entities. ROA.2049-50.

This Court has held that prejudicial extraneous evidence "often plays on the jury's emotions unfairly." *United States v. Riddle,* 103 F.3d 423, 434 (5th Cir. 1997). Inflamed passion, confusion of the issues and misleading the jury are all prohibited factors guarded against by Rule 403 of the Federal Rules of Evidence, "and they are especially troubling when they take up a significant portion of the government's case." *Id.* Though a trial court can seek to "substantially reduce" the danger of prejudice, the cumulative prejudicial effect of repeated errors by the prosecution cannot be cured by repeated limiting instructions. *Id.* at 435. This is particularly true where the government introduces the suggestion that the defendant is guilty of conduct that is not charged in the indictment, as occurred in the instant case. In such a situation, "it is too likely that the jury will feel that the defendant should be punished for that activity even if he is not guilty of the offense charged." *Id.* at 434. Such is the situation in the instant case, where there is a substantial degree of improper, prejudicial items of evidence, improper opinions by lay witnesses, improper opinions on ultimate issues of fact and law, and improper prosecutorial

56

suggestions and theories of extraneous, offensive non-charged conduct. *See id.; see also United States v. Gracia,* 522 F.3d 597 (5th Cir. 2008) (reversed conviction where "cumulative effect of these proximate comments was greater than the sum of its parts"); *United States v. Houston,* 481 Fed. Appx. 188, 194 (5th Cir. 2012) (conviction reversed where cumulative errors could not be overcome with jury instructions). In *Houston,* this Court held that "[c]umulative error analysis evaluates the number and gravity of the errors in the context of the case as a whole." *Id.* (consider whether "synergistic or repetitive error" violates defendant's constitutional right to a fair trial). The repeated number of serious errors prevented Moparty from receiving a fair trial. The cumulative effect of error warrants a reversal.

### VI. THE DISTRICT COURT COMMITTED REVERSIBLE ERROR IN INCREASING THE OFFENSE LEVEL FOR ABUSE OF POSITION OF TRUST PURSUANT TO U.S.S.G. §3B1.3.

The probation office recommended a 2-level upward adjustment under U.S.S.G. §3B1.3, asserting Moparty was "an owner of a hospital in the conspiracy." The district court overruled Moparty's objection without comment and imposed the 2-level upward adjustment. Neither the presentence report nor the evidence introduced at trial presented facts sufficient to support the government's burden to prove the application of this 2-level upward adjustment.

"[A] finding under the Guidelines must be based on reliable information and a preponderance of the evidence, *see* U.S.S.G. §6A1.3, commentary." *United States v. Conner*, 537 F.3d 480, 491-92 (5th Cir. 2008) (citation omitted). "And it is the '[t]he government [that] bears the burden of proving... that the facts support a sentencing enhancement.'" *Id*. At 492 (citation and footnote omitted); *see also United States v. Herrera-Solorzano,* 114 F.3d 48, 50 (5th Cir. 1997) (in a sentencing proceeding, "[t]he burden is on the party seeking to adjust the sentence level to prove 'by a preponderance of the relevant and sufficiently reliable evidence the facts necessary to support the adjustment.'") (quoting and citing *United States v. Alfaro*, 919 F.2d 962 (5th Cir. 1990)).

Sentencing decisions by a district court are reviewed for an abuse of discretion. *United States v. Harris,* 597 F.3d 242, 250 (5th Cir. 2010). While factual findings are reviews under a clear error standard, "the district court's interpretation or application of the Sentencing Guidelines is reviewed de novo." *Id.* The district court has not clearly erred if its findings are "plausible in light of the record as a whole." *Id.*

The Presentence Investigation Report (PSR) assessed Moparty a 2-level upward adjustment for abuse of position of trust pursuant to U.S.S.G §3B1.3, based on an assertion that he was the owner of a hospital. ROA.4541. The PSR applied the

adjustment, asserting Moparty was "an owner of a hospital in the conspiracy". ROA.4541. Moparty objected he did not abuse a position of trust; and specifically objected that he was not in fact the owner of a hospital involved in the conspiracy. ROA.4516. The District Court denied the objection without comment. ROA.2551.

U.S.S.G §3B1.3 increases the offense level for a particular crime if the defendant abuses a position of trust in a manner that significantly facilitated the commission or concealment of the offence. "A position of trust is characterized by (1) professional or managerial discretion (i.e. substantial discretionary judgment that is ordinarily given considerable deference), and (2) minimal supervision." *United States v. Ollison,* 555 F.3d 152, 166 (5th Cir. 2009) (Citing U.S.S.G §3B1.3 cmt. n.1). In determining whether to apply the position of trust enhancement, a court must first "determine whether the defendant occupied a position of trust at all" and then must "ascertain the extent to which the defendant used that position, to facilitate or conceal the offense. *Ollison*, 555 F.3d at 165. Application of the position of trust enhancement "is a sophisticated factual determination reviewed under the clearly erroneous standard." *Id* at 164-65.

The PSR cites to no reliable information showing Moparty was the "owner of the hospital." Trial testimony from government witness Keon Warren and from Moparty established that Moparty created an entity that was not a hospital but rather

59

a management company. ROA. 1960, 2270-71. Moparty had no ownership interest in the hospital. ROA. 2273. Testimony showed that Roy Moparty, not defendant Dayakar Moparty, was the sole owner, and the government produced no evidence to show otherwise. ROA.2329.

In any event, assigning a title of "owner" in no way satisfies the requirements set forth in the commentary of §3B1.3. The PSR addendum did not engage in the sophisticated factual determination required to show that Moparty occupied a position of trust. ROA.4554. Instead, the probation officer erroneously concluded without factual support that being an "owner" necessarily proved that Moparty maintained a position of trust with the insurance companies. ROA.4554. The government has not met its burden to prove by a preponderance of evidence the facts necessary to support an adjustment pursuant to §3B1.3. *See United States v. Vinalay*, 694 Fed. Appx. 278 (5th Cir. 2017). The court simply denied Moparty's objection without conducting the two-step inquiry and applied the adjustment. ROA.2551. Accordingly, the district court clearly erred by applying the position of trust enhancement.

Moparty received a sentence of one hundred and eight (108) months, which was at the low end of the Guidelines range. ROA.2576. The district court stated that a sentence at the low end was appropriate for Moparty. ROA.2576. Without the 2-

level upward adjustment the range would have been 87-108 months. Accordingly, the government cannot show beyond a reasonable doubt that the court would assess the same sentence without the position of trust enhancement. *See United States v. Lopez-Urbina*, 434 F.3d 750,765 (5th Cir. 2005). The sentence should be vacated, and the case remanded for resentencing.

### ***Reservation of Right to Adopt Co-Defendant's Arguments on Appeal Pursuant to Fed. R. App. P. 28(i)***

Defendant-Appellant Moparty respectfully reserves the right to adopt issues advanced by the codefendant in the present case.

## CONCLUSION

For the aforementioned reasons, the defendant-appellant, DAYAKAR MOPARTY, respectfully prays that all of his convictions be reversed and the sentence be vacated.

Respectfully submitted,

*/s/ Michael McCrum*
MICHAEL MCCRUM
404 E Ramsey Rd Ste 102
San Antonio, TX 78216-4665
(210) 225-2285 (Phone)
(210) 275.9945 (Facsimile)
email: michael@mccrumlegal.com

STEVEN J. LIEBERMAN
State Bar No. 12334020

61

The Jones on Main
712 Main Street, Suite 2400
Houston, Texas 77002
(713) 228-8500 (Telephone)
(713) 228-0034 (Facsimile)
Email: Slieber699@aol.com

Counsel For Defendant–Appellant,
DAYAKAR MOPARTY

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 22nd day of May 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered parties.

<u>*/s/ Michael McCrum*</u>
MICHAEL MCCRUM

No. 19-20797

**In The**
**United States Court Of Appeals**
**For The Fifth Circuit**

**UNITED STATES OF AMERICA,**
**Plaintiff-Appellee**

**V.**

**DAYAKAR MOPARTY & HARCHARAN SINGH NARANG,**
**Defendants-Appellants**

**Appealed from the**
**United States District Court**
**For the Southern District of Texas**
**Houston Division**

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of FED. R. APP. P.

32(a)(7)(B) because: this brief contains 12,974 words, excluding the parts of the

brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

2.     The brief complies with the typeface requirements of FED. R. APP. P.

32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because:

> this brief has been prepared in a proportionally spaced typeface using
> Microsoft Word for Windows in font Size 14 in Times New Roman type
> style and 12-point font as to footnotes.

                                             */s/Michael McCrum*
                                              MICHAEL MCCRUM

64