No. 19-20797

# *In the*
# *United States Court of Appeals*
# *for the Fifth Circuit*

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

DAYAKAR MOPARTY; HARCHARAN SINGH NARANG,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the Southern District of Texas, Houston Division
No. 4:17-cr-00290; Hon. Sim Lake, Judge Presiding

## BRIEF OF APPELLANT NARANG

Seth Kretzer
LAW OFFICES OF SETH KRETZER
440 Louisiana Street; Suite 1440
Houston, TX 77002

[Tel.] (713) 775-3050
[Fax] (713) 929-2019
seth@kretzerfirm.com (email)

ATTORNEY FOR APPELLANT NARANG

No. 19-20797

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

DAYAKAR MOPARTY; HARCHARAN SINGH NARANG,

*Defendants-Appellants.*

The undersigned counsel of record certifies the following listed persons have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate their possible recusal or disqualification.

1.      United States of America—Appellee. It is represented in the Fifth Circuit by:

Carmen Castillo Mitchell, Assistant U.S. Attorney
1000 Louisiana St.; Suite 2300
Houston, TX 77002

The United States was represented in the district court proceedings by:

AUSAs Andrew Pennebaker and Tina Ansari
1000 Louisiana Street; Suite 2300
Houston, TX 77002

2.      Harcharan Singh Narang, Appellant. Narang is represented in the Fifth Circuit by:

Mr. Seth H. Kretzer
LAW OFFICES OF SETH KRETZER
440 Louisiana Street; Suite 1440

Houston, TX 77002

Additional counsel who represented Narang in the district court proceedings

were:

Chris Flood
FLOOD & FLOOD
914 Preston at Main; Suite 800
Houston, Texas 77002

Michael Clark
BAKER DONELSON
1301 McKinney Street, Suite 3700
Houston, TX 77010

/s/ Seth Kretzer

Seth Kretzer

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Narang requests oral argument. In support of this request, Narang would urge this Court to note that his appeals arises from a complex jury trial for Medicare fraud.

More specifically, Narang presents as a point of error the District Court's denial of his motion for mistrial. The issue is habitual prosecutorial misconduct during the trial. Even though Narang did not prevail on harmless error grounds, Judge Lake's written order found that Narang carried his burden when it came to the testimony by Agent Lammons about the fact that a non-testifying witness, one Dr. Sihu, had taken a plea:

> While the government arguably had a legitimate purpose for referencing Dr. Sidhu's plea in its opening statement, ***the government can point to no proper purpose for Agent Lammons' testimony***. The dubious purpose of at least one of the challenged statements weighs slightly in favor of granting Defendants' Motion.

ROA.5964-5965 (emphasis added).

# TABLE OF CONTENTS

Certificate of Interested Parties..................................................................................i

Statement Regarding Oral Argument .....................................................................iii

Table of Authorities ................................................................................................ vii

Statement of Jurisdiction.........................................................................................1

Statement of Issues for Review................................................................................2

Statement of the Case and Facts .............................................................................3

    A.     Indictment....................................................................................3

    B.     404(b) Notice...............................................................................4

    C.     Trial .............................................................................................4

          1.    Problematic Opening Statement ................................4

          2.    Crux of the Government's Case..................................5

          3.    Corroborating Employee............................................7

          4.    Expert Testimonies ....................................................8

    D.     Rule 29 Motion..........................................................................10

    E.     Defense Case ............................................................................10

    F.     Jury Verdict ..............................................................................11

    G.     Motion for Mistrial..................................................................11

          1.    Background ................................................................11

| | 2. | Government's Response | 13 |
| | 3. | Narang's Reply Brief | 14 |
| | 4. | Written Order | 15 |
| H. | | PSR and Objections Thereto | 16 |
| | 1. | Relevant Conduct | 15 |
| | 2. | Base Offense Level | 17 |
| | 3. | Specific Offense Characteristic: Loss | 17 |
| | 4. | Specific Offense Characteristic: Victims | 17 |
| | 5. | Specific Offense Characteristic: Health Care Program Loss | 18 |
| | 6. | Specific Offense Characteristic: Sophisticated Means | 18 |
| | 7. | Specific Offense Characteristic: Identification | 18 |
| | 8. | Role Adjustments | 18 |
| | 9. | Total Offense Level | 19 |
| | 10. | Special Conditions of Release | 19 |
| | 11. | Restitution | 19 |
| I. | | Objections to PSR | 20 |
| J. | | Government's and Probation's Responses to Defense Objections | 21 |
| | 1. | Loss Rationale | 21 |
| | 2. | Loss Rationale | 22 |
| | 3. | "Means of Identification" Under U.S.S.G 2B1.1 | 22 |

K.      Reply Briefing ................................................................23

L.      Sentencing ....................................................................23

Summary of the Arguments ......................................................25

*Mistrial* ...................................................................................25

*Sentencing* .............................................................................26

Standards of Review ................................................................26

*Mistrial* ...................................................................................26

*Sentencing* .............................................................................27

Argument.................................................................................27

I.      The District Court Abused Its Discretion When It Denied the  Motion for Mistrial...............................................................27

        A.      Introduction .........................................................27

        B.      It Is Alarming That the Government Takes Comfort From the Repeated Instructions to the Jury In Response to Prosecutorial Misconduct .............................................28

        C.      Curative Instructions Are Not A *Deus Ex Machina* ...........................29

II.     Sentencing: The District Court Reversibly Erred In Its  Application of U.S.S.G. §2B1.1(b)(2)(A)(i).......................................31

        A.      Legal Framework ...............................................31

        B.      Argument.............................................................33

III.    Sentencing: The District Court Reversibly Erred in its  Application of U.S.S.G. § 2B1.1(b)(11)(C)(i) .............................34

IV.    Sentencing: The Procedural Error Were Guidelines Impactful....................36

Conclusion ..........................................................................................37

Certificate of Service ............................................................................39

Certificate of Compliance ......................................................................39

**TABLE OF AUTHORITIES**

**Cases**

*Arizona v. Fulminante*, <u>111 S. Ct. 246</u> (1991).........................................16

*Gray v. Maryland*, <u>523 U.S. 185, 196</u>, <u>118 S. Ct. 1151</u>, <u>140 L. Ed. 2d 294</u> (1998)31

*Molina-Martinez v. United States*, <u>136 S. Ct. 1338</u> (2016) ....................36

*Nash v. United States*, <u>54 F.2d 1006</u> (2d Cir. 1932)................................30

*United States v. Ainabe*, <u>938 F.3d 685</u> (5th Cir. 2019)............................32

*United States v. Baete*, <u>414 F.2d 782</u> (5th Cir. 1969)..............................29

*United States v. Barson*, <u>845 F.3d 159</u> (5th Cir. 2016) ....................... 22, 31, 32, 33

*United States v. Bennett*, <u>874 F.3d 236</u> (5th Cir. 2017)............................30

*United States v. Blocker*, <u>612 F.3d 413</u> (5th Cir. 2010)............................36

*United States v. Conner,* <u>537 F.3d 480</u> (5th Cir. 2008)............................27

*United States v. Cooks,* <u>589 F.3d 173</u> (5th Cir. 2009)............................35

*United States v. Delgado*, <u>401 F.3d 290</u> (5th Cir. 2005) ........................27

*United States v. Dupre*, <u>117 F.3d 810</u> (5th Cir.1997)..............................26

*United States v. Emordi*, <u>2020 WL 2488181</u>, *5 (5th Cir. May 14, 2020) ............33

*United States v. Fleetwood*, <u>528 F.2d 528</u> (1976) ....................................29

*United States v. Gonzalez*, <u>644 F. App'x 456</u> (6th Cir. 2016) ........................ 23, 35

*United States v. Harrell*, <u>436 F.2d 606</u> (5th Cir. 1970) .........................................29

*United States v. Kalu,* 936 F 3d. 678 (August 30, 2019)............................ 23, 35, 36

*United States v. King*, <u>505 F.2d 602</u> (5th Cir. 1974) ..............................................28

*United States v. Moreno*, <u>185 F.3d 465</u> (5th Cir.1999) .........................................27

*United States v. Murray*, <u>988 F.2d 518</u> (5th Cir. 1993)........................................28

*United States v. Nguyen*, <u>28 F.3d 477</u> (5th Cir.1994).........................................27

*United States v. Paul*, <u>142 F.3d 836</u> (5th Cir.1998). .............................................26

*United States v. Roy*, <u>819 F.3d 998</u> (7th Cir. 2016).............................................23

*United States v. Samet*, <u>200 F.  App'x 15</u> (2d Cir. 2006).....................................35

*United States v. Taylor*, <u>745 F.3d 15</u> (2d Cir. 2014) ...........................................31

*United States v. Watts*, <u>519 U.S. 148</u>, <u>117 S.Ct. 633</u>, <u>136 L.Ed.2d 554</u> (1997) ......32

**Statutes**

<u>18 U.S.C. § 1028(d)(7)</u>...............................................................................35

<u>18 U.S.C. § 1347</u>.................................................................................3, 17

<u>18 U.S.C. § 1349</u> ......................................................................................3

<u>18 U.S.C. § 1957</u>........................................................................................4

<u>18 U.S.C. § 3231</u>........................................................................................1

<u>18 U.S.C. § 3742(a)</u> ...................................................................................1

<u>28 U.S.C. § 1291</u> .......................................................................................1

Fᴇᴅ. R. Aᴘᴘ. P. 4(b)(1)(A) ............................................................1

U.S.S.G. § 2B1.1 ............................................................... 17, 22

U.S.S.G. § 2B1.1(a)(2) ...................................................................17

U.S.S.G. § 2B1.1(b)(1)(J) ...............................................................32

U.S.S.G. § 2B1.1(b)(1)(K) ..............................................................17

U.S.S.G. § 2B1.1(b)(2)(A)(i) ......................................... 2, 26, 17, 31, 37

U.S.S.G. § 2B1.1(b)(7)(B)(ii) .............................................. 23, 32

U.S.S.G. § 2B1.1(b)(10)(C) .............................................................18

U.S.S.G. § 2B1.1(b)(11)(C)(i) ................................... 2, 18, 26, 34, 35, 37

U.S.S.G. § 3B1.1(c) .......................................................................18

U.S.S.G. § 3B1.3 ..........................................................................18

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 18 U.S.C. § 3231. The district court announced sentence on November 14, 2019, ROA.7826, and entered an amended final judgment on November 19, 2019. ROA.6023. Narang timely filed notice of appeal on November 22, 2019. ROA.6033; FED. R. APP. P. 4(b)(1)(A).

This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## STATEMENT OF ISSUES FOR REVIEW

1.      Whether the district court reversibly erred when it denied Narang's

Motion for Mistrial.

2.      Whether the district court reversibly erred at sentencing when it

overruled Narang's written objections to the PSR under §2B1.1(b)(11)(C)(i)

and/or §2B1.1(B)(2)(A)(I).

## STATEMENT OF THE CASE AND FACTS

### A.    Indictment

On May 17, 2017, an Indictment charged Harchang Singh Narang with healthcare fraud. ROA.4950.

Count 1 charged Narang with conspiracy to commit health care fraud, in violation of 18 U.S.C. §§ 1349 and 1347. ROA.4954.  The named co-conspirators were Gurnaib Sidhu and Dayakar Moparty.  The crux of the allegations was that Doctors Narang and Sidhu ordered unnecessary tests for patients at a medical office where both physicians practiced, which tests were performed by independent contractor technicians. The technicians' services were, in turn, billed to private insurers as out-of-network "facility fees" by a small hospital named Red Oak Hospital (with which Dr. Sidhu was affiliated through a written Medical Director's Agreement) while Drs. Narang and Sidhu separately billed for the "professional component" related to these procedures.

Counts 2-18 charged healthcare fraud in violation of 18 USC §§1347 and 2. ROA.4964.  A chart found at ROA.4965-4968 specifies the dates, patient initials, and amount paid by Aetna, Blu Cross, or BCBS, respectively.  ROA.67.

 Counts 19-21 charged engaging in monetary transactions in property derived from specified unlawful activity, aiding and abetting, in violation of 18 U.S.C. §

<u>1957</u> and § 2.  <u>ROA.4968-4969</u>.  Each of these counts is predicated on deposit of a check in the year 2013.

Criminal Forfeiture is presented at <u>ROA.4970</u>.

**B.    404(b) Notice**

On January 25, 2019, the Government filed 404(b) notice as to Narang's past "Texas Medical Board Violations" and a litany of Diagnostic Testing, Billing Transfers to Dr. Sidu, and  "NCV tests scheme." <u>ROA.5181</u>.

**C.    Trial**

Dr. Gurnaib Sidhu pleaded guilty; he was not called to trial and passed away[1] before Narang and Moparty were sentenced.

**1.    Problematic Opening Statement**

Opening statements were held February 11, 2019.  <u>ROA.6122</u>.

It soon became clear that the Government intended to make their case on the strength of Sidhu having pleaded guilty even though he was too ill to attend trial:

> Around early 2013 the scheme changed a little. Same concept, but Dr. Narang tweaked his scheme a little. He decided to instead of putting all the medical tests under his name, he started putting it under his associate, Dr. Sidhu. You will hear in this case that Dr. Sidhu is kind of the Robin to Dr. Narang's

---

[1] Sidhu's failing health was well-known to the Government pretrial.  On November 21, 2018, the Government moved to take Sidhu's deposition as a material witness under Rule 15. <u>ROA.5140</u>.  "In 2013, Dr. Sidhu was diagnosed with liver cirrhosis and liver cancer, and his current diagnosis is hepatocellular carcinoma with adrenal metastasis.  He currently receives chemotherapy and regular (near-weekly) paracentesis to drain excess abdominal fluid.  For a time, Dr. Sidhu's condition seemed to be improving, however, since March 2018 his condition has deteriorated and his prognosis is tenuous." <u>ROA.5141</u>.

4

Batman, meaning he just follows the orders of Dr. Narang. He has no incentive to order all these unnecessary tests, because he's on salary. He's not going to make any more money, but he makes, you will hear, about 120 -- anywhere between 120 and $150,000 to just follow along ordering these unnecessary tests even though he knew it was a wrong thing to do. **And that's why he is a co-conspirator in this case.** *You will also hear that Dr. Sidhu is not in this trial because he has already pled guilty.*

ROA.6126 (emphasis added).

### 2. Crux of the Government's Case

The crux of the Government case was that a first level of fraud took the form of Dr. Narang's patients receiving tests that they did not need that were billed to and paid by the insurance companies; many of the tests were not performed at all or were not properly performed. The second level of fraud was billing for these services, which were performed at Dr. Narang's office, as if they had been performed at Red Oak Hospital. The insurance company representatives at trial testified that these claims would not have been paid had the insurance companies known of these fraudulent activities.

On any typical day, most patients at Narang's office automatically received a series of uncommon diagnostic tests that were not medically necessary, that were not properly provided or performed, and billed at a much higher hospital rate by Red Oak. The government focused on patients that bought Groupon weight loss shots online. In particular, the Government called Groupon patients Avery, Cline, Corbitt, Shaw, Stephens, and Culberson. The patients testified that they were there only for

5

weight loss shots and had no other health issues that required the need for nerve

conduction testing, allergy testing, ENG testing or cardio testing:

> Q. Yes. And here it says the 10 or 20 weekly Lipotropix weight-loss shots at
> a location here called Forever Fit Medical Spa?
> A. Correct.
>
> Q. Okay. And did you buy it for this $99 price?
> A. That's correct.
>
> Q. Okay. And so once you bought this coupon, what did you do next?
> A. I made an appointment, and I went in to get my first injection.
>
> Q. All right. Do you remember where it was that you went?
> A. I went to one of the buildings at North Cypress Medical Center.

ROA.6227 (testimony of Sharman Corbitt).

But the scheme was not limited to Groupon patients. For example, Edna

Lemke (a non-Groupon patient) came in for a thyroid issue; she testified Dr. Narang

still ran the same series of tests on Lemke similar to the Groupon patients:

> Q:    What I'm showing you on that first day, February 22, 2013, when you
> went there, here's an order form where it looks like someone -- it has the
> heading again of Red Oak – ordered you an echo test. Did you need an echo
> test on this day where you had ulcer issues?
> A. That's for your heart, isn't it?
>
> Q. Yes.
> A. No.
>
> Q. Were you having heart issues?
> A. No.
> Q. Okay.

A:     No.  I was having stomach issues, definitely.

ROA.6600-6601.


Q. Did Dr. Narang explain to you that you were having this test done?
A. He said that he thought I needed to have it done.

Q. Okay. And what did you respond to him?
A. I said I didn't think I needed to have it done, but at that point I was afraid I wasn't going to get my medication, so I went ahead and did them.

Q. Okay. But, again, you never explained to him about having numbness or tingling in your legs?
A. No, ma'am.

ROA.6603.


All patients testified that they had never been to Red Oak and did not

authorize any tests to be billed at Red Oak.

### 3.      Corroborating Employee

An employee of Dr. Narang's, Rikesha Burton, testified that Dr. Narang

interviewed all new patients at the clinic and he would instruct her to order the same

routine tests before Narang even saw the patient.  ROA.6383.  Burton testified that

sometimes Dr. Sidhu would also see patients, but that Dr. Narang was the main

doctor that would handle new patients and order the tests.  Burton also admitted that

most of the patients visited the clinic did not need the tests and she even warned

patients not to take the tests:

> A. We would -- when we were taking the vitals, we would tell the patients, you know, if you're here for a Groupon, you only have to do the Groupon. You may talk to the doctor and he may convince you that other tests are needed, but you don't need those tests. Just do what you pay, like, if you pay for a Groupon, get the shots, get the Lipo X. You don't have to do the other tests. It's not required or mandatory.

> Q. Did that ever get back to Dr. Narang?
> A. Yes.

> Q. And what happened?
> A. We got in trouble for telling the patients.

ROA.6414.

### 4.    Expert Testimonies

In addition to patient testimony, the government called four experts to testify that the medical tests were not medically necessary, not performed or provided properly, and billed at a higher rate.

Dr. Peter Grant testified as an expert in Electrodiagnostic Medicine (NCV testing).  ROA.6898.

Dr. Grant testified that he found an overwhelming lack of medical necessity, and found that patients were pulled into a "diagnostic testing mill" that were inappropriate and charged fraudulently and excessively by Red Oak. Dr. Grant found that code 95886 was billed 16 times greater than a more reasonable and customary

charge but was never performed because Dr. Narang did not have the proper equipment to charge this specific code. Dr. Grant found an extremely high normal rate, which he attributes to testing all patients that walk through the door. He noted the "cut and paste" technique for studies that were never performed and technicians who lacked proper supervision and who were not well trained, who did not provide quality testing, and who did not have the appropriate qualifications to substantiate the quality of the work.

Dr. Michael Bungo testified as a cardiology expert who evaluated approximately 40 charts, representing the best patient charts available for review. Dr. Bungo testified nearly all the patients had similar signs and symptoms, without any proper follow up. The documentation of the files fell below the standard of care and that the only tests utilized were those that financially benefited the defendants' practice. ROA.7023.

Dr. Rubina Wahid testified as an allergy expert who had reviewed approximately thirty-three patient files. ROA.6656. Dr. Wahid found that most the testing resulted with a negative response, which is a high normal rate. She observed no follow up visits to discuss the results and insurance companies were billed with allergy test procedure code 95004 [ROA.6666], a test pricking the skin.

Dr. Richard Gans testified as an expert in ENG testing, ROA.6333, and billing codes, ROA.6349-6353. Dr. Gans evaluated approximately twenty-nine patient files.

<u>ROA.6336-6338</u>.  Gans found an unusually high number of complaints of dizziness and particularly imbalance by patients in this relatively young group of female patients:

> Q. So you're saying that of the 15 files -- of the 29, 15 show people had serious abnormal issues on the --
> A. As indicated by the computer.
>
> Q. Did it show any follow-up by the doctor?
> A. I did not see any in the paperwork, no.
>
> Q. Was there any human follow-up in the documents showing this abnormal result from the computer?
> A. Not that I reviewed.
>
> Q. Okay. In your experience, is that abnormal?
> A. Well, yes, in my practice it would be.

<u>ROA.6356</u>.


**D.     Rule 29 Motion**

The Government rested on February 20, 2019. <u>ROA.7497</u>.

Narang made his Rule 29 motion:  "MR. CLARK: And we would separately move for a judgment of acquittal." <u>ROA.7499</u>.  The Court denied at <u>ROA.7499</u>.

**E.     Defense Case**

The defense cases ran from <u>ROA.7500-7701</u>.

Narang declined to testify.  <u>ROA.7702</u>.

**F.     Jury Verdict**

On February 22, 2019, the jury convicted on all counts.  <u>ROA.7801-7802</u>.

**G.     Motion for Mistrial**

**1.     Background**

After the Government rested, on Day 6 of trial, both Defendants moved for a

mistrial:

MR. CLARK: We're moving for a mistrial, Your Honor.

<u>ROA.7497</u>.

> I would just simply add to this that even today, as a bookend, if you would,
> not only we have it on the front end, on the opening statement, but on Mr.
> Lammons' testimony, it was elicited yet again -- and, again, they knew they
> weren't calling Mr. Sidhu. They knew they weren't going to call Dr. Sidhu at
> that point. You can give them the benefit of the doubt on the front end, that
> they were anticipating that the defense might seek to impeach. On the back
> end, however, when Mr. Pennebaker asked about Dr. Sidhu's conviction, it's
> clear they knew they weren't calling him. So I think that just kind of puts a
> high point on the issue, Your Honor, and I'll stand by it.

<u>ROA.7497-7498</u>.

The court reserved a ruling on the motion until it had been fully briefed by

the parties.

The first problem was that Government the government improperly referred

to Dr. Sidhu's guilty plea in the presence of the jury without calling Dr. Sidhu as a

witness.

The second problem is that Agent Lammons' [an FBI Agent who oversaw the investigation into Defendants] testimony:

> Q. And we haven't talked a lot about Dr. Sidhu yet. We've heard that he was working with Dr. Narang but haven't seen him in this trial. Why is that?
>
> A. He's already pled guilty.

ROA.7360.

Counsel for both Defendants objected to Agent Lammons' testimony as improper under Federal Rule of Evidence 403 and in violation of the Confrontation Clause, and asked the court for a limiting instruction requiring the jury to disregard the testimony:

> MR. CLARK: Judge, I'm going to object and ask for the Court to instruct the jury at this time -- this is a 403 issue.
>
> His plea of guilty is not before this jury. I don't have a right to cross-examine Dr. Sidhu. This is misconduct. And I object. A limiting instruction for them to disregard.

ROA.7360.

The Court responded by providing a limiting instruction requiring the jury not to consider Dr. Sidhu's guilty plea as evidence:

> THE COURT: Dr. Sidhu is not here. He did plead guilty. The fact that he's guilty is not evidence that any other person is guilty of any wrongdoing. His case was considered separately, and you're not to draw any adverse inference from the fact that Dr. Sidhu may believe he is guilty. It's not relevant to this case. These defendants are presumed to be innocent. The fact that somebody else may be guilty does not in any way affect the presumption of innocence

that cloaks them and remains with them until such time, if ever, that the government can prove these defendants guilty of anything.

ROA.7361.

On February 26, 2019, Narang filed a written motion for mistrial:

It is necessary in part because of the Government's misconduct during its Opening Statement when it told the jury about Dr. Sidhu having entered into a plea agreement to Healthcare Fraud Conspiracy in the same case as his codefendants on trial. This statement was not invited by defense counsel, served no legitimate purpose, and was clearly meant to be used as substantive evidence of guilt.

ROA.5819.

[N]o proper purpose exists for the Government to tell the jury about Dr. Sidhu's plea of guilty to a healthcare fraud conspiracy involving the two defendants on trial but then not to call him as a witness…

ROA.5821.

In this case, the non-testifying coconspirator's prior conviction was inadmissible, highly prejudicial, and the Government's unprovoked decision to inform the jury about it during its Opening Statement violated the fundamental tenet that guilt or innocence must be determined one defendant at a time—without regard to the disposition of charges against others.

Under this record, the Government's only reason for offering this evidence was to demonstrate the substantive guilt of the defendants on trial. Its misconduct was deliberate, designed to interfere with their fair trial rights, and has interfered with their constitutional rights

ROA.5822.

## 2.    Government's Response

On March 1, 2019, the Government responded.

"Once Defendants objected, the Court promptly sustained the objection, struck FBI Special Agent Kevin Lammons' testimony from the record, and gave a forceful limiting instruction

The government's two passing mentions of Sidhu's plea were not for an improper purpose.

Sidhu's plea was not improperly emphasized, nor was it offered as substantive evidence of Defendants' guilt.

ROA.5833.

### 3.  Narang's Reply Brief

Narang filed his Reply March 25, 2019:

Prosecutorial misconduct occurred at least three times during the trial – at its beginning (opening argument), middle (statement by the Prosecutor to the court) and end (trial testimony of Agent Lammons). In other words, it was pervasive.

ROA.5937.

The Government's response does not direct the reader to any defense testimony, defense exhibits, or even quote a single question from cross examination of any Government witness to justify its blatant, plain error.

ROA.5938.

At trial, the Government made the conscious decision to not call Sidhu as a witness even though they had mentioned his guilty plea in front of the Jury. Next, only AFTER stating to this Court that Sidu was not being called, the Government went further and elicited identically inadmissible evidence through Agent Lammons' testimony. Then, even when faced with the reality of its clear error, the Government did not seek to rectify the problem it created by asking for permission to reopen to call Sidhu.

ROA.5941.

### 4. Written Order

Judge Lake's order issued May 14, 2019:

> The government does not contest that counsel for Defendants did not invite the government's introduction of Dr. Sidhu's plea. The court must therefore apply the remaining three *King* factors to determine whether the government's introduction of Dr. Sidhu's plea is reversible error.

ROA.5959.

The first part of the Order was favorable to the Government:

> There is no evidence that the government did not intend to call Dr. Sidhu as a witness: The government and Defendants deposed Dr. Sidhu, who is of failing health, to ensure that his testimony would be preserved for trial.

> The statements made by the government during its opening statement therefore arguably had a legitimate purpose: to anticipate and preemptively counter defense counsel's efforts to impeach Dr. Sidhu with his guilty conviction during his eventual cross-examination

ROA.5964.

But the second part of the Order called out the AUSA's conduct:

> The same is not true for the statement made by Agent Lammons: Agent Lammons' testimony was provided near the conclusion of the government's case-in-chief, and the government likely knew at that point that it no longer planned to call Dr. Sidhu as a witness.

> The court concludes that there is no indication that either of the challenged statements were made in bad faith. While the government arguably had a legitimate purpose for referencing Dr. Sidhu's plea in its opening statement, the government can point to no proper purpose for Agent Lammons' testimony. The dubious purpose of at least one of the challenged statements ***weighs slightly in favor of granting Defendants' Motion.***

ROA.5964-5965 (emphasis added).

15

Ultimately, however, the defense motion did not succeed on harmless error

grounds:

> Although the reference by Agent Lammons to Dr. Sidhu's guilty plea was improper, any error on the government's part was harmless beyond a reasonable doubt. Dr. Sidhu's guilty plea was never admitted or considered by the jury as substantive evidence. The court gave two separate limiting instructions -- one at Defendants' first objection to the introduction of Dr. Sidhu's plea, and another before the jury was charged in the court's instructions to the jury-- requiring the jury not to consider Dr. Sidhu's plea as evidence. The references to Dr. Sidhu's guilty plea may be "quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." *Arizona v. Fulminante*, 111 S. Ct. 246, 1264 (1991) The admissible evidence presented to the jury "overwhelmingly eclipses the two [brief] mentions of Sidhu's plea."   Defendants Motion for Mistrial on this basis will therefore be denied.

ROA.5965-5966.

### H.    PSR and Objections Thereto

#### 1.    Relevant Conduct

The PSR issued July 3, 2019.   ROA.9896.   Relevant conduct begins at

ROA.9906:

> Harcharan Singh Narang was a medical doctor who participated in a health care fraud scheme. Narang and his co-coconspirators sold coupons for weight loss injections on a website called Groupon. Narang, and others, ordered the patients to have further testing that were medically unnecessary in order to proceed with their weight loss program.
>
> Narang employed Dr. Gurnaib Sidhu who also signed documents making it appear the tests were medically necessary and legitimate. Narang and Sidhu

submitted paperwork to Dayakar Moparty who fraudulently billed the health care companies through his hospital, Red Oak Hospital, which resulted in a higher reimbursement rate. The fraudulent bills submitted to health care benefit programs totaled approximately $20 million dollars. As a result, the conspirators were paid a total of approximately $3.2 million dollars.

Moparty then transferred the fraud proceeds to numerous bank accounts controlled by Narang and his wife. The offense involved 10 or more beneficiaries whose means of identification were used unlawfully or without authority. The offense involved the unauthorized transfer or use of any means of identification (health insurance policy/account number) unlawfully to produce or obtain any other means of identification (health insurance claim number). The offense also involved sophisticated means and money laundering. Since the defendant employed and paid Dr. Sidhu to participate in the health care conspiracy, he is viewed as a manager in the health care conspiracy.

### 2.    Base Offense Level

Paragraph 79 states, "The United States Sentencing Commission Guideline for a violation of 18 U.S.C. § 1347 is found at U.S.S.G. § 2B1.1. As such, the base offense level at U.S.S.G. § 2B1.1(a)(2) is 6." ROA.9908.

### 3.    Specific Offense Characteristic: Loss

Paragraph 80 discerns a loss amount of "more than $9,500,000, but less than $25,000,000" for a 20-level increase under U.S.S.G. § 2B1.1(b)(1)(K). ROA.9908.

### 4.    Specific Offense Characteristic: Victims

Paragraph 81 assessed a 10-level increase under USSG § 2B1.1(b)(2)(A)(i). ROA.9908.

### 5. Specific Offense Characteristic: Health Care Program Loss

Paragraph 82 added three levels under 2B1.1(b)(7)(ii) because "the defendant was convicted of a Federal health care offense involving a Government health care program and the loss under subsection (b)(1) to the Government health care program was more than $7,000,000." ROA.9908.

### 6. Specific Offense Characteristic: Sophisticated Means

Paragraph 83 assessed 2-levels because Probation deemed sophisticated means under § 2B1.1(b)(10)(C). ROA.9908.

### 7. Specific Offense Characteristic: Identification

Since the offense involved the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification, the offense level is increased by 2 levels, pursuant to U.S.S.G. § 2B1.1(b)(11)(C)(i).

### 8. Role Adjustments

Paragraph 86 assessed 2-levels for organizer/leader under § 3B1.1(c). ROA.9908.

Paragraph 87 added two more levels:

As an owner of medical clinics in the conspiracy, the defendant is considered to have abuse a position of trust which significantly facilitated the commission or concealment of the offense. The offense level is increased by 2 levels, pursuant to U.S.S.G. § 3B1.3.

### 9.     Total Offense Level

Paragraph 92 assessed a total of 39 [6+20+2+3+2+2+2+2].

With zero criminal history, Paragraph 122 assessed a range of 262-327 months.  ROA.9912.

### 10.     Special Conditions of Release

At ROA.9916, Probation stated:

You must provide the probation officer with access to any requested financial information and authorize the release of any financial information. The probation office may share financial information with the U.S. Attorney's Office.

You must not incur new credit charges or open additional lines of credit without the approval of the probation officer.

You must not participate in Government benefit programs of any kind without the approval of the probation officer.

**Justification:** The defendant's instant offense involves mandatory restitution; thus, these conditions will be beneficial in the probation officer's supervision of the defendant, including monitoring his financial situation and restitution payments. The imposition of the above noted conditions will ensure the defendant remains compliant with the payment plan ordered by the Court.

### 11.     Restitution

Paragraph 73 left open the issue of restitution:

As to Counts 1 through 18, the Mandatory Victims Restitution Act of 1996 is applicable in this matter. Blue Cross Blue Shield of Texas, Aetna Health, Inc., and Cigna Corporation have been identified as victims in this case. According to the Government, restitution is currently pending. Once this information is received, the probation

> office will notify the Court, via an Addendum or Revised PSR, of the
> individual victims along with the amount owed to each victim.

ROA.9907.

> But a Second Addendum filed November 4, 2019 stated:

> The Government has provided restitution in the amount of $202,954.40 is due
> and payable to Cigna Corporation.

> Restitution in the amount of $2,621,999.04 is due and payable as follows:
> $1,427,300.76 to Aetna Health, Inc., $991,743.88 to Blue Cross Blue Shield
> of Texas, and $202,954.40 to Cigna Corporation.

ROA.9924.

## I.    Objections to PSR

On July 17, 2019, Narang filed general objections to most factual contentions

in the PSR. ROA.9841. As to numerosity of the victims in Paragraph 81, Narang

argued, "Defendant objects to ¶ 81 on p. 13. The "offense" did not involve 10 or

more victims."

On October 4, 2019, Narang filed Supplemental Objections; the highlight was

a report produced by Dr. Ashok Kadambi, who opined that most of the files showed

medically necessary testing.  ROA.9851.

> If it is the Probation Department's position that Red Oak Hospital could not
> submit the bills for the tests performed because it was not a properly licensed
> outpatient facility, then the loss calculation should be offset by an amount that
> would have been paid for the services provided. In this case that amount would
> be the difference between the amount paid by the insurance companies billed
> at a "clinic rate" versus a "hospital rate."

[T]he reimbursement amount for the relevant tests at a clinic rate is $2,530,401.46. When you deduct that amount from the actual amount paid of $3,200,000.00, then the actual loss is $669,598.54.

ROA.9852.

### J.    Government's and Probation's Responses to Defense Objections

The Government responded on October 11, 2019.  ROA.9888.

#### a.    Loss Rationale

The government assumes that with both Moparty's and Narang's experience in the health care industry, they are aware of this billing practice. The government had considered this, and offered adjusting the intended loss amount to not more than $3.5 million dollars, which is close to the $3.2 million dollars that Dr. Narang received in the scheme.

The government requests the Court follow the PSR recommendation that the Total Offense Level remain at the $20 million intended loss amount, or in the alternative, use the loss amount of not more than $3.5 million resulting in a 2-point reduction.

ROA.9894.

Probation issued an addendum on October 25, 2019.  ROA.9917.  As to loss,

Probation argued:

The probation office maintains the intended loss of approximately $20 million is an accurate account of the amount billed to health care providers by Red Oak Hospital based upon the billing records provided by Red Oak Hospital. This amount is supported by the information provided in the Indictment and exhibits submitted in trial. The Government offered to reduce the loss amount to at least $3.5 million to account for the medical billing practices that does not pay providers the full billed amount. This would reduce the adjusted offense level by 2-levels. The defendant provides an actual loss of $669,598.54 and an intended loss of zero since they believe all of the tests

were medically necessary. Since the tests were proved to be medically unnecessary, the intended loss of zero is not supported by the facts. Further, the $669,598.54 calculated by the defendant is based upon a "clinic rate" of medically necessary tests. The probation office maintains, as was proven at trial, that all tests were not medically necessary and were billed at the higher "hospital rate." Thus, the probation office maintains the intended loss of $20 million is an accurate amount of loss based upon the billing records provided by Red Oak Hospital.

ROA.9920.

### b.     Numerosity of Victims

As to the numerosity of victims in Paragraph 81, Probation stated:

Red Oak Hospital used the means of identification of more than 10 victim health care identification numbers to submit fraudulent health care claims. The health care identification numbers were crucial to the success of the fraud scheme, without which Red Oak Hospital nor the defendant would not have received any money. *See United States v. Barson*, 845 F.3d 159, 167 (5th Cir. 2016), which held "Medicare beneficiaries for whom [fraud] conspirators falsely claimed benefits [are] 'victims' under the guidelines." Since Medicare beneficiaries are akin to health care beneficiaries, the probation office maintains the position that the fraud scheme involved 10 or more victims.

ROA.9920.

### c.     "Means of Identification" Under U.S.S.G. § 2B1.1

As to Paragraph 84, Probation responded:

U.S.S.G. § 2B1.1 defines "means of identification" pursuant to 18 U.S.C. § 1028, except that such means of identification must be that of an actual (i.e., not fictitious) individual, other than the defendant or a person for whose conduct the defendant is accountable under § 1B1.3(Relevant Conduct)."

For cases involving "means of identification," U.S.S.G. §2B1.1, comment (n. 4(E)) defines a "victim" as "any individual whose means of identification was used unlawfully or without authority." Health care patient identification

numbers are "means of identification" used by health care companies to identify individuals enrolled with the programs and the benefits those individuals are entitled to have covered. Each fraudulent claim that was submitted required the patient's health care identification number.

In a recent 5th Circuit decision, *U.S. v. Kalu*, 936 F 3d. 678 (August 30, 2019), the Court upheld the enhancement in regard to Medicare claim numbers. The Court referred to United States v. Gonzalez, 644 F. App'x 456 (6th Cir. 2016) (unpublished), which proved the enhancement was properly applied when the defendant submitted false claims to two insurance companies seeking reimbursement for medical injections that were purportedly administered to patients. The Sixth Circuit reasoned that the "names of the beneficiaries [first means of identification] were used to produce fraudulent health claims to obtain money." At 465. "The fraudulent health claims, which bear unique numbers, were the second, or 'other,' means of identification." Also, in *United States v. Roy*, 819 F.3d 998, 1002 (7th Cir. 2016), the enhancement was upheld when the defendant used the means of identification of 168 per sons to submit fraudulent claims to Medicare and Blue Cross Blue Shield. The facts in this case mirror the *Gonzalez* case.

ROA.9921.

## K.    Reply Briefing

Narang replied on November 6, 2019.  ROA.9925.

Probation issued a third addendum on November 13, 2019.  ROA.9947.

## L.    Sentencing

Sentencing was held November 14, 2019.  ROA.7826.  Narang's objections were partially successful; Narang prevailed on his challenge to subsection 2B1.1(b)(7)(ii): "The objection to Paragraph 82 is sustained for the reasons stated in the third addendum."  ROA.7831.  Next, Narang presented his expert witness on loss.  Judge Lake ruled as follows:

The Court concludes that defendants have not carried their burden of presenting credible evidence to support the argument that these services had a value of $669,598, that the defendants have not shown that the services underlying the bills were legitimate, or that the insurance companies would have paid for these services but for the defendants' fraud.

The credible evidence also supports the conclusion that the defendants knew or reasonably should have known that this illegal conduct would have resulted in an actual loss of at least $3,227,000.

ROA.7848.

The total amount paid by the insurance companies on the claims at issue was $3,227,091. The Court will, therefore, use this more conservative actual amount in calculating the loss.

So if you'll turn, please, to Paragraph 80 of Dr. Narang's report, I conclude that instead of using $9,500,000 it should be a plus 16, based on $1.5 million or more.

ROA.7849.

Judge Lake stated the procedural calculus as follows:

THE COURT: Paragraph 81 remains plus 2. Paragraph 82 is zero. The other paragraphs down through 89 are the same. Based on reducing Paragraph 80 by four levels and eliminating the three levels in Paragraph 82, I calculate that the adjusted offense level is 32; and that would result in a total offense level based on criminal history category one of 121 to 151 months in custody.

ROA.7850; *see also* ROA.9950 [Statement of Reasons].

After Narang allocuted, the Court pronounced sentencing:

[I]t is the judgment of the Court that you be sentenced to 120 months in custody on Counts 1 through 20 to run concurrently with each other and then to be sentenced to one month on Count 21 to run consecutively to the other counts for a total sentence of 121 months in custody.

You will pay restitution of $2,621,999.04 cents to the following victims. To Aetna Health, Inc., $1,427,300.76. To Blue Cross Blue Shield of Texas, $991,743.88. To Cigna Corporation, $202,954.40.

ROA.7875-7876.

Special conditions of release were stated as follows:

You will provide the probation officer with access to any requested financial information and authorize the release of any financial information. The probation officer may share financial information with the U.S. attorney's office.

You must not incur new credit charges or open additional lines of credit without the approval of the probation office.

You may not participate in a government benefit program of any kind without the approval of the probation office.

ROA.7877.

In turn, the written judgment presents these same 3 conditions at ROA.6027.

## SUMMARY OF THE ARGUMENTS

### *Mistrial*

The District Court reversibly erred when it overruled Narang's Motion for Mistrial on "harmless error" grounds after having prevailed on the illegitimate

purpose ground: "the government can point to no proper purpose for Agent Lammons' testimony." ROA.5965.

### *Sentencing*

The District Court reversibly erred when it overruled Narang's written objections to the PSR as concerns Medicare beneficiaries as "victims" under §2B1.1(b)(2)(A)(i).

The District Court reversibly erred by increasing Narang's offense level pursuant to U.S.S.G. § 2B1.1(b)(11)(C)(i). Neither Narang nor any co-defendant used a means of identification to produce or obtain another means of identification.

Viewed singularly or together, these procedural sentencing errors were Guidelines-impactful.

### STANDARDS OF REVIEW

### *Mistrial*

"We review the denial of a motion for mistrial for abuse of discretion." *United States v. Dupre*, 117 F.3d 810, 823 (5th Cir.1997).

A new trial is required only when, after a review of the entire record, it appears that there is a significant possibility that the prejudicial evidence had a substantial impact on the jury verdict. *United States v. Paul*, 142 F.3d 836, 844 (5th Cir.1998).

This Court gives great weight to the trial court's assessment of the prejudicial

effect of the evidence, and prejudice may be rendered harmless by a curative instruction. *United States v. Nguyen*, 28 F.3d 477, 483 (5th Cir.1994).

This Court also examine the context of the challenged statement to determine whether the prejudicial comment was elicited by the government or was a spontaneous act by the witness. *United States v. Moreno*, 185 F.3d 465, 472-73 (5th Cir.1999).

### *Sentencing*

"We review a district court's interpretation or application of the Guidelines de novo and its factual findings for clear error." *United States v. Conner*, 537 F.3d 480, 489 (5th Cir. 2008).

**ARGUMENT**

**I.** **THE DISTRICT COURT ABUSED ITS DISCRETION WHEN IT DENIED THE MOTION FOR MISTRIAL**

### A. Introduction

It is well settled that a defendant is "entitled to have questions of guilt on the evidence against [him], 'not on whether a government witness or a codefendant has plead guilty to the same charges.'" *United States v. Delgado*, 401 F.3d 290, 299–300 (5th Cir. 2005).

In reviewing a prosecutor's introduction of a codefendant's plea, the Fifth Circuit considers four factors from *United States v. King*, 505 F.2d 602 (5th Cir.

1974): "1) the presence or absence of a limiting instruction; 2) whether there was a proper evidentiary purpose for introduction of the guilty plea; 3) whether the plea was improperly emphasized or used as substantive evidence of guilt; and 4) whether the introduction of the plea was invited by defense counsel." *Delgado*, 401 F.3d at 299–300 (quoting *United States v. Murray*, 988 F.2d 518, 523 (5th Cir. 1993)).

At trial, the Government made the conscious decision to not call Sidhu as a witness even though they had mentioned his guilty plea in front of the Jury. Next, only AFTER stating to this Court that Sidu was not being called, the Government went further and elicited identically inadmissible evidence through Agent Lammons' testimony. Then, even when faced with the reality of its clear error, the Government did not seek to rectify the problem it created by asking for permission to reopen to call Sidhu.

**B.**   **It Is Alarming That the Government Takes Comfort From the Repeated Instructions to the Jury In Response to Prosecutorial Misconduct**

Narang certainly agrees with the District Court's memorandum opinion insofar as it concludes: "the government can point to no proper purpose for Agent Lammons' testimony. The dubious purpose of at least one of the challenged statements weighs slightly in favor of granting Defendants' Motion." ROA.5965.

It should not give the Government much comfort that it basically did the same thing during opening argument.

It should give this Court pause that the Government's post-trial response briefing did not disagree that prosecutorial misconduct occurred throughout the trial – at its beginning (opening argument) and its end (trial testimony of Agent Lammons). In other words, it was pervasive. More specifically, the Government conceded, "The jury was instructed twice to disregard the fact of Sidhu's plea." ROA.5835.

## C.    Curative Instructions Are Not A *Deus Ex Machina*

As an initial matter, it must be noted that the curative instruction was given after objection following the Government's *second* instance of misconduct. Moreover, as the Fifth Circuit long ago observed "We have also noted that in some instances information pertaining to the guilty pleas of others might so taint the trial of an individual that the error could not be cured despite a cautionary instruction." *United States v. Fleetwood*, 528 F.2d 528, 535-536 and n.16 (1976) (citing *United States v. Baete*, 414 F.2d 782, at 783-784 (5th Cir. 1969); *United States v. Harrell*, 436 F.2d 606 (5th Cir. 1970)). As the *Harrell* court explained "we think that the evidentiary purpose ordinarily to be served by proof of a co-defendant's plea of guilty is so shadowy, so insubstantial that it would be the better practice in run-of-the-mill cases to exclude such proof altogether." 436 F.2d at 617.

It must also be noted that when the Government's misconduct led the court to question defense counsel in front of the jury if his curative instruction was sufficient, defense counsel replied that it was not due to the Confrontation Clause aspects involved. Unfortunately, the Court's responsive comment that "doesn't [Narang] have the same right to subpoena Sidhu?" only compounded the harm created by the Government as it suggested to the jury that Narang had a burden in the criminal prosecution against him:

> Ms. Bennett first argues that the prosecutor improperly shifted the burden of proof and suggested that evidence not presented at trial provides additional grounds for Ms. Bennett's guilt. For example, the prosecutor insisted that "nothing stops [the Defendants] from issuing a subpoena for the bank records they claim that the government hid from you" and that "[t]hey don't have to put on anything, ___**but they have subpoena power**___." We "do not approve of comments reflecting on the lack of evidence presented by a defendant in a criminal case ... [as] [s]uch a course of action is a parlous one at best, of necessity sailing close to implying that the defendant is obligated to produce evidence of his innocence."

*United States v. Bennett*, 874 F.3d 236, 251 (5th Cir. 2017) (finding summation misconduct by Prosecutor, but not harm).

Narang contends that even a strongly worded curative instruction is insufficient in these circumstances. Limiting instructions call for "a mental gymnastic which is beyond, not only [the jury's] powers, but anybody's else." *Nash v. United States*, 54 F.2d 1006, 1007 (2d Cir. 1932) (L. Hand, J.). The risk is heightened when, as here, the circumstances deprive a defendant of the

constitutional right to confront the witnesses against him. *Gray v. Maryland*, [523](link) [U.S. 185, 196](link), [118 S. Ct. 1151](link), [140 L. Ed. 2d 294](link) (1998). *See also United States v. Taylor*, [745 F.3d 15](link) (2d Cir. 2014) (vacating and remanding for new trial on *Bruton* issue).

## II. SENTENCING: THE DISTRICT COURT REVERSIBLY ERRED IN ITS APPLICATION OF [USSG §2B1.1(B)(2)(A)(I)](link)

### A. Legal Framework

Responding to Narang's objection, Probation's logic [adopted by the District Court] was this:

> Red Oak Hospital used the means of identification of more than 10 victim health care identification numbers to submit fraudulent health care claims. The health care identification numbers were crucial to the success of the fraud scheme, without which Red Oak Hospital nor the defendant would not have received any money. *See United States v. Barson*, [845 F.3d 159, 167](link) (5th Cir. 2016), which held "Medicare beneficiaries for whom [fraud] conspirators falsely claimed benefits [are] 'victims' under the guidelines." Since Medicare beneficiaries are akin to health care beneficiaries, the probation office maintains the position that the fraud scheme involved 10 or more victims.

[ROA.9920](link).

Narang argues that while it is true that the Fifth Circuit ratified this method in *United States v. Barson*, [845 F.3d 159](link) (5th Cir. 2016), it should be noted that Judge Jones issued a dissent:

> The government has not established that the 429 Medicare claimants had to spend "significant time," or any time at all, resolving credit or related issues.

Even real Medicare beneficiaries are not normally victims of Medicare fraud because Medicare, not the patient, pays the billing provider directly. The real victim is the U.S. taxpayer, through Medicare, and that has been accounted for by the guidelines in this case. There is no proof at all that the purported beneficiaries in this case suffered any harm, pecuniary or otherwise; they cannot be considered victims under Note 4(E).

It must also be noted that a recent opinion of this Court featured a

concurrence by Judge Dennis mirroring Judge Jones's logic in *Barson*:

Similarly here, the record does not show that Medicare beneficiaries spent "significant time"—or any time at all—resolving credit problems or related issues due to Ainabe's use of their identities. Based on the express rationale behind Application Note 4(E), the government ought shoulder the burden of proving this hardship to Medicare beneficiaries before they can properly be deemed "victims" under the Guidelines. See *United States v. Watts*, 519 U.S. 148, 156, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997) (government must prove conduct by a preponderance of the evidence at the sentencing phase). Further, the loss to the real victim—the American taxpayer—has already been accounted for in Ainabe's three-level sentencing enhancement under section 2B1.1(b)(7)(B)(ii) and the eighteen-level enhancement under section 2B1.1(b)(1)(J). Bound by *Barson*'s incorrect interpretation of "victim," I respectfully concur.

*United States v. Ainabe*, 938 F.3d 685, 693-394 (5th Cir. 2019).

More recently, this Court has noted the "disagreements in our precedents":

As Okwilagwe discusses, the court has not been unanimous in its conclusion. *See Barson*, 845 F.3d at 168–69 (Jones, J., concurring in part and dissenting in part) (disagreeing with majority as to meaning of "victim"); *United States v. Ainabe*, 938 F.3d 685, 694–95 (5th Cir. 2019)

(Dennis, J., concurring) (disagreeing with *Barson* as to meaning of "victim").

> We note Okwilagwe's objection and the disagreement in our precedents, but we are bound by *Barson*. The district court did not err in imposing this two-level enhancement.

*United States v. Emordi*, 2020 WL 2488181, *5 (5th Cir. May 14, 2020).

As of this writing in May 2020, the *Emordi* Panel has given an extension to Okwilagwe for his petition for *en banc* rehearing. If this Court grants en banc, Narang urges that his appeal be held pending the outcome. Alternatively, Narang raises this point to preserve the issue for his own future *en banc* petition.

## B.     Argument

It should be noted about Red Oak that even the Government's own response argument was clear: "All patients testified that they had never been to Red Oak and did not authorize any tests to be billed at Red Oak." ROA.9890.   Narang contends that the Probation's logic reach as to the *Barson* holding exceeds the grasp of that opinion: if being part of the wrongdoing did not completely impede the victimhood status of the medical beneficiaries in *Barson*, then the complete lack of criminal

wrongdoing by the beneficiaries at issue in Narang's case militates in favor of a finding that these people were not victims.

In sum, there were at most three insurance companies who were victims in this case: Aetna Health, Inc., Blue Cross Blue Shield, and Cigna Corporation. This is far less than ten victims as required for the enhancement.

## III. SENTENCING: THE DISTRICT COURT REVERSIBLY ERRED IN ITS APPLICATION OF USSG § U.S.S.G. § 2B1.1(B)(11)(C)(I)

Probation never explained how or why Narang's intent supposedly shifted from using the beneficiaries' means of identification 'so that the defendant and/or the co-defendants could bill' to using the means of an identification "to produce another means of identification."

Narang argues that (at worst) the scheme's intent was only to use beneficiaries' health care information numbers for false billing. By contrast, the scheme was not intended to produce or obtaining secondary means of identification. In other words, it is illogical to think that Narang intended to use the beneficiaries' means of identification for anything other than billing Aetna Health, Inc., Blue Cross Blue Shield, and/or Cigna Corporation. This was not a case where any defendant's intent was to use the beneficiaries' means of identification to produce or obtain yet another means of identification.

The enhancement's language does not call for a two level increase merely because the offense involves a "means of identification" from which another "means of identification" is unintentionally or tangentially created. Instead, the Guidelines calls for the enhancement when a defendant uses a means of identification specifically to produce or obtain another means of identification. The defendant's intent to produce or create a second means of identification is required for the enhancement to apply.

Probation's strongest argument was that the Fifth Circuit came to a contrary opinion in *United States v. Kalu*:

> In *United States v. Cooks*, we upheld the means of the identification enhancement, reasoning that "each mortgage loan number, like a bank account number, is presumably unique, and thus traceable to the mortgagor." 589 F.3d 173, 186 (5th Cir. 2009); *accord United States v. Samet*, 200 F. App'x 15, 23 (2d Cir. 2006) (holding that a lease constitutes a "means of identification" within the meaning of the Guideline, reasoning that 18 U.S.C. § 1028(d)(7) and the Guideline bank loan example "focus on the generation of a unique identifying number ... not on whether a document would be proffered as a form of identification"). Applying this same reasoning, because a Medicare claim number is unique and inextricably tied to a particular Medicare beneficiary, it was not erroneous for the district court to conclude that the claim numbers qualified as "means of identification," and that Kalu's offense thus warranted the two-level enhancement.

> Turning to our sister circuit, *United States v. Gonzalez*, 644 F. App'x 456 (6th Cir. 2016) (unpublished), is directly on point, and, thus, particularly instructive. When presented with a factually analogous appeal, the Sixth Circuit in Gonzalez concluded that the § 2B1.1(b)(11)(C)(i) enhancement was properly applied.6 644 F. App'x at 465. In *Gonzalez*, the defendant submitted false claims to two insurance companies seeking reimbursement for medical injections that were purportedly administered to patients. Id. at

458. Affirming the application of the enhancement, the Sixth Circuit reasoned that the "names of the beneficiaries [first means of identification] were used to produce fraudulent health claims to obtain money." *Id*. at 465. "The fraudulent health claims, which bear unique numbers, were the second, or 'other,' means of identification."7 *Id*. We see no reason to disagree. Moreover, Kalu provides no authority which is on point and contrary.

936 F.3d 678, 682-683 (5th Cir. 2009).

Narang would urge this Court to note that the *Kalu* court conceded that it was dealing with an issue of first impression:

> [W]e have not squarely addressed a similar challenge to the application of the enhancement in this particular context…

*Kalu*, at 681.

Insofar as the *Kalu* precedent binds this Panel on Narang's second sentencing issue, he would urge the Court to issue a concurrence so that he may present the point upon future review.

## IV.   SENTENCING: THE PROCEDURAL ERROR WERE GUIDELINES IMPACTFUL

Narang recognizes that when the sentence imposed "falls inside both the correct and incorrect guidelines ranges" this Court has "shown considerable reluctance in finding a reasonable probability that the district court would have settled on a lower sentence." *United States v. Blocker*, 612 F.3d 413, 416 (5th Cir. 2010) (citation omitted); *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1345 (2016) ("When a defendant is sentenced under an incorrect Guidelines range -

whether or not the defendant's ultimate sentence falls within the correct range - the error itself can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error.").

At Level 32, Narang's range was 121-151 months. But at Level 28, the range would fall to 78-97 months. Even at Level 30, the range would fall to 97-121 months. Having picked the lowest point at Level 32, there is no reason to think that Judge Lake would pick the highest point at Level 30.

## CONCLUSION

Narang's case must be remanded for a new trial if he prevails on the mistrial issue.

Alternatively, he must be resentenced with either four, or two, levels removed for the improper application of §2B1.1(b)(11)(C)(i) and/or §2B1.1(B)(2)(A)(I). respectively.

Respectfully submitted,

/s/Seth Kretzer_____

LAW OFFICES OF SETH KRETZER
440 Louisiana Street; Suite 1440
Houston, TX 77002

[Tel.] (713) 775-3050
[Fax] (713) 929-2019


ATTORNEY FOR APPELLANT NARANG

## CERTIFICATE OF SERVICE

I certify that the Brief of Appellant was filed with the Court in electronic format via the ECF system on the 27th day of May 2020.

I further certify that an electronic copy of the brief was served on all counsel of record by filing on the ECF System on the same date.

/s/ Seth Kretzer
_____
Seth Kretzer

## CERTIFICATE OF COMPLIANCE

1.      This brief exceeds the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 8,198 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft® Office Word 2003 in 14-Point Times New Roman font.

/s/ Seth Kretzer
_____
Seth H. Kretzer

Date: May 27, 2020