No. 19-20797

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
_____

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

DAYAKAR MOPARTY; HARCHARAN SINGH NARANG,
Defendants-Appellants.
_____

On Appeal from the United States District Court
for the Southern District of Texas
Houston Division, Case No. 4:17-cr-00290
_____

BRIEF OF PLAINTIFF-APPELLEE
_____

RYAN K. PATRICK
United States Attorney

CARMEN CASTILLO MITCHELL
Chief, Appellate Division

EILEEN K. WILSON
Assistant United States Attorney

United States Attorney's Office
1000 Louisiana, Suite 2300
Houston, Texas 77002
Phone: (713) 567-9102

ATTORNEYS FOR APPELLEE

## STATEMENT REGARDING ORAL ARGUMENT

The United States agrees this Court would benefit from oral argument in this health care fraud appeal based upon the lengthy trial, the number of exhibits, and the nature of the appellate issues. *See* Fed. R. App. P. 34(a)(1).

# TABLE OF CONTENTS

**PAGE**

STATEMENT REGARDING ORAL ARGUMENT ....................................i

TABLE OF AUTHORITIES ................................................ viii

STATEMENT OF JURISDICTION ..........................................1

STATEMENT OF THE ISSUES ...........................................1

STATEMENT OF THE CASE ..............................................4

    I.    COURSE OF PROCEEDINGS AND DISPOSITION BELOW. ..............4

    II.    FACTS RELEVANT TO THE ISSUES ON APPEAL. .........................5

        A.    OVERVIEW OF THE HEALTH CARE FRAUD SCHEME. .........5

        B.    DR. NARANG RAN UNNECESSARY TESTS ON HIS WIFE'S SPA PATIENTS AND HIS OWN PATIENTS...............9

        C.    EXPERT WITNESSES CONFIRMED UNNECESSARY AND INCOMPETENT TESTING OCCURRED AT INFLATED RATES. ...........................................................16

        D.    MOPARTY WAS CRITICAL TO THE SUCCESS OF THE FRAUDULENT BILLING SCHEME. ....................................22

            1.    DR. NARANG AND MOPARTY ENGINEERED AND EXECUTED A PASS-THROUGH BILLING SCHEME. ...........................................................22

            2.    MOPARTY ALSO DOUBLE BILLED INSURANCE COMPANIES. .........................................................26

E.  PATIENTS WERE STUNNED WHEN THEY RECEIVED THEIR EXPLANATIONS OF BENEFITS, WHICH CONFLICTED WITH THEIR VISITS TO FOREVER FIT AND DR. NARANG'S OFFICE. ...........................................27

F.  AETNA, BCBS, AND CIGNA REPRESENTATIVES EXPLAINED HOW THEIR COMPANIES WERE DEFRAUDED. ....................................................................30

G.  MOPARTY WAS THE KEY FIGURE IN LAUNDERING THE INSURANCE REIMBURSEMENTS. ...............................34

H.  MOPARTY AND DR. NARANG TRIED TO REBUT THE GOVERNMENT'S EVIDENCE. ...........................................40

I.  THE JURY'S VERDICT AND THE DISTRICT COURT'S DENIAL OF THE JOINT MOTION FOR A MISTRIAL. ..........48

III.  MOPARTY'S AND DR. NARANG'S SENTENCINGS. ......................49

A.  PSRS. ...............................................................................49

1.  MOPARTY. ............................................................49

2.  DR. NARANG. ......................................................53

B.  THE SENTENCING HEARING. ...........................................57

1.  DR. NARANG. ......................................................57

2.  MOPARTY. ............................................................62

SUMMARY OF ARGUMENT ...................................................................65

ARGUMENT ..........................................................................................70

# TABLE OF CONTENTS

I.   AMPLE EVIDENCE SUPPORTS MOPARTY'S CONVICTIONS FOR CONSPIRACY TO COMMIT HEALTH CARE FRAUD, SEVENTEEN SUBSTANTIVE COUNTS OF HEALTH CARE FRAUD, AND THREE COUNTS OF MONEY LAUNDERING. (Responsive to Moparty's First Issue) .................................. 70

    A.   THIS COURT MUST VIEW THE EVIDENCE IN THE LIGHT MOST FAVORABLE TO THE JURY'S VERDICT AND NOT REWEIGH IT. .................................. 70

    B.   MOPARTY CONSPIRED WITH DR. NARANG TO COMMIT HEALTH CARE FRAUD. .................................. 71

        1.   THE ELEMENTS OF CONSPIRACY. .................................. 71

        2.   THE CONSPIRACY EVIDENCE ESTABLISHED THAT MOPARTY KNOWINGLY AND WILLINGLY ENTERED INTO AN AGREEMENT WITH DR. NARANG. .................................. 72

    C.   MOPARTY AND DR. NARANG KNOWINGLY AND WILLINGLY EXECUTED THEIR SCHEME TO DEFRAUD HEALTH INSURANCE COMPANIES .................................. 74

        1.   THE ELEMENTS OF HEALTH CARE FRAUD. .................................. 74

        2.   THE HEALTH CARE FRAUD EVIDENCE PROVED THAT MOPARTY AND DR. NARANG DEFRAUDED PATIENTS AND THEIR INSURERS USING PASS-THROUGH AND DOUBLE BILLING FOR UNNECESSARY AND FOR NONEXISTENT MEDICAL TESTS. .................................. 75

D.  MOPARTY WAS THE CENTRAL FIGURE IN THE MONEY LAUNDERING. ...................................................80

    1.  THE ELEMENTS OF MONEY LAUNDERING.............80

    2.  MOPARTY RECEIVED AND DISTRIBUTED THE REIMBURSEMENT MONIES FOLLOWING HIS OFFICE'S SUBMISSION OF FRAUDULENT CLAIMS TO THE INSURANCE COMPANIES..............81

II.  THE DISTRICT COURT CORRECTLY APPLIED THE TWO-LEVEL ENHANCEMENTS UNDER U.S.S.G. § 2B1.1(b)(11)(C)(i) AND UNDER § 2B1.1(b)(2)(A)(i) AT DR. NARANG'S SENTENCING. (Responsive to Dr. Narang's Second Issue) ........................................................83

A.  THIS COURT SHOULD APPLY *DE NOVO* AND CLEAR ERROR REVIEW. .............................................83

B.  PRECEDENT SUPPORTS THE ENHANCEMENT UNDER U.S.S.G. § 2B1.1(b)(2)(A)(i) FOR 10 OR MORE VICTIMS. .......................................................84

C.  PRECEDENT SUPPORTS THE ENHANCEMENT UNDER U.S.S.G. § 2B1.1(b)(11)(C)(i) FOR DR. NARANG'S UNAUTHORIZED TRANSFER OR USE OF ANY MEANS OF IDENTIFICATION UNLAWFULLY TO PRODUCE OR OBTAIN ANY OTHER MEANS OF IDENTIFICATION. ..........88

III.  THE DISTRICT COURT CORRECTLY APPLIED A TWO-LEVEL ENHANCEMENT UNDER U.S.S.G. § 3B1.3 BECAUSE MOPARTY ABUSED A POSITION OF TRUST. (Responsive to Moparty's Sixth Issue) ........................................................92

# TABLE OF CONTENTS

A. THIS COURT SHOULD REVIEW FOR CLEAR ERROR. .........92

B. MOPARTY'S SUPERIOR POSITION PROVIDED THE FREEDOM TO COMMIT AND CONCEAL CRIMES. ...............92

IV. MOPARTY HAS FAILED TO ESTABLISH REVERSIBLE PLAIN ERROR THAT LAY WITNESS FBI FORENSIC ACCOUNTANT ANDERSON OPINED ON THE ULTIMATE ISSUE OF CRIMINAL INTENT. (Responsive to Moparty's Third Issue) ...................99

A. THIS COURT SHOULD REVIEW FOR REVERSIBLE PLAIN ERROR. ................................................................99

B. ANDERSON'S TESTIMONY PRIMARILY WAS BASED ON OBJECTIVE FACTS WITH FEW OPINIONS. .......................100

V. MOPARTY HAS FAILED TO PROVE REVERSIBLE PLAIN ERROR OR THAT THE DISTRICT COURT ABUSED ITS DISCRETION IN PERMITTING THE INSURANCE COMPANIES' REPRESENTATIVES TO TESTIFY ABOUT THEIR RESPECTIVE EMPLOYERS' PRACTICES AND POLICIES AND OCCASIONALLY ABOUT BROADER MATTERS IN THE INDUSTRY. (Responsive to Moparty's Fourth Issue)...........109

A. THIS COURT SHOULD APPLY BOTH PLAIN ERROR REVIEW AND THE ABUSE OF DISCRETION STANDARD HERE. ..........................................................................109

B. THE INSURANCE COMPANIES' REPRESENTATIVES STAYED WITHIN THEIR RESPECTIVE EVIDENTIARY BOUNDARIES. ................................................................110

# TABLE OF CONTENTS

VI. MOPARTY AND DR. NARANG HAVE FAILED TO SATISFY THEIR HIGH BURDEN OF PROVING THE DISTRICT COURT REVERSIBLY ERRED IN DENYING THEIR MOTION FOR MISTRIAL. (Responsive to Dr. Narang's First Issue and Moparty's Second Issue) ...................................................... 117

    A. THIS COURT MUST DETERMINE WHETHER THE DISTRICT COURT ABUSED ITS DISCRETION AND WHETHER REVERSIBLE PLAIN ERROR OCCURRED. ....... 117

    B. THE DISTRICT COURT CORRECTLY DETERMINED THE PROSECUTORS DID NOT ACT IN BAD FAITH AND ANY ERROR WAS HARMLESS. ................................................ 119

    C. THE DISTRICT COURT'S CONTEMPORANEOUS INSTRUCTION TO THE JURY CURED ANY PROBLEM WITH DR. GRANT'S BRIEF STATEMENT REGARDING A THIRD-PARTY PHYSICIAN'S HEALTH CARE FRAUD CONVICTION .................................................................. 130

VII. THE RARELY USED CUMULATIVE ERROR DOCTRINE HAS NO PLACE HERE. (Responsive to Moparty's Fifth Issue) ..... 133

CONCLUSION ........................................................................ 137

CERTIFICATE OF SERVICE ................................................. 138

CERTIFICATE OF COMPLIANCE ........................................ 139

# TABLE OF AUTHORITIES

**CASES**                                                              **PAGE(S)**

*Arizona v. Fulminante*, 111 S. Ct. 1246 (1991) ..................................... 128

*Burlington N. R. Co. v. State of Neb.*, 802 F.2d 994 (8th Cir. 1986) .... 110

*Cleveland v. United States*, 121 S. Ct. 365 (2000).................................. 97

*Derden v. McNeel*, 978 F.2d 1453 (5th Cir. 1992) (en banc) ................ 129

*DIJO, Inc. v. Hilton Hotels Corp.*, 351 F.3d 679 (5th Cir. 2003) .......... 109

*National Hispanic Circus, Inc. v. Rex Trucking, Inc.*, 414 F.3d 546
    (5th Cir. 2005)................................................................................ 105

*Richardson v. Marsh*, 107 S. Ct. 1702 (1987)................................ 120, 127

*Rosales-Mireles v. United States*, 138 S. Ct. 1897 (2018) ............... 95, 102

*Sheppard v. Davis*, 967 F.3d 458 (5th Cir. 2020).................................. 127

*Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co.*,
    320 F.3d 1213 (11th Cir. 2003) ............................................. 106, 111

*Texas A&M Research Found. v. Magna Transp., Inc.*, 338 F.3d 394
    (5th Cir. 2003)........................................................................ 105, 106

*United States v. Ainabe*, 938 F.3d 685 (5th Cir. 2019), *cert. denied,*
    No. 19-1407, 2020 WL 5882339 (U.S. Oct. 5, 2020)................. 81, 82

*United States v. Akingbade*, 789 F. App'x 488 (5th Cir. 2020)
    (unpublished)............................................................................. 81, 91

*United States v. Alaniz*, 726 F.3d 586 (5th Cir. 2013) ...................... 76, 98

**CASES**                                                                        **PAGE(S)**

*United States v. Auzenne*, No. 2:19-CR-53-KS-MTP,
    2020 WL 6276173 (S.D. Miss. Oct. 26, 2020) ................................. 98

*United States v. Barnes*, No. 18-31074, 2020 WL 6304699
    (5th Cir. Oct. 28, 2020) ................................................................. 133

*United States v. Barson*, 845 F.3d 159 (5th Cir. 2016) ......... 72, 77, 86, 87

*United States v. Bates*, 796 F. App'x 217 (5th Cir.) (unpublished),
    *cert. denied sub nom. Bates v. United States* No. 20-5293,
    2020 WL 5883669 (U.S. Oct. 5, 2020) ................................. 96, 97, 98

*United States v. Bowen*, 799 F.3d 336 (5th Cir. 2015) .......................... 119

*United States v. Brown*, 7 F.3d 1155 (5th Cir. 1993) .............................. 97

*United States v. Burden*, 964 F.3d 339 (5th Cir. 2020) ................. 125, 126

*United States v. Chapman*, 851 F.3d 363 (5th Cir. 2017) ...................... 70

*United States v. Chikere*, 751 F. App'x 456 (5th Cir. 2018)
    (unpublished) ................................................................................. 134

*United States v. Churchwell*, 807 F.3d 107 (5th Cir. 2015) ................. 101

*United States v. Coffman*, 969 F.3d 186 (5th Cir. 2020) ......... 99, 109, 116

*United States v. Cooks*, 589 F.3d 173 (5th Cir. 2009) .......................... 103

*United States v. Cuti*, 720 F.3d 453 (2d Cir. 2013) .............................. 115

*United States v. Dahlstrom*, 180 F.3d 677 (5th Cir. 1999) .............. 96, 98

*United States v. Daniel*, 933 F.3d 370 (5th Cir. 2019) ............. 72, 79, 100

# TABLE OF AUTHORITIES

**CASES**                                                                  **PAGE(S)**

*United States v. del Carpio Frescas*, 932 F.3d 324 (5th Cir.),
    *cert. denied,* 140 S. Ct. 620 (2019) ............................................... 102

*United States v. Delgado*, 401 F.3d 290 (5th Cir. 2005) ............... 119, 124

*United States v. Delgado*, 668 F.3d 219 (5th Cir. 2012) ................... 71, 72

*United States v. Delgado*, 672 F.3d 320 (5th Cir. 2012) .............. 133, 134

*United States v. Diaz*, 637 F.3d 592 (5th Cir. 2011) ............................ 106

*United States v. Emordi*, 959 F.3d 644 (5th Cir. 2020) ................. *passim*

*United States v. Espino-Rangel*, 500 F.3d 398 (5th Cir. 2007)............. 116

*United States v. Evans*, 892 F.3d 692 (5th Cir. 2018).............. 80, 81, 102

*United States v. Ganji*, 880 F.3d 760 (5th Cir. 2018)............................ 74

*United States v. Gevorgyan*, 886 F.3d 450 (5th Cir. 2018) ................... 126

*United States v. Gill*, 642 F. App'x 323 (5th Cir. 2016)
    (unpublished)................................................................................... 125

*United States v. Gonzalez*, 644 F. App'x 456 (6th Cir. 2016)
    (unpublished)..................................................................................... 91

*United States v. Gonzalez*, 907 F.3d 869 (5th Cir. 2018) ....................... 71

*United States v. Granadeno*, 605 F. App'x 298 (5th Cir. 2015)
    (unpublished)................................................................................... 105

*United States v. Harms*, 442 F.3d 367 (5th Cir. 2006).......................... 118

# TABLE OF AUTHORITIES

**CASES**                                                                  **PAGE(S)**

*United States v. Houston*, 481 F. App'x 188 (5th Cir. 2012)
    (unpublished) ................................................................. 135

*United States v. Kalu*, 936 F.3d 678 (5th Cir. 2019) ...................... *passim*

*United States v. Kerley*, 784 F.3d 327 (6th Cir. 2015) ................... 111, 114

*United States v. Keys*, 747 F. App'x 198 (5th Cir. 2018),
    *cert. denied,* 139 S. Ct. 847 (2019) (unpublished) ...................... 107

*United States v. Kilpatrick*, 51 F. App'x 929 (5th Cir. 2002)
    (unpublished) ................................................................. 96

*United States v. King*, 505 F.2d 602 (5th Cir. 1974) ........................... 124

*United States v. Lucas*, 849 F.3d 638 (5th Cir. 2017) ......................... 108

*United States v. Lugo-Lopez*, 833 F.3d 453 (5th Cir. 2016) ................... 79

*United States v. Maes*, 961 F.3d 366 (5th Cir.),
    *as revised* (June 2, 2020) ................................................. 134

*United States v. Martinez*, 921 F.3d 452 (5th Cir.), *cert. denied sub nom.*
    *Nguyen v. United States*, 140 S. Ct. 571 (2019) ........... 72, 75, 80, 81

*United States v. Mazkouri*, 945 F.3d 293 (5th Cir. 2019) ................ 84, 86

*United States v. McMillan*, 600 F.3d 434 (5th Cir. 2010) ............. 112, 114

*United States v. Medina-Arellano*, 569 F.2d 349 (5th Cir. 1978) ......... 131

*United States v. Miller*, 607 F.3d 144 (5th Cir. 2010) ........................... 92

*United States v. Miller*, 906 F.3d 373 (5th Cir. 2018) ........................... 95

**CASES**                                                                                 **PAGE(S)**

*United States v. Njoku*, <u>737 F.3d 55</u> (5th Cir. 2013) ................................ 98

*United States v. Ollison*, <u>555 F.3d 152</u> (5th Cir. 2009) ......... 93, 95, 97, 98

*United States v. Oti*, <u>872 F.3d 678</u> (5th Cir. 2017) .................. 99, 110, 117

*United States v. Owens*, <u>683 F.3d 93</u> (5th Cir. 2012) ........................... 105

*United States v. Perez-Ceballos*, <u>907 F.3d 863</u> (5th Cir. 2018) .............. 70

*United States v. Portillo*, <u>969 F.3d 144</u> (5th Cir. 2020) .................. 99, 100

*United States v. Powers*, 578 F. App'x 763 (10th Cir. 2014)
    (unpublished) ......................................................... 112, 115

*United States v. Pruett*, <u>681 F.3d 232</u> (5th Cir. 2012)
    (per curiam) ...................................................................... 92

*United States v. Ramos-Cardenas*, <u>524 F.3d 600</u>
    (5th Cir. 2008) ................................................................ 125, 132

*United States v. Reda*, <u>787 F.3d 625</u> (1st Cir. 2015) ........................... 103

*United States v. Reeves*, <u>255 F.3d 208</u> (5th Cir. 2001) ........................ 96

*United States v. Robinett*, No. 18-11402, <u>2020 WL 6053363</u>
    (5th Cir. Oct. 13, 2020) (unpublished) ........................................... 93

*United States v. Rodriguez*, <u>630 F.3d 377</u> (5th Cir. 2011) ..................... 86

*United States v. Romero-Medrano*, <u>899 F.3d 356</u>
    (5th Cir. 2018) ................................................................ 118, 132

*United States v. Sanders*, <u>952 F.3d 263</u> (5th Cir. 2020) ......... 76, 102, 118

**CASES** **PAGE(S)**

*United States v. Sanders*, <u>966 F.3d 397</u> (5th Cir. 2020) ...................... 133

*United States v. Sanjar*, <u>876 F.3d 725</u> (5th Cir. 2017),
  *cert. denied sub nom. Main v. United States*, <u>138 S. Ct. 1577</u>
  (2018) .......................................................................... 72, 101, 110

*United States v. Scott*, <u>892 F.3d 791</u> (5th Cir. 2018) .............................. 79

*United States v. Sparks*, <u>941 F.3d 748</u> (5th Cir. 2019),
  *cert. denied,* <u>140 S. Ct. 1281</u> (2020) ................................................ 94

*United States v. Staggers*, <u>961 F.3d 745</u> (5th Cir.), *cert. denied,*
  No. 20-5051, <u>2020 WL 5883456</u> (U.S. Oct. 5, 2020) ..................... 116

*United States v. Stalnaker*, <u>571 F.3d 428</u> (5th Cir. 2009) ..................... 125

*United States v. Stanford*, <u>823 F.3d 814</u> (5th Cir. 2016) ...................... 135

*United States v. Thomas*, <u>847 F.3d 193</u> (5th Cir. 2017) ........................ 102

*United States v. Tovar*, <u>719 F.3d 376</u> (5th Cir. 2013) ............................ 72

*United States v. Valencia*, <u>600 F.3d 389</u> (5th Cir. 2010) .............. 110, 114

*United States v. Willett*, <u>751 F.3d 335</u> (5th Cir. 2014) ................ 75, 93, 97

*United States v. Zamora-Salazar*, <u>860 F.3d 826</u> (5th Cir. 2017) ........... 70

*Weeks v. Angelone*, <u>528 U.S. 225</u> (2000) ................................................ 133

*Yates v. Evatt*, <u>111 S. Ct. 1884</u> (1991) .................................................... 134

# TABLE OF AUTHORITIES

**STATUTES AND RULES**                                    **PAGE(S)**

18 U.S.C. § 2 ................................................................................... 4

18 U.S.C. § 1028(d)(7) .............................................................. 89, 90

18 U.S.C. § 1347 ........................................... 4, 50, 53, 75, 81

18 U.S.C. § 1349 ............................................................ 4, 71, 73

18 U.S.C. § 1957 ............................................... 4, 49, 51, 102, 105

18 U.S.C. § 1957(a) ................................................................ 80

18 U.S.C. § 1957(f)(2)(i) ....................................................... 81

18 U.S.C. § 3231 ..................................................................... 1

18 U.S.C. § 3553(a) .............................................................. 61

18 U.S.C. § 3742(a) ................................................................ 1

28 U.S.C. § 1291 ..................................................................... 1

Fed. R. App. P. 4(b)(1)(A)(i) ................................................. 1

Fed. R. App. P. 34(a)(1) ........................................................... i

Fed. R. Crim. P. 36 ................................................................. 1

Fed. R. Evid. 701 .................................................. 68, 101, 110, 114

Fed. R. Evid. 701(a) ........................................................ 112, 115

Fed. R. Evid. 701(b) ............................................................ 104

# TABLE OF AUTHORITIES

**STATUTES AND RULES**                                     **PAGE(S)**

FED. R. EVID. 702 ............................................................... 101, 114

FED. R. EVID. 704 ...................................................................... 103

FED. R. EVID. 704(a) ................................................................. 103

5TH CIR. LOC. R. 47.5.4 ............................................................... 86

**UNITED STATES SENTENCING GUIDELINES**

U.S.S.G. Ch. 3, Part D ............................................................. 49, 53

U.S.S.G. § 1B1.3 ..................................................................... 53, 89

U.S.S.G. § 2B1.1 ........................................................................ 45

U.S.S.G. § 2B1.1(a)(1) ................................................................. 45

U.S.S.G. § 2B1.1(b) .................................................................... 60

U.S.S.G. § 2B1.1(b)(1)(I) ............................................................. 61

U.S.S.G. § 2B1.1(b)(1)(K) ....................................................... 50, 53, 61

U.S.S.G. § 2B1.1(b)(2) ......................................................... 66, 85, 86

U.S.S.G. § 2B1.1(b)(2)(A)(i) ..................................................... *passim*

U.S.S.G. § 2B1.1(b)(7)(B)(i) ........................................................ 57

U.S.S.G. § 2B1.1(b)(7)(B)(ii) .................................................... 50, 62

U.S.S.G. § 2B1.1(b)(7)(ii) ........................................................... 54

# TABLE OF AUTHORITIES

**UNITED STATES SENTENCING GUIDELINES**      **PAGE(S)**

U.S.S.G. § 2B1.1(b)(10)(C) .................................................................. 51, 54

U.S.S.G. § 2B1.1(b)(11)(C)(i) ........................................................ *passim*

U.S.S.G. § 2B1.1 cmt. n.1 ......................................................................... 89

U.S.S.G. § 2B1.1 cmt n.3(A) .................................................................... 60

U.S.S.G. § 2B1.1 cmt. n.4(E) ........................................... 50, 84, 85, 86, 88

U.S.S.G. § 2S1.1(a)(1) ............................................................................. 49

U.S.S.G. § 2S1.1(b)(2)(A) ....................................................................... 51

U.S.S.G. § 3B1.1(c) ........................................................................... 51, 55

U.S.S.G. § 3B1.3 ......................................................................... 3, 55, 67, 92

U.S.S.G. § 3B1.3 cmt. n.1 ........................................................................ 93

## STATEMENT OF JURISDICTION

Defendant-Appellant Dayakar Moparty ("Moparty") timely filed a notice of appeal on November 19, 2019, from the judgment entered on November 18, 2019. (ROA.697, 704).[1] *See* FED. R. APP. P. 4(b)(1)(A)(i). Defendant-Appellant Harcharan Singh Narang ("Dr. Narang") timely filed a notice of appeal on November 22, 2019, from the judgment entered on November 15, 2019 and the amended judgment[2] entered on November 19, 2019. (ROA.6016, 6023, 6030). *See* FED. R. APP. P. 4(b)(1)(A)(i). The district court (Lake, J.) had jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## STATEMENT OF THE ISSUES

I.    Whether the district court abused its discretion when it denied Dr. Narang's motion for mistrial finding any error regarding the two brief references to Dr. Sidhu's guilty plea was harmless based on the overwhelming evidence against Dr. Narang and the prosecutors' lack of bad faith. (Dr. Narang's First Issue Restated)

---

[1] "ROA." refers to the appellate record stamped "19-20797" and is followed by the applicable page number(s). "PSR" means presentence investigation report and is followed by the applicable page and paragraph number(s).

[2] The judgment was amended for the "Correction of Sentence for Clerical Mistake (FED. R. CRIM. P. 36)." (ROA.6023).

II.     Whether the district court reversibly erred when it overruled Dr. Narang's objections to the two-level enhancements under U.S.S.G. § 2B1.1(b)(11)(C)(i) where the offense involved the unauthorized identification transfer or use of any means of identification and under § 2B1.1(b)(2)(A)(i) where the offense involved 10 or more victims.  (Dr. Narang's Second Issue Restated)

III.    Whether the evidence, when viewed in the light most favorable to the verdict, is sufficient to support Moparty's convictions for conspiracy to commit health care fraud, 17 substantive counts of health care fraud, and three counts of money laundering based on numerous witnesses' testimonies and banking, medical, insurance, real estate, and other records.  (Moparty's First Issue Restated)

IV.    Whether the district court abused its discretion in denying Moparty's motion for new trial finding any error regarding the two brief references to Dr. Sidhu's guilty plea was harmless based on the overwhelming evidence against Moparty and the prosecutors' lack of bad faith and in denying the motion because an expert witness's statement regarding a third-party doctor's health care fraud conviction also was harmless.  (Moparty's Second Issue Restated)

V.     Whether Moparty has proven reversible plain error occurred during a lay witness's testimony where her statements primarily were based on objective documentary evidence and where she gave few opinions, although she and the prosecutor referred to "money laundering" a few times.  (Moparty's Third Issue Restated)

VI.    Whether the district court abused its discretion or whether reversible plain error occurred where experienced representatives from three insurance companies testified about their respective employers' policies and procedures and sometimes industry practices.  (Moparty's Fourth Issue Restated)

VII.   Whether the rarely used cumulative error doctrine should be applied where there is substantial evidence of Moparty's guilt and where the district court found that the Defendants' right to a fair trial was not compromised by any alleged misconduct.  (Moparty's Fifth Issue Restated)

VIII. Whether the district court reversibly erred by imposing a two-level enhancement under U.S.S.G. § 3B1.3 for Moparty's abuse of a position of trust where his ownership of the hospital gave him the "freedom to commit a difficult-to-detect wrong."  (Moparty's Sixth Issue Restated)

## STATEMENT OF THE CASE

## I. COURSE OF PROCEEDINGS AND DISPOSITION BELOW.

Dr. Narang, Moparty, and Dr. Gurnaib Singh Sidhu ("Dr. Sidhu") were charged with conspiracy to commit health care fraud (Count 1), in violation of 18 U.S.C. § 1349, which occurred from on or about May 2012 and continued through on or about December 2014, and health care fraud, in violation of 18 U.S.C. § 1347 and § 2, which occurred on or about January 3, 2013 (Counts 2-3), January 24, 2013 (Count 4), March 7, 2013 (Count 5), February 1, 2013 (Count 6), June 3, 2013 (Counts 7-8), June 17, 2013 (Count 9), January 14, 2013 (Count 10), November 13, 2013 (Counts 11-13), November 14, 2013 through December 4, 2013 (Count 14), and July 15, 2013 (Counts 15-18). (ROA.19, 4950). Moparty and Dr. Narang also were charged with money laundering, in violation of 18 U.S.C. § 1957 and § 2, which occurred on or about January 20, 2013 (Count 19), April 5, 2013 (Count 20), and April 9, 2013 (Count 21). (ROA.19, 4950). The indictment also included a notice of criminal forfeiture. (ROA.19, 4950).

Dr. Sidhu pleaded guilty to conspiracy pursuant to a plea

agreement.[3]  (*See* ROA.668).  Following an eight-day trial, a jury convicted Moparty and Dr. Narang on all 21 counts.  (*See* ROA.19, 509, 4950, 5771).

The district court sentenced Moparty to concurrent terms of 108 months imprisonment on each count, followed by three years of supervised release.  (ROA.697-98, 2576).  The court sentenced Dr. Narang to concurrent terms of 120 months imprisonment on Counts 1 through 20 and one consecutive month of imprisonment on Count 21, for a total of 121 months imprisonment, followed by three years of supervised release.  (ROA.6016-17, 6023-24, 7875-76).

The court also ordered that Moparty and Dr. Narang were jointly and severally liable for $2,621,999.04 in restitution – $1,427,300.76 to Aetna Health, Inc. ("Aetna"), $991,743.88 to Blue Cross Blue Shield of Texas ("BCBS"), and $202,954.40 to Cigna Corporation ("Cigna"). (ROA.2546-47, 7875-76).

## II. FACTS RELEVANT TO THE ISSUES ON APPEAL.

### A. OVERVIEW OF THE HEALTH CARE FRAUD SCHEME.

Dr. Narang is an internist who owned and practiced medicine at

---

[3] Dr. Sidhu died after the trial.  (*See* ROA.2539).

North Cypress Clinical Associates, P.A. ("North Cypress") in Cypress, Texas.[4] (ROA.1382, 2012; *see* ROA.1236-37, 2036). Dr. Sidhu worked for Dr. Narang primarily at North Cypress' other office on Antoine Drive in Houston. (ROA.1056-57, 1059, 2033, *see* ROA.1055, 3422 – GX-24).

Moparty, who has a master's degree in computer science, co-owned Red Oak Hospital ("ROH") in Houston with his physician brother. (ROA.2265-66, 2268, 4048-49 – GX-136, *see* ROA.2327). The hospital opened on January 3, 2013. (ROA.2006, *see* ROA.4048 – GX-136).

Dr. Narang and Moparty used these and other entities they owned or had interests in to commit health care fraud and launder the proceeds. From May 2012 through December 2014, Dr. Narang, Moparty, and Dr. Sidhu conspired to and did defraud health insurance companies, including Aetna, BCBS, and Cigna, and their insureds – (1) Dr. Narang would order unnecessary tests, which his technicians often administered incorrectly; (2) instead of billing the patients' private insurance carriers directly, Dr. Narang's office would email the patients' information, including their insurance and testing details, to Moparty's office; (3) sometimes this information included tests the patients never had

---

[4] Cypress, Spring, and Cleveland are part of the Houston metro area.

received; (4) Moparty's office would use the information to prepare and submit claims to the patients' insurance carriers as though ROH had treated the patients and had performed the tests on ROH's premises; (5) this scheme enabled Moparty and Dr. Narang to charge and obtain higher reimbursement rates from the insurance companies than if Dr. Narang's office had billed for the claims, (6) if an insurer denied a claim, Moparty sometimes would rebill it using the name of a different entity in which he had an interest, (7) ROH and his other entities ultimately billed the insurance companies approximately $20 million for medical tests that either were performed in Dr. Narang's office and/or never occurred, (8) after the insurance companies paid ROH or another Moparty entity at least $3.2 million, he tried to disguise the movement of the money from his companies and/or himself to Dr. Narang and to various entities Dr. Narang and/or his wife owned by relying on suspicious real estate transactions, leases, and other alleged contracts, (9) the insurance companies would not have paid the claims had they known ROH and other entities had billed for tests performed in Dr. Narang's office because claims must come from whomever and wherever services are rendered, and (10) the insurance companies also would not have paid the

claims had they known tests had not been performed or were unnecessary.

Hoping to rebut the Government's proof, the defense tried to persuade the jury that ROH had operated an outpatient clinic in Dr. Narang's medical office space; that Dr. Sidhu worked for ROH as its medical director; that the medical tests were necessary, were done, and were performed correctly; that real estate sales documents, leases, employment contracts, emails, and other materials reflected the legitimacy of ROH's outpatient site in Dr. Narang's office; that the claims filed with the insurance companies were legitimate; and that Moparty used the insurance company reimbursements to pay Dr. Narang, his wife, and/or their entities for outstanding debts and obligations unrelated to ROH.

The jury rejected Moparty's and Dr. Narang's positions and convicted them of conspiracy, health care fraud, and money laundering.

## B. DR. NARANG RAN UNNECESSARY TESTS ON HIS WIFE'S SPA PATIENTS AND HIS OWN PATIENTS.

Dr. Narang's wife Ranjit Kaur ("Kaur") owned Forever Fit Wellness Center, PLLC ("Forever Fit"),[5] which shared office space with Dr. Narang at North Cypress. (ROA.2012, *see* ROA.4139 – GX-125C). In 2013, Forever Fit offered a coupon for "Lipotropix weight-loss shots" on the Groupon website. (*See* ROA.897-98, 1073, 1193, 1201, 1807, 1847, *see also* ROA.4042 - GX-7). The coupon entitled a buyer to weekly injections at a discounted rate. (*See* ROA.897, *see also* ROA.4042 - GX-7). The small print stated that, "Prior to the shot regimen, medical professionals consult with the client for 30 minutes, during which they perform a weight-loss analysis. They then administer weekly Lipotropix weight-loss shots." (ROA.4042 - GX-7, ROA.3525 - GX-77).

At trial, four women testified among the hundreds who had bought the Groupons. (*See* ROA.896-97, 1192-93, 1805-06, 1846-47, *see also* ROA.4042 - GX-7). When they went to redeem their coupons at Forever Fit, they were asked to fill out medical and personal history forms. (*See* ROA.3460 – GX-100, ROA.3525 - GX-77, ROA.3797 - GX-68). The women

---

[5] Forever Fit also went by "Forever Fit Medical Spa." (*See* ROA.4042 - GX-7).

reported they were in good health and did not have medical complaints. (*See* ROA.900-01, 993-94, 1194, 1808, 1847, 1851-56, *see also* ROA.1198-99, 3525 - GX-77, ROA.3460 - GX-100, ROA.3797 - GX-68). They answered the "[m]ain reason" for their visits was to get the weight loss shots. (*See* ROA.3460 – GX-100, ROA.3525 - GX-77, ROA.3797 - GX-68, *see also* ROA.897-98, 4042 - GX-7).

After completing the form and having their vital signs taken, the Groupon clients typically met with Dr. Narang. (ROA.899, 1196, 1850, *see* ROA.1812). He was kind and spent time with them. (*See* ROA.901, 937, 940, 1196, 1850). Dr. Narang would ask general, open-ended questions to induce affirmative answers, such as whether the person had ever had a headache, backache, or been dizzy. (*See* ROA.899, 906, 993, 1817, *see* ROA.937-38). Although their sole purpose for being there was to get weight loss shots, the women found themselves answering "yes" to Dr. Narang's questions, and he then would persuade them to get certain tests before receiving the weight loss shots. (*See* ROA.901-03, 974, 994, 1197, 1809, *see also* ROA.906, 3525 – GX-77, ROA.3460 – GX-100, ROA.3797 – GX-68). Dr. Narang assured the women their insurance

companies would cover the costs and they would not be charged. (ROA.906, 1196, 1198, 1813, 1819).

With slight variations, Dr. Narang ordered cardiac and/or abdominal ultrasounds, ENGs (for vertigo and dizziness), nerve conduction ("NCV") tests (a form of electrodiagnostic testing where small shocks are put in different areas to see how fast and how efficiently the nerves are conducting and whether there are pinched nerves, compressed nerves, or other nerve problems), electromyography ("EMG") tests (the second form of electrodiagnostic testing where little pin sticks are placed underneath the skin into different muscles), allergy tests, and artery and/or vein doppler tests, although specialists in these fields and the women themselves testified the tests were unnecessary. (*See* ROA.902, 904-07, 1058-59, 1273-74, 1291-92, 1571, *see also* ROA.910-11, 2030, 4096 – GX-98).

Rikesha Burton ("Burton"), a former longtime medical assistant for Dr. Narang, testified about the importance of getting Groupon buyers and others to agree to medical tests. (*See* ROA.1139, 1054-55, *see also* ROA.1059). Burton explained that the Groupon purchasers basically were in good health, but wanted to lose weight. (ROA.1076-77, 1079).

Dr. Narang was the only physician who would meet with them. (ROA.1074-75). Everyone was required to have an EKG, but if a person had insurance, Dr. Narang would want to do more tests. (*See* ROA.1074-75, *see also* ROA.1084, 2029). Burton had watched him ask leading questions and convert the answers into health concerns. (*See* ROA.1082, 1084). She estimated that 80%, maybe even 90%, of the Groupon patients with insurance agreed to the tests. (ROA.1077).

Dr. Narang had told Burton she could do the patient consultations. (ROA.1081). If she listened carefully, people would volunteer information that would justify testing. (*See* ROA.1082). Burton declined because she did not think she could convince people to have unnecessary tests. (ROA.1084).

Burton also testified that, when she or another medical assistant were taking the Groupon purchasers' vital signs, they sometimes warned them that the doctor might try to convince them they needed tests, but they did not have to listen.[6] (*See* ROA.1085, 1145-46). Groupon purchaser L.S.[7] testified that happened to her. (*See* ROA.1847-49). The

---

[6] Burton and the other medical assistant later got in trouble for doing so. (ROA.1085, 1146).

[7] The Government has redacted all the patients' names.

worker also had warned L.S. not to give Dr. Narang her insurance card. (ROA.1848). L.S. did not listen and wound up receiving several tests. (ROA.1849-50, 1854-55).

Although Dr. Narang was the only person who ordered tests, they typically were written under Dr. Sidhu's name. (ROA.1075-76). Burton did not know why. (ROA.1076).

Except for ultrasounds and NCV studies, which two other technicians usually did,[8] Burton and another assistant did the tests. (*See* ROA.1060-65). Dr. Narang's wife and other medical assistants had taught Burton how to do most of them. (ROA.1060-61). Sometimes Dr. Narang told Burton to test patients before he even got to the office. (ROA.1100). All the tests were done in Dr. Narang's office. (ROA.1067).

Burton did not know why the name at the top of the testing/diagnostic forms changed from North Cypress to ROH to Trinity Healthcare Network ("Trinity Healthcare"). (ROA.1066, *see* ROA.3176 – GX-91). "It was kind of interchangeable." (ROA.1066). "They would cut the top off of the paper and then make a copy with the new header on the forms." (ROA.1067). The bottom part did not change. (ROA.1067).

---

[8] The technician who did the NCV tests failed the licensing test. (ROA.2229, 2246, ROA.4151 – GX-114). He also did not use needles in his testing. (ROA.2249).

Sometimes it was done after the form had been filled out. (ROA.1067). Burton explained that, when ROH's name was on the paperwork, it "wasn't really concealed, but" she and another assistant "would give the patients paperwork so fast that they really d[id]n't have time to read it." (ROA.1118). Burton was taught to do it that way and did not think the patients paid attention to what was on the header. (ROA.1118).

Burton knew nothing about an alleged lease between ROH and Dr. Narang for half of the office space. (*See* ROA.1068). ROH did not share space in the North Cypress office, and Burton had never seen any signs for ROH, Trinity Healthcare, 2920 MRI, or Cleveland Imaging. (ROA.1067-68). The employees also did not wear badges for ROH or anyone else. (ROA.1068).

The office was performing all the tests when Burton arrived in 2009 and was still doing them when she left in October 2015. (*See* ROA.1064-65, *see also* ROA.1055, 1061, 1139, 1173). The technicians also were working for Dr. Narang when Moparty opened ROH in January 2013. (*See* ROA.1056, 1061-63, 2006, 2329). No one ever claimed to work for ROH. (ROA.1063).

Burton also testified about a compliance meeting she had to attend at ROH with Kaur and a technician from Dr. Narang's office. (ROA.1069, 1071). The speaker warned them about not having price lists and being careful what they said on the phone. (ROA.1071). The next meeting was at North Cypress where the same speaker told them about other places in their zip code being investigated for fraud and how everyone risked going to jail if they did not follow what was being taught in the meeting. (ROA.1072). Burton thought the meeting was not about improving their work, but how to avoid getting "caught up in the fraud that he was talking about, that the other clinics were getting in trouble for." (ROA.1072).

Unlike the Groupon buyers who testified, E.L. went to see Dr. Narang for medical reasons. (ROA.1266-67). She was in acute pain and needed medicine for her ulcer. (ROA.1267-68, 1283, 1295). She saw Dr. Narang three times and agreed to unnecessary tests because she was afraid she would not get her ulcer medication if she refused. (ROA.1274, 1277). She did not have heart issues, but received an echocardiogram. (ROA.1271, 1273). E.L. was not having problems with her legs, but received an NCV test. (ROA.1273-75). Unlike the Groupon buyers who

testified they did not see signs for ROH or Trinity Healthcare or workers wearing badges, E.L., who was bent over in pain, saw a sign for Trinity Healthcare, but she did not receive any bills from Trinity Healthcare. (ROA.1206-07, 1319-20, 1322, 1830).

## C. EXPERT WITNESSES CONFIRMED UNNECESSARY AND INCOMPETENT TESTING OCCURRED AT INFLATED RATES.

Four highly credentialed expert witnesses testified at trial: (1) Dr. Richard Gans, a vestibular[9] and balance disorder specialist (ROA.1004-07, 1020), (2) Dr. Rubina Wahid, an allergy and immunology specialist (ROA.1327, 1360), (3) Dr. Peter Grant, an internist with an expertise in electrodiagnostic medicine (ROA.1569-70, 1574, 1611-12), and (4) Dr. Michael Bungo, a cardiologist (ROA.1694). After reviewing the available patient files, they concluded patients were given unnecessary tests that often were performed incorrectly and misinterpreted. In addition, excessive amounts of money were charged for the tests.

---

[9] "[T]he vestibular system is best described as the balance part of your ear." (ROA.1006). Typically, people with disabling vertigo, which is different from dizziness, need this type of testing. (ROA.1006).

Dr. Gans,[10] who has conducted, performed, or interpreted over 150,000 ENG/VNG tests, reviewed 29 of Dr. Narang's patient files.[11] (ROA.1005, 1007). Key data was missing, and test results often were useless because there were no recordings or the calibrations were wrong. (ROA.1008-10, 1012-13, 1024, 1043, *see* ROA.2805 - GX-92).

Dr. Gans also is an expert on the billing codes that are used in the medical field.[12] (ROA.1020). Here, five codes consistently were billed, which is uncommon for an internist, such as Dr. Narang, to use. (ROA.1023, 1049, *see* ROA.1017, 1019, 1029).

---

[10] Dr. Gans is not a medical doctor, but has a Ph.D. (ROA.1004). He founded and is the executive director of "one of the largest dizziness, vertigo, balance clinics in the United States." (ROA.1004).

[11] During the investigation, the Government was provided with the names of over 400 patients for whom insurance companies had been billed. (ROA.2018-19, 2021, *see* ROA.3053 – GX-16A). Nevertheless, the Government received only 27 patient files from Dr. Narang and 65 patient files from Dr. Sidhu. (ROA.2018-21). The Government received approximately 750 patient files from Forever Fit, but they were "spa files," not medical files. (ROA.2019-20). Red Oak's files were limited to "mostly test order forms, sometimes the test results, patient demographic sheets . . . the things that were needed for billing." (ROA.2020). There also were other problems with the files, such as inaccuracies in Dr. Sidhu's signature. (*See* ROA.2024, 2030-31).

[12] They are known as "CPT codes," which stands for "[c]urrent procedural terminology." (ROA.1328). A code "basically defines the procedures that a physician performs in their [sic] office. And there's a particular code for every procedure . . . perform[ed]." (ROA.1328).

Dr. Wahid examined 33 patient charts and "did not find anything convincing" that warranted allergy testing. (ROA.1332, 1342). Files were missing detailed patient histories, assessments, plans, discussions of results, and follow-ups. (ROA.1341-43). Also, tests had been improperly performed and recorded. (*See* ROA.1338-39, 1342-43, 1367).

Dr. Wahid also "noticed that patients presented for weight loss after buying a Groupon and once they were in the office, they were documented to have allergies, chest pain, abdominal pain, nerve pain, dizziness, and that was pretty much across the board." (ROA.1343). They wound up getting a "battery of tests," and the tests were "pretty much the same across the board. EKGs, nerve conduction studies, tests for dizziness, ultrasound, echos, allergy tests." (ROA.1344-45). Dr. Wahid concluded there was an "overutilization of services, overbilling." (ROA.1367).

Dr. Grant testified that electrodiagnostic medicine involves two different tests – an NCV study and an EMG. (ROA.1571). The two tests "are always supposed to be done together." (ROA.1571). The results help determine whether a patient has a pinched nerve, carpel tunnel syndrome, ALS, or some other neuromuscular disease. (ROA.1571-72).

Here, Dr. Grant reviewed the tests for 68 patients, which amounted to more than 500 actual NCV studies. (ROA.1575). He determined that 83-94% of the NCV studies were not medically necessary. (ROA.1585-86, *see also* ROA.1572, 1575-76). The NCV tests also were "fraught with errors and inaccuracies," and the two "EMGs [recorded and billed for] were not done" based on the failure to do them correctly. (ROA.1576, 1591-92, 1602). Of the 538 conductions, 436 or 81% "were useless, they were worthless." (ROA.1576-77). S.C. did not need testing, and there were problems with each one of her studies. (*See* ROA.1587, 1590-91).

Dr. Grant also was astonished by the excessive amounts charged – more than $40,000 per study. (ROA.1576). Up until now, the most he had seen charged was $17,600. (ROA.1576). Dr. Grant also noted that here EMGs were billed at $3,870; whereas, he charges only $238 for the same test. (*See* ROA.1591-92). The bill for C.S.'s NCV and EMG was over $32,000, which is what Dr. Grant would charge in a whole week of seeing patients and would include spending time with them and doing the tests correctly. (ROA.1597-99).

Dr. Michael Bungo, the cardiologist, reviewed 40 patient files, including intake forms, doctor's notes, and test results. (ROA.1695-96).

He testified the patients were mostly 30 to 68 year-old females whose statistical probability of having cardiovascular disease was extremely low, regardless of symptomology. (ROA.1697). Also, every patient was described as having chest pain or swelling of the ankles, dizziness, a runny nose, claudication (calf cramping), and palpitations, which was "so medically improbable that it bordered on impossible, that 40 people could present" that way. (ROA.1696-97, *see also* ROA.1698-2000).

Dr. Bungo did not "have 40 people in thousands of patients that all present with the constellation of symptoms that are identical." (ROA.1697). Even if they had symptoms, which he would question, a prudent analysis was not performed, and appropriate tests were not ordered. (ROA.1697, 1699). The files of the women identified in the indictment shared these and other deficiencies, including no doctor notes, testing without symptomology, and contradictory notes regarding cardiac history. (*See* ROA.1704-05, 1707-11, 1715, 1717-18). "There was a complete disconnect." (ROA.1708). The few cases with positive findings were usually small or inconsequential. (ROA.1698). Like Dr. Grant, Dr. Bungo also saw signs of outrageous billing, such as $12,000 for a cardiac ultrasound that usually costs $500. (ROA.1717).

The Government also called Dr. Aditya Samal, a board certified cardiologist, as a fact witness. (ROA.1874). Dr. Narang had hired his group to read echocardiograms and vascular studies for $35 per study. (ROA.1875). Dr. Narang's office performed the tests and then sent them to Dr. Samal's office. (ROA.1875-76). During the one year the group worked for him, Dr. Narang sent "close to 800 studies," which Dr. Samal and his two partners divided up and read. (ROA.1876-77, *see* ROA.1882).

The high number of studies was unusual, and the quality of them fell below the appropriate medical standards. (ROA.1877). Some of the studies had been done months earlier. (ROA.1883). Also, most of the tests were unnecessary based on the appropriate medical standards, including the patients' symptoms, ages, and sex, and the results were normal. (ROA.1877, 1884, *see* ROA.1878-79). Dr. Samal and his partners "saw a pattern of this low quality, inappropriate studies" and decided to end the relationship with Dr. Narang. (ROA.1882).

Dr. Samal also admitted his company had plead guilty to conspiracy in another health care fraud case. (ROA.1884-85). Unbeknown to the physicians, their company had billed for services at much higher rates.

(ROA.1885-87).  Dr. Samal and his partners were going to pay back the difference.[13]  (ROA.1885-86).

### D. MOPARTY WAS CRITICAL TO THE SUCCESS OF THE FRAUDULENT BILLING SCHEME.

#### 1. DR. NARANG AND MOPARTY ENGINEERED AND EXECUTED A PASS-THROUGH BILLING SCHEME.

Unbeknownst to the Groupon patients, E.L., and others, Dr. Narang did not bill their insurance companies directly for their visits and tests.  Instead, Dr. Narang and Moparty designed and executed a pass-through billing scheme.  Pass-through billing occurs where services are rendered at one place, but the bills are submitted from a different place to make more money.  (ROA.1655, *see* ROA.3562 – GX-109E).  At trial, Keon Warren ("Warren"), Moparty's billing director and 12-year employee,[14] explained how the process worked.  (*See* ROA.1903-04).

In 2012, Moparty called Warren into his office.  (ROA.1907).  Dr. Narang and his wife Kaur, who also was his office manager and the owner of Forever Fit, were there.  (ROA.1907, *see* ROA.1056, 2012, 2274).  Moparty told Warren that they "would be doing some billing with Dr.

---

[13] The jury later was instructed "[t]he fact that Dr. Samal has entered a plea of guilty to the offense charged is not evidence of the guilt of any other person."  (ROA.471).

[14] Warren was still working for Moparty at the time of trial.  (ROA.1904).

Narang." (ROA.1905). Dr. Narang's office "was going to be . . . an extension of the hospital, part of the HOPD [hospital outpatient department] that they were in." (ROA.1905). "They" told Warren "how it's going to go." (ROA.1907). Warren "would get directions after that as to what we were going to be billing." (ROA.1906). He would "receive the emails, what's going to be on them, what we're going to be billed, and so forth." (ROA.1907, *see also* ROA.1908).

Kaur started emailing Warren patients' demographics, their forms and signatures, insurance information, tests, and the billing codes – "pretty much all . . . [he] need[ed]." (*See* ROA.1908-14, 1923-26, 1967-68, ROA.3522 – GX-117, ROA.4016 – GX-122, *see also* ROA.3176 – GX-91). After clarifying any issues, Warren would ensure claims were prepared to bill the patients' insurance companies.[15] (*See* ROA.1924-28, 1967-68, *see also* ROA.1917-18, 4021 – GX-122). As Warren explained, "If they were on the list, they got billed." (ROA.1918)

Warren made certain to copy Moparty on his emails to keep him informed. (ROA.1909, *see* ROA.3522 – GX-117, ROA.4016 – GX-122, *see*

---

[15] Warren's signature line showed he worked for Trinity Healthcare, ROH, and 2920 ER LLC. (*See* ROA.3522 – GX-117).

*also* ROA.4445 – GX-126). Warren did not do anything on his own. (ROA.1921). Moparty told Warren what to do. (ROA.1921, 1937-38).

Warren determined what fees to bill after looking at Medicare rates and a third-party's software and consulting Moparty. (ROA.1928-29). Warren would increase the rates based on what he knew about markups. (ROA.1928).

Not only was Moparty copied on emails, but he also wrote emails, such as directing that all reports say Trinity Healthcare, although patients were being seen at Dr. Narang's office. (*See* ROA.1908, 1913-15, 1917, 4023, *see also* ROA.3522 – GX-117, 4016, 4022-23 – GX-122). Dr. Narang also sent Moparty emails. (*See* ROA.2040-42). Text messages between Kaur and Moparty also were introduced. (ROA.1519-20, 4052 – GX-115).

The first billing entity used was Doctor's Diagnostic Hospital ("DDH"), a hospital in Cleveland, Texas, in "[l]late June, mid to late 2012." (ROA.1906-07). Warren knew all the entities Moparty and/or his family had and knew they were involved with DDH.[16] (ROA.1905-06).

---

[16] During his testimony, Moparty agreed he had deposited $17 million in his bank account from DDH in 2011 and 2012. (ROA.2318).

In the latter part of 2012, Moparty changed the billing entity to 2920 ER or Trinity Healthcare. (*See* ROA.1914-15, 1917-18, 1921). 2920 ER is also known as Trinity Healthcare. (ROA.2007). In October 2012, 2920 ER had gotten its own "freestanding emergency center" license, meaning it could operate as an outpatient emergency facility. (*See* ROA.1915-16). Warren thought that is when they stopped billing under DDH's name. (ROA.1918-19). Either Dr. Narang or Dr. Sidhu typically was listed as the referring physician in the billing information. (ROA.1919).

Then "one day Daykar [Moparty] said" Warren should now use ROH as the billing entity. (ROA.1920-21). It was early 2013, and ROH had been formed.[17] (ROA.1919-20). Warren complied. (*See* ROA.3053 – GX-16A). Moparty also showed Warren an email that Dr. Narang's office would "be an extension, satellite site, basically." (ROA.1920, 1922). Warren testified that Moparty or his family were involved with ROH. (ROA.1919-20).

---

[17] ROH's application for a license to operate a general or special hospital was approved on January 3, 2013. (ROA.4048 – GX-136).

The process remained the same.  (ROA.1923).  Dr. Narang's office would send "the [test] order form, the patient demographics, the results from the tests, all the signatures from the patient.  And with the demographics is, of course, their insurance, date of birth, and all of that.  And that's pretty much all . . . [Warren] need[ed]."  (ROA.1923-24, *see* ROA.3157 – GX-76, 3166 – GX-66, 3176 – GX-91).

Warren billed the insurance companies using the industry standard claim form for facilities instead of the one professionals, such as Dr. Narang, use.  (ROA.1927).  Moparty's office "only did facility billing."  (ROA.1927).

## 2.  MOPARTY ALSO DOUBLE BILLED INSURANCE COMPANIES.

Sometimes an insurance company would deny ROH's claim.  (ROA.1031).  Warren would inform Moparty, who told him to rebill the same claim showing Cleveland Regional Med Center ("Cleveland Regional"), a hospital in Cleveland, Texas, as the provider.  (ROA.1031, *see* ROA.1035).  This type of billing where the exact same patient's name, service, charge, and date of service are resubmitted with a different facility name and tax ID number is called "double billing" or "double

submission" and is prohibited. (ROA.1658). Warren referred to it as "rerout[ing]." (ROA.1031-32).

In the instant case, Moparty double billed for L.C. (Count 10), T.C. (Count 6), and others. (ROA.1031, 1034-35, 1474-76, 1933, *see* ROA.1022). When L.C.'s insurer rejected the second claim, which Cleveland Regional had submitted, Moparty went a step further. (ROA.1031, 1034-35, 1933, *see also* ROA.1474-76). He directed Warren to bill the same claim using 2920 Open MRI, which is a separate entity from 2920 ER. (ROA.1933-34, *see* ROA.2007). Warren "didn't want to do it, especially that last one, that 2920. It just didn't seem right." (ROA.1034). Moparty did not listen and told Warren "to see what happens." (ROA.1935).

### E. PATIENTS WERE STUNNED WHEN THEY RECEIVED THEIR EXPLANATIONS OF BENEFITS, WHICH CONFLICTED WITH THEIR VISITS TO FOREVER FIT AND DR. NARANG'S OFFICE.

When the Groupon customers and E.L. received their explanations of benefits ("EOB") from their insurance companies, they discovered that ROH or another entity, not Dr. Narang, had billed their insurance companies for tests and at exorbitant amounts. E.L.'s EOBs showed Cleveland Regional had billed Cigna for thousands of dollars, but she had

never been there.  (ROA.1283-85, 1322-23, *see* ROA.3997 - GX-125B).

ROH also had billed Cigna, but, once again, E.L. had never been a patient

there.  (ROA.1285 *see* ROA.4001 - GX-125B).

She was adamant her tests had "nothing to do with" ROH.

(ROA.1276).  E.L. stressed that she reads things before she signs them

and did not see anything on the form about ROH.  (ROA.1270).  If she

had, she would not have signed because her husband previously had a

bad experience at ROH.  (ROA.1269).  E.L. was certain that either ROH

was not on the paperwork, the name was covered up when she signed the

forms, or the name was placed there after she signed the forms.

(ROA.1271, 1320).  There also was nothing in Dr. Narang's office

indicating the employees were working for ROH or Cleveland Regional.

(ROA.1286).  Also, no one told her that her tests would be billed at the

rates hospitals charge.  (ROA.1286).

E.L. and her husband went to Dr. Narang's office and demanded to

meet with him.  (ROA.1285).  They secretly taped the conversation, and

the jury could hear Dr. Narang tell them not to worry if the insurance

company would not cover it.  (ROA.1287-89, *see* ROA.1290, GX-118).

Not once did Dr. Narang claim a hospital was renting or was

otherwise in his office space. (*See* ROA.1289). Dr. Narang said it was a doctor's office, and E.L. thought it looked like a typical doctor's office. (*See* ROA.1289). In fact, only Dr. Narang's and Forever Fit's names were on the front door. (ROA.1286, *see* ROA.4139 – GX-125C). The jury heard how upset E.L. was while at the same time Dr. Narang was trying to convince her to get more tests. (ROA.1291).

T.A.'s EOBs showed ROH had billed her insurer approximately $28,000 for an EKG and an ultrasound. (ROA.1818, 1820, 1829). She testified that she too had never been to ROH and had never seen Dr. Sidhu, who also was one of the billers. (ROA.1821, 1844). When she called Dr. Narang's office, she was told not to worry because they would write off what the insurance company did not pay. (ROA.1819).

L.S. testified she too was surprised to discover ROH had billed her insurer, and the charges for one day were almost $40,000. (ROA.1854-56, *see* ROA.3521 - GX-106).

S.C. also received an EOB showing she had been to Red Oak, which was false. (ROA.901, 905, 915-17, 947, ROA.3176 - GX-91, *see also* ROA.4096 - GX-98). BCBS also was billed $800,000 even though she was at Dr. Narang's office for only one hour. (ROA.912-13). S.C.'s husband

spent "eight hours or so" trying to understand and fix the problem. (ROA.913-14). Dr. Narang's office never returned S.C.'s call. (ROA.914). Ultimately, ROH claimed a "billing error" had caused the problem. (ROA.997, 2806 – GX-92).

The Groupon patients and E.L. subsequently discovered that their insurance companies also had been billed for tests they never received. (ROA.917-18, 934, 972, 999-1000, 1123, 1212-15, 1218-19, 1822-23, *see* ROA.908, 1824, 1827-29, ROA.3525 - GX-77, ROA.4096 – GX-98). In addition, when they were shown or told about notes in their patient files, they denied they had the symptoms that had been written down. (ROA.1000, 1198-99, 1218-19, 1278-79, 1816-17, *see* ROA.3166 - GX-66). The patients also denied Dr. Sidhu had treated them, even though his signature was on some of the paperwork. (*See* ROA.908, 943, 997, 1820-21, 1844).

## F. AETNA, BCBS, AND CIGNA REPRESENTATIVES EXPLAINED HOW THEIR COMPANIES WERE DEFRAUDED.

Representatives from Aetna, BCBS, and Cigna with extensive experience in the insurance industry and their respective companies also testified at trial. (*See* ROA.1371-79, 1484-86, 1644-45). They explained how insurance companies trust and rely on physicians, outpatient

facilities, and hospitals to bill accurately for the services they render and to disclose who provided the services. (*See* ROA.1384, 1386-87).

After a patient sees a doctor or goes to a hospital, the provider or entity files a claim with the insurance company using an industry standard form. (ROA.1374, 1447-48, 1543-44). The claim identifies the patient by name, her date of birth, her insurance information, the dates of service, the procedures that were performed, and who is billing for the services. (ROA.1374). Form 1500, which a physician submits, also requires the identification of the place of the service. (ROA.1544, *see* ROA.1374, 1443). Form UB-04, which a facility, such as ROH uses, does not. (ROA.1444-46, 1546, *see* ROA.1544, 1675). Unless an insurance company requests a patient's medical records, it does not have firsthand knowledge of where the services actually were performed. (ROA.1386).

How much an insurance company will pay for a service depends on who provided it, where it was provided, and whether it was inside or outside the insurance network. (ROA.1486-87, 1647, *see generally* ROA.1488). Providers enter into contracts with insurance companies, as Dr. Narang did here, to become part of their preferred provider (in-network) or services organization and treat their insureds. (ROA.1379-

82, 1488, 1491-92, 1650-51, *see* ROA.3896 – GX-109d1, ROA.2580 - GX-109K). An insured pays less when she uses in-network providers because they have negotiated allowable amounts for services. (*See* ROA.1372, 1382, 1388, 1488, 1649).

An insured pays more when she goes to an out-of-network facility. (ROA.1496). Typically, out-of-network providers will bill more and gain more in reimbursements. (ROA.1648).

Although none of the patients who testified had been informed or seen anything indicating that ROH was involved while they were at Dr. Narang's office, summaries of claims data showed that ROH or other entities had submitted claims for the patients here and accepted payment. (ROA.1495-96, 1504, *see* ROA.3053 – GX-16A, ROA.3496 – GX-69, ROA.3968 - GX-108e, ROA.3996 – GX-104).[18]

In certain charts used at trial, the jury also could see the financial windfall and differences between when ROH, an out-of-network hospital, and Dr. Narang, an in-network provider, billed for the same services. For certain claims submitted on S.C.'s behalf, ROH was eligible to receive

---

[18] The GX-108 series of exhibits contain summaries of the claims data. (ROA.1509, *see* ROA.4060 – GX-108A, ROA.4149 - GX-108B, ROA.3991 - GX-108c, ROA.4013 - GX-108d, ROA.3968 – GX-108e).

$34,539.50[19]$ versus the $3164.32 that would be due if Dr. Narang submitted the claim under his contract. (ROA.1384-86, 1388-89, 1428-29, *see* ROA.4177 – GX-96).

A similar comparison was shown for L.S. Cigna paid ROH, an out-of-network provider, $36,936.55; whereas, Dr. Narang, an in-network physician, would have received $1,411.40. (ROA.1653-54, *see* ROA.3996 – GX-104).

Another situation occurred where ROH, rather than Dr. Narang, submitted a claim for T.A. (ROA.1655, *see* ROA.1821). Instead of the $1411.40 Dr. Narang would have received, Cigna paid $9,983.81. (ROA.1655, *see* ROA.4159 – GX-82). Moparty's wife Dr. Sushma Gorrela is shown as the provider, but T.A. testified she never heard of her. (ROA.1656-57, 1829-30, 4159 – GX-82, *see also* ROA.2268, 4165 – GX-80A).

The Aetna, BCBS, and Cigna representatives were clear that their companies would not pay a claim if a physician performed a test at his office, but a hospital or outpatient clinic billed for it to make more money.

---

[19] After factoring in the patient's copayment, coinsurance, and deductible, BCBS paid ROH $27,979.51. (*See* ROA.1389, 4177 – GX-96).

(*See* ROA.1383, 1387, 1401, 1462, 1511, 1655-56).  Pass-through billing is prohibited.  (ROA.1655, 3562 – GX-109E).

Likewise, insurance companies would not pay a claim if they knew the testing had not occurred or was unnecessary.  (ROA.1387).  In addition, BCBS would not permit an agreement between Dr. Narang and the owner of a hospital or imaging facility that, in exchange for him sending patients, the owner would not charge them anything.  (ROA.1462, *see also* ROA.1663).  An insured is responsible for paying her copayments, deductible, and coinsurance.  (ROA.1389).  A provider, such as Dr. Narang, cannot waive these charges.  (*See* ROA.1381, 1649-50, *see* ROA.1394).

In the instant case, the insurance companies paid ROH or other Moparty entities approximately $3.2 million.  (ROA.2017, *see* ROA.3053 – GX-16A, *see also* ROA.2016-17, 2048).

## G.   MOPARTY WAS THE KEY FIGURE IN LAUNDERING THE INSURANCE REIMBURSEMENTS.

Agent Lammons has spent 29 years investigating criminal fraud, with the last 14 focused on health care fraud.  (*See* ROA.2002-03).  Here, Agent Lammons analyzed insurance and bank records and corporate filings.  (ROA.2004-05, 2007, 2011).  He interviewed S.C. and others.

(ROA.2004, 2007, 2022, 2026).  Agent Lammons learned that, while the company names on the patient forms changed, nothing did in Dr. Narang's actual practice, including the technicians and the CPT codes used.  (ROA.2025-26, 2043-47, *see* ROA.2036-40, 2936 – GX-132).

Agent Lammons also requested a "same date of service analysis," which he explained as, "say for Dr. Narang and Dr. Sidhu, they would look at their claims data and see which patients they've seen.  And then each time they bill on a particular patient, say, like, you know, John Smith was seen on January 1st, then they would look in their claims data and see did anyone else provide service to that patient on that same date."  (ROA.2005).

ROH opened in 2013, and Agent Lammons examined records from that time frame forward.  (ROA.2006).  He discovered "a pattern of patients being seen by either Dr. Narang or Dr. Sidhu and then on the very same date, Red Oak Hospital would bill for several diagnostic tests." (ROA.2005-06).  Agent Lammons did not find any evidence that Dr. Sidhu ever worked at ROH.  (ROA.2017).

In addition to pass-through billing, the data also showed instances of double billing.  (ROA.2006, 2044-45, 2047-48, 2059, *see* ROA.2043).

When insurance companies would deny ROH's claims, sometimes another entity, such as Cleveland Regional or 2920 Open MRI, would resubmit the same claim under its name. (ROA.2006, 2048, 2059).

Agent Lammons also did a same date of service analysis for 2012 and saw DDH and Trinity Healthcare, which is also known as 2920 ER, being used. (ROA.2007).

The common thread among these entities was Moparty's ownership in all the companies except DDH. (ROA.2007-08). "[H]e exerted a lot of control in the operation of that facility," however. (ROA.2008). Bank records showed DDH transferred over $17 million into Moparty's personal bank account between 2011 and 2012. (*See* ROA.2008, 2318). From there, money went to Spring Klein Surgical Hospital ("Spring Klein"). (ROA.2009-10).

Significant amounts of money also went from ROH to Spring Klein, which he described as a shell company. (ROA.2009). Agent Lammons thought it "seemed to be an account that collects money from all sorts of different places." (ROA.2010).

ROH billed approximately $20 million, and approximately $3.2 million was paid to the billing entities. (ROA.2017, *see* ROA.2048, 2060).

Agent Lammons discovered that Dr. Narang and Moparty either owned or had interests in the numerous entities where insurance money was deposited, passed through, and ultimately received:



Page 1 of 1

(*See* ROA.2007-15, 2146-47, 2060, 4032 – GX-108).[20]

_____

[20] Also, as the January 2013-2014 accounting for all services ROH billed where Dr. Sidhu was the alleged referring provider shows, sometimes other Moparty entities got paid for Dr. Sidhu's alleged patients.  (ROA.2016-17, *see* ROA.3053 – GX-16A, *see also* ROA.2027-29).  GX-16A is based on information the Government received from ROH.  (ROA.3055, *see* ROA.2016).

Dr. Sidhu made less than his $175,000 contractual salary during this time.  (*See* ROA.2033-35, 3422 – GX-24, ROA.3693 – GX-27).  On the other hand, approximately 85% of the total amount Red Oak received for Dr. Narang's patients is represented in the monies that went from Spring Klein to the Dr. Narang entities.  (ROA.2092).

Kathleen Anderson ("Anderson"), a forensic accountant with the FBI, with a certified fraud examiner's license, has been tracing money in health care cases for 30 years.  (ROA.2124-25).  Anderson took the jury through the process step-by-step.

Anderson testified about the bank accounts that Dr. Narang, his wife Kaur, Moparty, his wife Dr. Gorrela, and Dr. Sidhu had or shared plus those for Dr. Narang's and Moparty's entities, such as ROH.  (*See* ROA.2125-28, *see also* ROA.4101 - GX-1A, ROA.4156 - GX-4A, ROA.4094 - GX-10, ROA.4174 – GX-13A,[21] ROA.4061 – GX-20,[22] ROA.4152 – GX-26, ROA.4103 - GX-29A, ROA.4117 - GX-31A).  She then showed how specific sums moved through the accounts:

---

[21] Moparty and his brother Roy Moparty are on the Regions Bank signature card for ROH.  (ROA.2128, 4174 - GX-13A).

[22] Moparty, his wife, and the same brother are on the signature card for Spring Klein. (ROA.2128, ROA.4062 – GX-20).

38



Page 1 of 1

19-20797.4185

(ROA.2147, ROA.4185 – GX-22, *see* Summaries and checks from Spring Klein to others: ROA.3742 – GX-1B (to Kaur), ROA.3856 – GX-39 (to G. Nanak), ROA.3829 – GX-37 (to Only Thirteen), ROA.3915 – GX-5 (to Forever Fit), ROA.4068 – GX-45 (to Gurdev LLC), ROA.4109 – GX-54 (to Excelerate), ROA.4142 – GX-10A (to North Cypress), ROA.4179 – GX-30 (to Medical Equipment Nationwide), ROA.4184 – GX-50 (to Breton Ridge), *see also* ROA.2126-29, ROA.3693 – GX-27 (March 2012 to January 2015 summary of North Cypress checks to Dr. Sidhu).

Anderson also went through the money laundering counts in the indictment tracing the money from the private insurers:

(1)     split between 2920 ER and Cleveland Imaging with proceeds eventually meeting up and passing through Spring Klein and then to Gurdev (Count 19) (ROA.4140-41 – GX-46);

(2)     2920 ER through Spring Klein to Only Thirteen (Count 20) (ROA.2129-31, 4115-16 – GX-33); and

(3)     2920 ER through Spring Klein to G. Nanak Inc. (Count 21) (ROA.4144-45 – GX-40).

After the Government rested, the district court denied Dr. Narang's and Moparty's motions for judgments of acquittal. (ROA.2168-70). They also moved and filed for mistrials based on two references to Dr. Sidhu's guilty plea. (ROA.2169). The district court took the matter under advisement awaiting the Government's formal response. (ROA.2169).

## H.    MOPARTY AND DR. NARANG TRIED TO REBUT THE GOVERNMENT'S EVIDENCE.

Dr. Narang called a distributor of diagnostic equipment hoping to negate Dr. Gans' prior testimony that certain tests could not have been performed because Dr. Narang lacked the necessary equipment. (*See* ROA.2172-74, 2179-83). A certified public accountant testified about Dr.

Narang's businesses and banking practices, including that he, his wife, and "people at . . . [their] direction" had been advised to have separate bank accounts.  (*See* ROA.2184-91).

In addition, Dr. Narang called his long-time medical technician Edward Castillo ("Castillo") who did NCV testing.  (ROA.2226, 2228-29, 2240, 2243).  Castillo worked for Dr. Narang, but primarily followed Dr. Sidhu to and from the North Cypress and Antoine offices.  (*See* ROA.2229, 2236-40, 2243).  Sometimes Castillo was "sent" to ROH, which was in a different location, "to perform studies, through Dr. Narang and the gentleman that owned the company – that owned the hospital."  (ROA.2236).

Castillo claimed Dr. Narang's office had a sign about "Red Oak or Trinity" that "we're working together."  (ROA.2237).  Castillo thought the ROH arrangement lasted six months, and the signage was there most of the time.  (ROA.2251).  He agreed he "perform[ed] tests as a technician for Red Oak" and said "if the [patient] form said 'Red Oak,' it's Red Oak."  (ROA.2244).  Kaur also told Castillo what name and referring physician to put on the form.  (ROA.2243, *see* ROA.2245).  The source of Castillo's paychecks did not change from 2011-2014.  (ROA.2255).

Dr. Narang's final witness was his receptionist who had worked for him since 2003. (ROA.2360). She claimed it was obvious the office was affiliated with ROH and denied anyone ever cut and pasted the forms so patients did not know about ROH. (ROA.2368).

Hoping to persuade the jury he had a legitimate plan to expand his businesses, as he allegedly had done inside Dr. Narang's office, and to explain the monies that ultimately passed through the different companies, Moparty called a real estate attorney. (ROA.2203). The attorney tried to explain the three one-page documents for the sale of three different pieces of real estate between Dr. Narang's entities and Moparty's entities totaling over $9,000,000, with required monthly payments. (ROA.2193-96, *see* ROA.4182 - GX-36 (Only Thirteen to 2920 ER for $2,500,000, effective 1/1/2013, Dr. Narang and Moparty signed), ROA.4178 - GX-48 (Gurdev to 2920 ER for $6,000,000, effective 9/1/2012, Dr. Narang and Moparty signed), ROA.4180 - GX-52 (G. Nanak II, LLC to 2920 ER for $768,000, effective 2/1/2013, Kaur and Moparty signed), *see also* ROA.2063-64, 2195-97, 2203, 2304-05). The attorney claimed it was "not unusual" for people in the "Old British India" community "to not rely on lawyers for the initial buying and selling of property," and he

ultimately advised Moparty not to proceed because the FBI was investigating Dr. Narang. (*See* ROA.2197-2200). The attorney also dismissed the misspelling of Moparty's name in the document for the $6 million transaction. (ROA.2201-02, 4178 - GX-48).

Moparty also testified and tried to justify his alleged business activities and plans to the jury. He said Spring Klein was created to build a hospital in Spring, Texas, but that did not happen. (ROA.2270). To avoid confusion, Trinity Healthcare was created as a DBA. (ROA.2271).

Moparty claimed Spring Klein was a staffing company and provided Cleveland Regional with all its 300 employees, including the CEO, doctors, nurses, and janitors. (ROA.2272). Spring Klein also managed and staffed 2920 ER's approximately 100 employees and ROH's 100 employees. (ROA.2272-73, *see* ROA.2274). Under ROH was Humble, 2920 ER, and the clinic associated with Dr. Narang, Dr. Sidhu, and Kaur at North Cypress. (ROA.2274). According to Moparty, Spring Klein would collect any money owed to the companies and distribute it. (ROA.2276-77). Contrary to the documentary evidence and Agent Lammons' findings, Moparty denied he had any ownership interest in

Red Oak, Cleveland, and 2920. (ROA.2006-08, 2011, 2273, 2326-27, 4048-49 – GX-136, ROA.4174 – GX-13A).

Trying to explain the one-page real estate documents for the three properties, Moparty claimed ROH planned to expand in the area where Exxon and its 20,000 employees were moving, and 2920 ER planned to put 24-hour emergency room services around the Exxon campus. (ROA.2279-81).

In addition, two one-page leases were signed: (1) Only Thirteen (Landlord/Kaur signed) and 2920 ER (Moparty's brother-in-law signed) on 10/1/2012 for medical services, and (2) G. Nanak (Landlord/Kaur signed) and 2920 ER (Moparty's brother-in-law signed) on 10/1/2012 for medical services. (ROA.4181 – GX-35, ROA.4183 – GX-43, *see also* ROA.2346-47).

Moparty also spent time discussing the personal research he did to open an outpatient facility in Dr. Narang's office "[t]o provide outpatient diagnostic services," which he claimed was Dr. Narang's or Kaur's idea. (ROA.2281-85, 2297-2300). Notably, his primary efforts included reading the Texas Department of Health and Human Services website and emailing the Texas Department of State Health Services. (ROA.2285-

88). Another one-page document was prepared and signed on December 1, 2012. (*See* ROA.4160 – GX-12). This time it was an alleged lease between North Cypress and ROH for half of North Cypress's office space. (ROA.2298-99, 4160 – GX-12, *see* ROA.2085). The permitted use was to perform ambulatory tests. (ROA.4160 – GX-12, *see* ROA.2085). Moparty wanted signage for ROH and the staff to wear badges. (ROA.2300).

Moparty testified he hired Dr. Narang's wife to help with business development and find locations for the 2920 ER expansion. (*See* ROA.2285, 2306-07). Kaur signed a program management agreement in August 2012, which Moparty repeatedly referenced to hold Kaur also responsible for the operation of ROH's alleged outpatient clinic and to remove himself from the daily management. (*See* ROA.2306, 2330, 2334-36, 2342-46). Moparty also tried to distance himself from Kaur's and Warren's billing. (*See* ROA.2309-12, 2330).

Moparty did not hire anyone for Kaur and claimed all technicians were employed and paid by her. (*See* ROA.2332, 2335-36, 2342-44). He admitted that, in response to a subpoena, he had represented no ROH employees worked at North Cypress. (ROA.2341-42, 4167 – GX-135).

At Kaur's or Dr. Narang's suggestion, Moparty testified he also allegedly hired Dr. Sidhu as ROH's medical director for non-radioactive outpatient services. (*See* ROA.2307-08). He denied he intended to violate the law, conspire with Dr. Narang, or launder money through his hospital or other businesses. (ROA.2313).

The jury easily could have concluded that Moparty's testimony was problematic on numerous levels. For example, as Agent Lammons testified, the $6 million sales document failed to identify which lot among 76 was being sold. (ROA.2064). The properties were never transferred to Moparty. (*See* ROA.2065-66, 3777 – GX-48A). The leases represented they were "made" on 10/1/2012, but at the bottom of the one-page documents they stated they were executed on January 10, 2012. (ROA.2067-68, 4181- GX-35, ROA.4183 – GX-43). As Agent Lammons noted, DDH started getting paid in October 2012. (ROA.1068).

Agent Lammons also showed that the "flow of money" to Kaur was "not consistent with the Schedule A fee of $7,500 a month" in her alleged contract. (*See* ROA.2061-62). Likewise, the timing and amount of the alleged lease payments were not consistent with the actual payments to

the contracting entities. (*See generally* ROA.2069-71, 2076-77, 3829 - GX-37).

Agent Lammons also could not find any evidence Dr. Sidhu was the medical director for ROH. (ROA.2086). Bank records would have proven that relationship, but none existed. (*See* ROA.2086-87). The terms of the alleged contract also made no sense. (ROA.2087-88, *see also* 2089-90).

During cross-examination, it was established that Moparty started "papering up" after learning about a 2012 lawsuit Aetna had filed against Trinity Healthcare to recover fees paid to DDH for emergency services rendered at Trinity before it received its license.[23] (*See* ROA.2318-19, *see also* ROA.2337, 2345-46, 4046 – GX-134, *see generally* ROA.2333-34). Despite the district court's findings in the Aetna lawsuit, Moparty denied it was similar to his actions with Dr. Narang. (*See* ROA.2319, 2321-22).

Moparty also denied ROH needed a separate state license to operate an outpatient clinic at North Cypress. (*See* ROA.2324-26, 2356, *see also* ROA.2323). Instead, he kept insisting he obtained authorization from a series of emails with the Texas Department of State Health Services, even though the general counsel had rejected Moparty's

---

[23] Moparty was not added until 2017 or 2018. (*See* ROA.2312-13).

"attempt[ ] to solicit legal opinions" regarding a "14-page unsigned document." (ROA.2324-26, 2354-55, 3883 – GX-137). In fact, the general counsel "very strongly recommend[ed]" Moparty obtain legal counsel. (ROA.3883 – GX-137).

Also, when confronted with emails or questions about rebilling and other matters, the jury could see Moparty try to sidestep the questions or hear his nonresponsive answers. (*See* ROA.2331-33, 2339-40, 2342-44).

After the defense rested, Moparty reurged his motion for a judgment of acquittal, which the court denied. (ROA.2371, 2375).

## I.    THE JURY'S VERDICT AND THE DISTRICT COURT'S DENIAL OF THE JOINT MOTION FOR A MISTRIAL.

The jury convicted Moparty and Dr. Narang on all counts. (ROA.509, 5771). Dr. Narang and Moparty filed a joint motion for mistrial arguing that Dr. Sidhu's guilty plea improperly came up twice during trial. (*See* ROA.534, 5819). They also complained that the Government had misled them about Dr. Grant's prior experience as an expert witness and his disclosure that a third-party physician was a convicted felon. (*See* ROA.538, 5823).

As set forth more fully below, the district court denied the motion. (ROA.5970). The court concluded that the challenged statements were

not made in bad faith, and the Government "arguably had a legitimate purpose for referencing Dr. Sidhu's plea in its opening statement." (ROA.677).  The court also found that the Government could "point to no proper purpose for Agent Lammons" statement, and "[t]he dubious purpose of at least one of the challenged statements weigh[ed] slightly in favor of granting Defendants' Motion."  (ROA.677).  After applying the requisite test, the district court concluded the error "was harmless beyond a reasonable doubt."  (ROA.677).

## III.  MOPARTY'S AND DR. NARANG'S SENTENCINGS.

### A.    PSRS.

#### 1.    MOPARTY.

A PSR was prepared using the 2018 *Guidelines Manual*. (ROA.4540 - ¶ 76).  Moparty's total offense level was 38 based on the following:

| TYPE | DESCRIPTION | LEVEL INCREASE | RELEVANT U.S.S.G. § | RECORD CITE |
|---|---|---|---|---|
| Base Offense Level[24] | Health care fraud | 6 | 2B1.1(a)(1) | ROA.4540-41 - ¶ 78 |

---

[24] Based on Moparty's multiple counts of conviction, the grouping rules under U.S.S.G. Ch. 3, Part D applied.  (ROA.4540 - ¶ 77).  Count 19, engaging in money transactions in property derived from specified unlawful activities, was the most serious count and controlled the determination of Moparty's base offense level. (ROA.4540 - ¶ 77).  The guideline for violating 18 U.S.C. § 1957 is found in U.S.S.G. § 2S1.1(a)(1), which calls for a base offense level for the underlying offense from which

| | | | | |
|---|---|---|---|---|
| | Loss exceeded $9,500,000, but not $25,000,000, to wit: $20,000,000[25] | 20 | 2B1.1(b)(1)(K) | ROA.4540-41 - ¶ 78 |
| | Offense involved 10 or more beneficiaries whose means of identification were used unlawfully or without authority and, as such are victims, as defined in U.S.S.G. § 2B1.1 cmt. n.4(E) | 2 | 2B1.1(b)(2)(A)(i) | ROA.4540-41 - ¶ 78 |
| | Convicted of a federal health care offense involving a Government health care program and | 3 | 2B1.1(b)(7)(B)(ii) | ROA.4540-41 - ¶ 78 |

---

the laundered funds were derived. (ROA.4540 - ¶ 78). Here, that is health care fraud, a violation of 18 U.S.C. § 1347. (ROA.4540 - ¶ 78). In turn, the relevant guideline is U.S.S.G. § 2B1.1. (ROA.4540 - ¶ 78).

[25] The PSR grouped this row and the following three rows under the "Base Offense Level" paragraph. (*See* ROA.4540 - ¶ 78).

| | the loss under (b)(1) to the program was more than $7,000,000 | | | |
|---|---|---|---|---|
| | Offense involved sophisticated means and Moparty intentionally engaged in or caused the conduct constituting sophisticated means | 2 | 2B1.1(b)(10)(C) | ROA.4540-41 - ¶ 78 |
| Enhancement | Convicted under 18 U.S.C. § 1957 | 1 | 2S1.1(b)(2)(A) | ROA.4541 - ¶ 79 |
| Adjustment for Role in the Offense | As an owner of a hospital in the conspiracy, Moparty is considered to have abuse a position of trust that significantly facilitated the commission or concealment of the offense | 2 | 3B1.1(c) | ROA.4541 - ¶ 81 |

Because Moparty's criminal history score was zero, his criminal history category was I. (ROA.4542 - ¶ 89). Coupled with a 38 total offense level, the guideline range for imprisonment was 235 to 293 months. (ROA.4545 - ¶ 109).

Moparty filed numerous objections to the PSR. (*See* ROA.4512-17 - ¶¶ 1-23). He disagreed with the 20-level increase based on the amount of loss and with the three-level increase related to a federal health care offense involving a Government health care program. (ROA.4515 - ¶ 19, ROA.4616 - ¶ 20). Moparty also disputed he had abused a position of trust. (*See* ROA.4554). He contended he was not the owner of a hospital involved in the conspiracy and, as the PSR allegedly showed, did not profit from the alleged fraudulent billing. (ROA.4516 - ¶ 21).

The probation officer agreed the offense did not involve a Government health care program and removed the three-level enhancement. (ROA.4557). Moparty's total offense level dropped to 35, and the new guideline range was 168 to 210 months imprisonment. (ROA.4557).

The probation officer acknowledged that, although "[t]he Government support[ed] the" $20 million total loss amount, it recognized

that, due to known billing practices that do not pay providers the full billed amount, "the Government considers adjusting the loss amount to not more than $3.5 million (which is close to the $3.2 million received by Narang)." (ROA.4550).  If the district court agreed, the total offense level would be reduced by two levels to 36.  (ROA.4550).   The guideline range of imprisonment would become 188 to 235 months.  (ROA.4550).

## 2.    DR. NARANG.

The 2018 *Guidelines Manual* was used to prepare Dr. Narang's PSR.  (ROA.9907 - ¶ 78).  His total offense level was 39 based on the following:

| TYPE | DESCRIPTION | LEVEL INCREASE | RELEVANT U.S.S.G. § | RECORD CITE |
|------|-------------|----------------|---------------------|-------------|
| Base Offense Level[26] | Health care fraud | 6 | 2B1.1 | ROA.9908 - ¶ 79 |
| Enhancement | Loss exceeded $9,500,000, but not $25,000,000 | 20 | 2B1.1(b)(1)(K) | ROA.9908 - ¶ 80 |
| Enhancement | Offense involved 10 or more victims | 2 | 2B1.1(b)(2)(A)(i) | ROA.9908 - ¶ 81 |

---

[26] Based on Narang's multiple counts of conviction, the grouping rules under U.S.S.G. Ch. 3, Part D applied.  (ROA.9907 - ¶ 77).  Due to U.S.S.G. § 1B1.3, Counts 1 through 18 resulted in the highest offense level.  (ROA.9907 - ¶ 77).  *See also* 18 U.S.C. § 1347.  Count 2 was used to determine Dr. Narang's base offense level.  (ROA.9907 - ¶ 77).

| Enhancement | Convicted of a federal health care offense involving a Government health care program and the loss under subsection (b)(1) to the program was more than $7,000,000 | 3 | 2B1.1(b)(7)(ii) | ROA.9908 - ¶ 82 |
|---|---|---|---|---|
| Enhancement | Offense involved sophisticated means and Dr. Narang intentionally engaged in or caused the conduct constituting sophisticated means | 2 | 2B1.1(b)(10)(C) | ROA.9908 - ¶ 83 |
| Enhancement | Offense involved the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any | 2 | 2B1.1(b)(11)(C)(i) | ROA.9908 - ¶ 84 |

| | other means of identification | | | |
|---|---|---|---|---|
| Adjustment for Role in the Offense | For being an organizer, leader, manager, or supervisor in any criminal activity | 2 | 3B1.1(c) | ROA.9908 - ¶ 86 |
| Adjustment for Role in the Offense | For being an owner of medical clinics in the conspiracy, Dr. Narang is considered to have abused a position of trust that significantly facilitated the commission or concealment of the offense | 2 | 3B1.3 | ROA.9908 - ¶ 87 |

Because Dr. Narang's criminal history score was zero, his criminal history category was I. (ROA.9909 - ¶¶ 95-96). Coupled with a total offense level of 39, the guideline range for imprisonment was 262-327 months. (ROA.9912 - ¶ 122).

Dr. Narang filed numerous objections to the PSR. (*See* ROA.9841-

46 - ¶¶ 1-38).  He also disputed the 20-level increase tied to the amount of loss and the three-level increase for a conviction involving a Government health care program with a loss of more than $7,000,000. (ROA.9845 - ¶¶ 29, 31, ROA.9848, *see* ROA.9908 - ¶¶ 80, 82).  Dr. Narang provided his own loss calculations.  (*See* ROA.9848-52).

In relation to his appellate points, Dr. Narang generally disagreed that the offense involved 10 or more victims under U.S.S.G. § 2B1.1(b)(2)(A)(i) and that the offense involved the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification under U.S.S.G. § 2B1.1(b)(11)(C)(i). (ROA.9845 - ¶ 30, ROA.9846 - ¶ 33, *see also* ROA.9947).  The probation officer disagreed.  (ROA.9930-21, *see also* ROA.9947-49).

The probation officer responded the Government supported the $20 million total loss amount, but recognized that known billing practices do not pay providers the full amount billed.  (ROA.9917).  The probation officer added that, "the Government considers adjusting the loss amount to not more than $3.5 million (which is close to the $3.2 million received by Narang)."  (ROA.9917-18).  If the district court agreed, the total offense level would be reduced by two levels to 36, and the guideline

range would become 188 to 235 months imprisonment.  (ROA.9918).

The probation officer agreed the offense did not involve a Government health care program and removed the three-level enhancement under U.S.S.G. § 2B1.1(b)(7)(B)(i).  (ROA.9948).  Dr. Narang's total offense level dropped to 36.  (ROA.9948).  Coupled with the criminal history category of I, the new guideline range was 188 to 235 months imprisonment.  (ROA.9948).

## B.    THE SENTENCING HEARING.

### 1.    DR. NARANG.

At the sentencing hearing, the district court recognized that Dr. Narang had filed objections to the PSR, supplemental objections, and objections to the first and second addendum, where, "for the first time, [he] set out legal and factual arguments really supporting the basis of the previously filed legal objections."  (ROA.7831).  The court then sustained Dr. Narang's objection that he was not convicted of a federal healthcare offense.  (ROA.7831, *see* ROA.9908 - ¶ 82).

Dr. Narang called Dr. Ashok Kadambi, a board certified internist and endocrinologist, on his behalf.  (ROA.7833-34).  Dr. Kadambi testified that he had examined approximately 300 patient files, and, based on the

nature of Dr. Narang's "proactive practice," he "did not find any instance where a particular test was not indicated or was not necessary." (*See* ROA.7834-44).

The district court responded by directing the parties to page 13 of the PSR because it would "help" its "ruling be more understandable." (ROA.7846). The court then stated it had "carefully considered the two expert reports that were submitted with . . . [Dr. Narang's] supplemental objections" to the PSR loss calculation and Dr. Kadambi's testimony, but it also had "reflected on the two weeks' testimony at trial and the notes . . . [it had] made during the trial." (ROA.7846). The court concluded:

> that the credible evidence at trial from Dr. Narang's patients, from Dr. Narang's employee Rikesha Burton, and from the medical experts called by the government establish that Dr. Narang's patients did not need the tests that were billed to and paid by the insurance companies and that many of the tests were not performed at all or were not properly performed. This was the first level of fraud found by the jury.
>
> Defendant Moparty then committed additional fraud by billing for these services, which were performed at Dr. Narang's office, as if they had been performed at Red Oak Hospital. The insurance company representatives at trial testified that these claims would not have been paid had the insurance companies known of these fraudulent activities as part of the conspiracy engaged in and found by the jury committed by Dr. Narang and Mr. Moparty.

The expert testimony provided in support of Dr. Narang's motion speculate about what might have motivated Dr. Narang's decisions to prescribe so many tests for his weight-loss patients and for a few other patients who testified at trial. But the experts' opinions do not consider the testimony of the patients, the medical experts, or the insurance company representatives at trial. The speculative testimony of the experts fall far short of providing a credible basis for rebutting the extensive trial testimony from Dr. Narang's former patients, employees, and the experts who testified at trial, which the jury found credible, which the Court finds credible, and upon which the presentence report relies.

The defendants' experts reports also overlook the fact that Dr. Narang's patients did not want, request, or need the services for which the insurance companies were billed. The Court concludes that there was no benefit and no value for the services discussed at trial.

(ROA.7846-47).

The district court also rejected the argument that the actual loss was $669,598 because the insurance companies would have paid that amount had the service been billed from Dr. Narang's office. (ROA.7847-48). The court stated that the evidence at trial established the insurance companies would not have paid anything because the services were not legitimate. (ROA.7848). The defense had not carried its burden of presenting credible evidence to support the argument that these services had a value of $669,598; that the services underlying the bills were

legitimate; or that the insurance companies would have paid for these services, but for the defendants' fraud. (ROA.7848). Instead, the credible evidence supported the conclusion that the defendants knew or reasonably should have known that this illegal conduct would have resulted in an actual loss of at least $3,227,000. (ROA.7847).

The court directed the parties to page 13 of the PSR and U.S.S.G. § 2B1.1(b) because it had an additional ruling dealing with loss. (ROA.7848). The court stated that § 2B1.1(b) provides increases above the base offense level based on the amount of loss. (ROA.7849). Under comment 3(A), "loss" is the greater of actual or intended loss, and "actual loss" means the reasonably foreseeable pecuniary harm that resulted from the conspiracy. (ROA.7849). Here, based on GX-16A, the total amount billed during the conspiracy was $20,491,297.53, but healthcare providers such as Dr. Narang and Moparty know that insurance companies frequently adjust the amounts billed and pay lesser amounts on the claims. (ROA.7849). The insurance companies paid a total of $3,227,091 on the claims. (ROA.7849). The district court, therefore, chose to use this more conservative amount in calculating the loss. (ROA.7849). In doing so, the court reduced the 20-level enhancement for

a $9,500,000 loss to a 16-level enhancement based on a $1,500,000 loss. (ROA.7849, *see also* ROA.9908 - ¶ 80). *See* U.S.S.G. § 2B1.1(b)(1)(I) & (K).

Dr. Narang's new adjusted offense level was 32, which reduced the guideline range to 121 to 151 months imprisonment. (ROA.7849). The court overruled Dr. Narang's other objections. (*See* ROA.7850).

Before being sentenced, Dr. Narang testified about his medical practice and other "facts" related to the trial. (*See* ROA.7852-62). He also allocuted. (*See* ROA.7863-72).

Following argument, the district court discussed the 18 U.S.C. § 3553(a) factors. (*See* ROA.7872-75). While agreeing certain factors weighed in Dr. Narang's favor, the court stressed that the trial testimony "was ample to support the jury's conclusion that the defendant was guilty on all counts of a massive insurance fraud scheme." (*See* ROA.7874). The court understood the defense "view of the facts, but the evidence was multiple tests were submitted for services that were not needed, that were not performed, [and] that were performed inadequately." (ROA.7874). "Red Oak billed for tests as if they were done at the hospital, when they were on . . . [Dr. Narang's] premises." (ROA.7875). There was

testimony "from the people who did the tests. Most of them were not credible." (ROA.7875).

Even so, the court thought a sentence at the low end of the guidelines was appropriate. (ROA.7875). The court sentenced Dr. Narang to concurrent sentences of 120 months imprisonment on Counts 1 through 20, plus one month on count 21 to run consecutively, for a total sentence of 121 months in custody. (ROA.7875). The court also ordered $2,621,999.04 in restitution paid to the following victims – $1,427,300.76 to Aetna, $991,743.88 to Blue Cross, and $202,954.40 to Cigna. (ROA.7875-76). Dr. Narang and Moparty were held jointly and severally liable. (ROA.7876).

## 2. MOPARTY.

For the reasons stated during Dr. Narang's sentencing, the district court reduced the 20-level loss enhancement to 16. (ROA.2550, *see* ROA.4540-41 - ¶ 78). The court also removed the three-level enhancement under § 2B1.1(b)(7)(B)(ii) because Moparty was not convicted of convicted of a federal health care offense involving a Government health care program. (*See* ROA.2550, 4540-41 - ¶ 78). The court denied Moparty's remaining objections. (ROA.2551).

Based on the court's rulings, Moparty's total offense level was now 31. (ROA.2551). Coupled with the criminal history category of I, the new guideline range was 108 to 135 months imprisonment. (ROA.2551).

Moparty called Brendan Mueller ("Mueller), a certified public accountant and fraud examiner, to testify. (ROA.2553). Mueller had been working with Moparty since 2007 and previously had produced Moparty's 2012-15 tax returns, the working papers, and some documents showing payments from Spring Klein to affiliates of Dr. Narang. (ROA.2554). Mueller testified that, from 2012-2014, Moparty and his wife and the entities they owned or participated in paid $3,093,457.50 to Dr. Narang. (ROA.2555).

The payments "were variously categorized on Moparty's tax returns as lease expenses, professional fees, outside services, or they were capitalized to the cost of real estate." (ROA.2555-56). Mueller deferred to a third-party's audit of the financials, although Mueller's company had assisted with the bookkeeping. (ROA.2556-57). He also testified that all payments going from Moparty to Dr. Narang were related to "either lease of real estate, purchase of real estate, or payment for professional services." (ROA.2557).

63

Moparty also called Suman Smith ("Smith") to demonstrate the financial impact on him. (*See* ROA.2566). Smith provides billing and collections work for several facilities Moparty operates, but did not meet him until April of 2019. (ROA.2559).

Moparty asked her to analyze the insurance payments, recoupments, and billings related to the $3.2 million paid to Red Oak to determine what happened to the money. (ROA.2559-60, 2563). Smith "reviewed around 500-and-some cases that were relatable to the $3.2 million case, and . . . followed each single one from the path of the billing as well as to remittances." (ROA.2561). She also "engaged the health plans themselves." (ROA.2562). Smith testified in detail regarding the financial consequences here. (*See* ROA.2562-65, 2568-69).

During Moparty's allocution, he disavowed any intent to commit fraud and discussed his financial losses. (ROA.2572-73).

The district court determined a sentence at the low end of the guideline range was appropriate and sentenced Moparty to concurrent terms of 108 months imprisonment on counts one through 21, followed by three years of supervised release. (ROA.2576). Moparty was held jointly and severally liable with Dr. Narang for $2,621,999.04 in

restitution – $1,427,300.76 to Aetna, $991,743.88 to Blue Cross, and $202,954.40 to Cigna. (ROA.2576-77).

## SUMMARY OF ARGUMENT

I.    When the evidence is viewed in the light most favorable to the verdict, there is substantial evidence to support Moparty's convictions for conspiracy to commit health care fraud, seventeen substantive counts of health care fraud, and three counts of money laundering. Dr. Narang and Moparty planned and executed a health care fraud scheme. Dr. Narang ran unnecessary tests on his wife's spa patients and his own patients. His office then sent the requisite medical and testing information to Moparty's office along with the patients' insurance and other billing details. Dr. Narang also included information for tests that had never occurred.

Moparty's office took this information and billed various health care benefit programs, including BCBS, Aetna, and Cigna, as if the tests had been performed at ROH so that it could receive higher reimbursement rates. Moparty sometimes even doubled billed the insurance companies using a different entity.

Moparty also was the key figure in laundering the insurance reimbursements. The insurance companies sent the reimbursements to the companies that had filed the claims. Moparty effectively received the money because he either had an interest in or owned the entities. Moparty controlled the distribution of the monies as they were deposited, went through, and landed in different bank accounts, most of which Dr. Narang, his wife, and/or both controlled. Moparty hoped to disguise the payments by relying on suspicious real estate and other contracts. (Responsive to Moparty's first issue)

II. The district court correctly applied the two-level enhancements under U.S.S.G. § 2B1.1(b)(11)(c)(i) and under § 2B1.1(b)(2)(a)(i) at Dr. Narang's sentencing. As Dr. Narang concedes, precedent supports the enhancement under U.S.S.G. § 2B1.1(b)(2)(a)(i) because the fraud involved 10 or more victims. Individuals whose identities are used to file fraudulent claims qualify as "victims" under § 2B1.1(b)(2).

This Court also has applied U.S.S.G. § 2B1.1(b)(11)(C)(i) in health care fraud cases. Dr. Narang's unauthorized transfer or use of any means of identification unlawfully – the patients' social security numbers and insurance information – to produce or obtain any other means of

identification – fraudulent health care claims – supports the enhancement.  (Responsive to Dr. Narang's second issue)

III.    The district court correctly applied a two-level enhancement under U.S.S.G. § 3B1.3 because Moparty abused a position of trust.   His ownership of the hospital gave him the "freedom to commit a difficult-to-detect wrong."  He was in charge and not subject to supervision.  Moparty took advantage of his superior position to facilitate a crime.  (Responsive to Moparty's sixth issue)

IV.    Moparty has failed to establish reversible plain error that lay witness FBI forensic accountant Anderson allegedly testified on the ultimate issue of criminal intent.  Her testimony largely was based on objective documentary evidence, such as insurance reimbursements and banking information, with few opinions.   Alternatively, Moparty's complaint fails under the third and/or fourth prong of plain error review based on the ample evidence of his guilt.   (Responsive to Moparty's third issue)

V.    Moparty has failed to prove reversible plain error or that the district court abused its discretion in permitting the insurance companies' representatives to testify about their respective employers'

practices and policies and occasionally about broader matters in the industry. Under FED. R. EVID. 701, the representatives could testify about matters relating to their business affairs, such as industry practices. Their testimonies were based on personal knowledge. (Responsive to Moparty's fourth issue)

VI.    Moparty and Dr. Narang have failed to satisfy their high burden of proving the district court abused its discretion in denying their motion for mistrial based on two brief references to Dr. Sidhu's guilty plea. The court determined the Government's reference during opening statement "arguably had a legitimate purpose: to anticipate and preemptively counter defense counsel's efforts to impeach Dr. Sidhu with his guilty conviction during his eventual cross-examination." Although the district court found Agent Lammons' statement on direct examination "weigh[ed] slightly in favor of granting" the motion, the court concluded any error was harmless. The prosecutors did not act in bad faith in referencing Dr. Sidhu's guilty plea, and the evidence against Moparty and Dr. Narang was overwhelming.

The district court also did not abuse its discretion in denying a mistrial based on Dr. Grant's brief statement that a third-party

physician, whom Dr. Narang had used to read NCV studies, previously had been convicted of heath care fraud. Any error was harmless based on the district court's contemporaneous instructions to the jury to disregard the statements and the presumption that the jury followed the court's instructions. Also, Moparty failed to show substantial prejudice, as evidenced by the testimonies and documents supporting the jury's guilty verdict. (Responsive to Dr. Narang's First Issue and Moparty's Second Issue)

VII. The rarely used cumulative error doctrine has no place here. As the jury, and subsequently the judge found, there was substantial evidence of Moparty's guilt. The district court determined that the Defendants' right to a fair trial was not compromised and the prosecutors did not act in bad faith. Also, the jury is presumed to have followed the district court's instructions during trial and during its deliberations. (Responsive to Moparty's Fifth Issue)

## ARGUMENT

I. **AMPLE EVIDENCE SUPPORTS MOPARTY'S CONVICTIONS FOR CONSPIRACY TO COMMIT HEALTH CARE FRAUD, SEVENTEEN SUBSTANTIVE COUNTS OF HEALTH CARE FRAUD, AND THREE COUNTS OF MONEY LAUNDERING. (Responsive to Moparty's First Issue)**

### A. THIS COURT MUST VIEW THE EVIDENCE IN THE LIGHT MOST FAVORABLE TO THE JURY'S VERDICT AND NOT REWEIGH IT.

Moparty preserved his challenges to the sufficiency of the evidence to support his convictions for conspiracy, health care fraud, and money laundering. (*See* Moparty Brief, p. 18). (*See* ROA.2169-70, 2375).

This Court reviews preserved challenges *de novo*, but is highly deferential to the verdict. *United States v. Chapman*, 851 F.3d 363, 376 (5th Cir. 2017); *see United States v. Perez-Ceballos*, 907 F.3d 863, 866-67 (5th Cir. 2018) (if defendant timely moved for judgment of acquittal, sufficiency challenges reviewed *de novo*). This Court searches the record for evidence supporting the convictions beyond a reasonable doubt and examines "the evidence 'in the light most favorable to the verdict, accepting all credibility choices and reasonable inferences made by the jury.'" *Chapman*, 851 F.3d at 376. This Court may not reweigh the evidence. *United States v. Zamora-Salazar*, 860 F.3d 826, 832 (5th Cir. 2017).

A defendant seeking reversal on the basis of insufficient evidence "swims upstream." *United States v. Gonzalez*, 907 F.3d 869, 873 (5th Cir. 2018).  The "conviction will be affirmed if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *Id.* (emphasis original).

### B. MOPARTY CONSPIRED WITH DR. NARANG TO COMMIT HEALTH CARE FRAUD.

#### 1. THE ELEMENTS OF CONSPIRACY.

Count 1 charged Moparty with conspiracy to commit health care fraud under 18 U.S.C. § 1349.  (ROA.23).  The elements of the crime are (1) the existence of an agreement between two or more people to pursue the offense of fraud; (2) the defendant knew about the agreement; and (3) he voluntary participated.  *United States v. Emordi*, 959 F.3d 644, 650 (5th Cir. 2020); *United States v. Delgado*, 668 F.3d 219, 226 (5th Cir. 2012).

Moparty contends that the evidence failed to show he entered into an agreement, but contrary to his argument, the evidence did not have to show that he and Dr. Narang "discussed unlawful common aims and interests" or "stated between themselves a single detail of the alleged scheme." (*See* Moparty Brief, pp. 20, 22).  Direct evidence of a conspiracy

is not necessary. *Delgado*, <u>668 F.3d at 226</u>. The Government can use direct or circumstantial evidence to prove each element. *United States v. Barson*, <u>845 F.3d 159, 164</u> (5th Cir. 2016).

An agreement also does not have to be formal. *United States v. Martinez*, <u>921 F.3d 452, 467</u> (5th Cir.), *cert. denied sub nom. Nguyen v. United States*, <u>140 S. Ct. 571</u> (2019). It can be silent and informal. *Barson*, <u>845 F.3d at 163</u>. An agreement also may be inferred from concert of action, voluntary participation may be inferred from a collocation of circumstances, and knowledge may be inferred from surrounding circumstances. *United States v. Daniel*, <u>933 F.3d 370, 377</u> (5th Cir. 2019); *see also Emordi*, <u>959 F.3d at 650</u> (knowledge and voluntary participation may be inferred from the surrounding circumstances); *see Delgado*, <u>668 F.3d at 226</u> (each element may be inferred from circumstantial evidence).

### 2. THE CONSPIRACY EVIDENCE ESTABLISHED THAT MOPARTY KNOWINGLY AND WILLINGLY ENTERED INTO AN AGREEMENT WITH DR. NARANG.

"[C]onspiring to commit a crime is an offense wholly separate from the crime which is the object of the conspiracy." *United States v. Tovar*, <u>719 F.3d 376, 383</u> (5th Cir. 2013). A "[c]onspiracy to commit health care fraud requires a scheme." *United States v. Sanjar*, <u>876 F.3d 725, 748</u> (5th

Cir. 2017), *cert. denied sub nom. Main v. United States*, 138 S. Ct. 1577 (2018) (citing 18 U.S.C. § 1349).  Willfully joining with someone to engage in a scheme, with awareness of the agreement's unlawful purpose, is a conspiracy to commit health care fraud.  *Id*. at 745.

Here, Moparty and Dr. Narang agreed to defraud insurance companies into reimbursing them for allegedly legitimate medical tests when, in fact, the tests were unnecessary, did not occur, or both.  Moparty and Dr. Narang also agreed to use ROH, instead of Dr. Narang's office, to submit the claims because it would mislead the insurance companies into paying higher reimbursements.  (*See* ROA.4029 – GX-65, ROA.4096 – GX-98, ROA.4150 – GX-83, ROA.4162 – GX-90, ROA.4166 – GX-75, ROA.3521 – GX-106).

The paper trail related to the reimbursements and subsequent disbursements also proved that Moparty and Dr. Narang had an agreement on how to handle the millions of dollars the insurance companies paid ROH or another one of Moparty's other entities.  (*See* ROA.3056 – GX-16A, ROA.4032 – GX-108, ROA.4115 – GX-33, ROA.4140 – GX-46, ROA.4144 – GX-40, ROA.4185 – GX-22).  Also, contrary to Moparty's claims, his relationship with Dr. Narang exceeded "mere

association," and they did not act independently, as evidenced by the emails, texts, the billing director's and patients' testimonies, and the billing and other documentation. (*See* Moparty Brief, p. 21). (*See* ROA.4016 – GX-122, ROA.4052 – GX-115, ROA.4445 – GX-126).

"What people do is logical, albeit, circumstantial, evidence of what lies in their mind." *United States v. Ganji*, 880 F.3d 760, 768 (5th Cir. 2018). "Concerted action between conspirators illustrates that an agreement had to exist because the individuals would not have otherwise acted in that particular manner." *Id*. The evidence was sufficient for a rational jury to conclude that Moparty and Dr. Narang conspired to execute a scheme to defraud healthcare benefit programs.

### C. MOPARTY AND DR. NARANG KNOWINGLY AND WILLINGLY EXECUTED THEIR SCHEME TO DEFRAUD HEALTH INSURANCE COMPANIES

#### 1. THE ELEMENTS OF HEALTH CARE FRAUD.

The evidence also supports the substantive counts in the indictment, as charged in Counts 3-18. (*See* ROA.32-37). The Government had to prove that Moparty knowingly and willfully executed a scheme or artifice (1) to defraud any health care benefit program, or (2) to obtain, by means of false or fraudulent pretenses, representations, or

promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services. *See United States v. Willett*, 751 F.3d 335, 339 (5th Cir. 2014); 18 U.S.C. § 1347. (*See* ROA.483). "It is enough for criminal liability if a defendant 'associates with the criminal activity, participates in it, and acts to help it succeed.'" *Martinez*, 921 F.3d at 472.

### 2. THE HEALTH CARE FRAUD EVIDENCE PROVED THAT MOPARTY AND DR. NARANG DEFRAUDED PATIENTS AND THEIR INSURERS USING PASS-THROUGH AND DOUBLE BILLING FOR UNNECESSARY AND FOR NONEXISTENT MEDICAL TESTS.

The patients' testimonies combined with the testimonies from the expert witnesses, the insurance representatives, Dr. Narang's medical assistant, Moparty's billing director, and others as well as the numerous documents, including problematic patient files and misleading insurance claims, establish health care fraud. This evidence proved the patients received unnecessary testing at Dr. Narang's office; that Dr. Sidhu did not treat them; that Dr. Narang and Moparty billed the patients' insurance companies for tests they did not receive; that Dr. Narang and Moparty used pass-through billing to defraud the insurance companies

to obtain higher reimbursement rates; that the claims often falsely represented that Dr. Sidhu was the treating physician and, at times, Moparty's wife; that Moparty sometimes resubmitted patients' claims using a different entity if an insurance company rejected ROH's original claim; and that Moparty's entities accepted reimbursements from the insurance companies and distributed them to Dr. Narang and his and/or his wife's various entities under the guise of real estate transactions and payroll obligations. (*See* ROA.4032 – GX-108, ROA.4185 – GX-22).

Moparty argues, however, there is no evidence he knowingly participated in the administration of unnecessary medical procedures or knowingly overbilled for medical procedures. (Moparty Brief, p. 19). He also contends there is no evidence that he participated in ordering or administering any medical procedure or knew that he was participating in the billing for procedures that were medically unnecessary, never provided, or both. (Moparty Brief, p. 20).

To prevail here, the Government had to show that Moparty "participated in the scheme to defraud, not that he took part in every aspect of that scheme." *United States v. Sanders*, 952 F.3d 263, 277 (5th Cir. 2020); *see Emordi*, 959 F.3d at 650 (defendant does not have to be

the one who "personally submitted the necessary forms to be guilty");

*Barson*, 845 F.3d at 164 (defendant does not have to submit the necessary forms requesting reimbursement from Medicare to be guilty of health care fraud or conspiracy to commit health care fraud).

Each person in the fraudulent scheme had an important role.  Dr. Narang was the starting point.  He used his medical expertise and his "people skills" to persuade the Groupon purchasers and E.L. to have unnecessary tests, which often were improperly performed and ineffective.  He bundled this information along with false information about tests that had not been performed and sent it to Moparty. Moparty's office prepared the necessary billing documents using ROH to obtain higher reimbursements rates, although the patients were clear they went to and saw Dr. Narang in his office – the one with only his name and his wife's company on the front door.  (*See* ROA.4139 – GX-125C).  Without Moparty and his entities, the scheme would not have succeeded.  (*See* ROA.4185 – GX-22).

Regardless, the evidence shows Moparty did have knowledge about the testing part of the scheme and actively participated in it.  In one text message between Moparty and Kaur, he told her ROH "does not provide

allergy testing any more [sic] from Jan 1....Please do not send us those referrals." (ROA.4056 – GX-115) (ellipsis original). In another text, Moparty told Kaur to send "all cardio..pain and lab referrals....noon allergy." (ROA.4056) (ellipses original). On January 13, 2014, he also confirmed he wanted Dr. Sidhu's application. (ROA.4056). Later, he texted "Hi..aetna has stopped payments to redoak since February..everything..is there anything they r doing in your clinics." (ROA.4057) (ellipses original). In another text, Moparty said "[t]old doctor we have to stop these services for few months until we calm down all these insurances mess..thanks for cooperation..try to send them to main hospital." (ROA.4057) (ellipses original). In July, Kaur asked when Dr. Sidhu could start "at your er," but Moparty needed to see if someone had formally approved. (ROA.4058). Later that month Kaur asked if Moparty was "in network with Aetna at Trinity I have pt for mri and doppler." (ROA.4059). Moparty told her to send them. (ROA.4059). When Kaur asked what the referral fee was, Moparty said he would call her. (ROA.4059).

In addition, the jury saw emails where Moparty was copied such as when his billing manager told Kaur that "going forward we are not able

to accept any Aetna patients." (ROA.3522 – GX-117, *see also* ROA.4445 – GX-126). On another email, Dr. Narang's office wrote Moparty's billing director asking him to "confirm if you have all these pts in your list.  mr. moparty is waiting on the answer." (ROA.4018 – GX-122).

The jury also saw Moparty's March 7, 2013 email to Dr. Narang's wife where he complained about "zero payments for patient claims." (ROA.4445 – GX-126). Moparty "attached 65 pages of patients where insurances [sic] paid **zero $**." (ROA.4445 – GX-126) (emphasis original). He also wrote "**we need your and your staff's help to continue**."[27] (ROA.4445 – GX-126) (emphasis original).

Viewing the evidence in the light most favorable to the verdict and drawing all reasonable inferences from the evidence to support the verdict, a rational trier of fact could have found Moparty was guilty of health care fraud beyond a reasonable doubt.

---

[27] Moparty also gave some instructions about testing for ROH, printing signs about ROH for patients to read, sending badges for technicians to wear, but using Narang's staff to handle various insurance matters. (ROA.4445 – GX-126). The jury had the right to discredit this testimony. The jury "retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of witnesses." *United States v. Scott*, 892 F.3d 791, 796-97 (5th Cir. 2018); *see Daniel*, 933 F.3d at 378 (jury convicted defendant after hearing co-conspirator's testimony and thus made its credibility determination); *United States v. Lugo-Lopez*, 833 F.3d 453, 457 (5th Cir. 2016) (jury is free to choose among reasonable constructions of the evidence). This Court "repeatedly [has] stated that the jury is the final arbiter of the credibility of witnesses." *Daniel*, 933 F.3d at 378.

**D. MOPARTY WAS THE CENTRAL FIGURE IN THE MONEY LAUNDERING.**

**1. THE ELEMENTS OF MONEY LAUNDERING.**

Moparty also challenges the sufficiency of the evidence supporting his three convictions for money laundering under 18 U.S.C. § 1957(a). (Moparty Brief, pp. 28-29). He contends that, because there allegedly was no evidence of his knowing intent to commit fraud, the money laundering convictions cannot be upheld. (Moparty Brief, p. 28).

"Section 1957(a) makes it a crime knowingly to 'engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from' certain specified crimes." *United States v. Evans*, 892 F.3d 692, 708 (5th Cir. 2018), *as revised* (July 6, 2018). The Government was required to prove three elements: (1) property valued at more than $10,000 that was derived from a specified unlawful activity; (2) the defendant's engagement in a financial transaction with the property; and (3) the defendant's knowledge that the property was derived from unlawful activity. *Martinez*, 921 F.3d at 476; *see* 18 U.S.C. § 1957(a).

"'Criminally derived property' means any property constituting, or derived from, proceeds obtained from a criminal offense[.]" 18 U.S.C. §

1957(f)(2)(i); *see Evans*, <u>892 F.3d at 708</u>.  The specified unlawful activity

identified in the indictment was health care fraud, in violation of <u>18</u>

<u>U.S.C. § 1347</u>.  *See Martinez*, <u>921 F.3d at 476-77</u>.  (*See* <u>ROA.37</u>).

2. **MOPARTY RECEIVED AND DISTRIBUTED THE REIMBURSEMENT MONIES FOLLOWING HIS OFFICE'S SUBMISSION OF FRAUDULENT CLAIMS TO THE INSURANCE COMPANIES.**

"[T]he knowledge inquiry looks only to whether the property was

derived from an 'unlawful activity.'  Accordingly, the *mens rea* element of

the offense does not extend to whether the defendant knowingly

laundered the funds, only whether the defendant 'knew the funds were

illicit and engaged in a 'financial transaction' with them regardless."

*United States v. Alaniz*, <u>726 F.3d 586, 602</u> n.8. (5th Cir. 2013) (emphasis

original).

Moparty argues that, because "the evidence was legally insufficient

to prove Moparty's knowing participation in the 'essential' of the alleged

conspiracy and his knowing execution of a scheme to defraud a health

care benefit program, the convictions for money laundering should be

reversed."  (Moparty Brief, p. 29).  He disavows any "knowing intent to

commit fraud."  (Moparty Brief, p. 28).

As set forth above, there is ample evidence Moparty knew the $3.2

million in reimbursements were derived from unlawful activities and part of the overall health care fraud scheme. The jury heard testimony and saw documentary evidence that Moparty was involved in coordinating not only the initial billing of the insurance claims with Dr. Narang's office, but that he was responsible for ensuring claims were resubmitted under different entities' names if an insurance company denied ROH's original claim. His billing manager was clear – Moparty was in charge. (ROA.1921). Warren did not do anything on his own. (ROA.1921).

Moreover, the insurance companies deposited reimbursement monies only into Red Oak's bank account, Cleveland Regional's bank account, and/or 2920 Open MRI's bank account. Moparty then transferred the proceeds as he saw fit and/or how he previously had arranged with Dr. Narang. Viewing the evidence and all reasonable inferences in the light most favorable to the verdict, any rational juror could have found the essential elements of the money laundering offenses were satisfied beyond a reasonable doubt. (*See* ROA.4032 – GX-108, 4185 – GX-22).

## II. THE DISTRICT COURT CORRECTLY APPLIED THE TWO-LEVEL ENHANCEMENTS UNDER U.S.S.G. § 2B1.1(b)(11)(C)(i) AND UNDER § 2B1.1(b)(2)(A)(i) AT DR. NARANG'S SENTENCING. (Responsive to Dr. Narang's Second Issue)

### A. THIS COURT SHOULD APPLY *DE NOVO* AND CLEAR ERROR REVIEW.

Dr. Narang contends the district court erred in overruling his objections to the two-level enhancements he received under U.S.S.G. § 2B1.1(b)(2)(A)(i) because the offense involved 10 or more victims and under § 2B1.1(b)(11)(C)(i) because the offense involved "the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification."  (*See* Narang Brief, pp. 2, 31, 34).  (*See* ROA.7831, 9908 - ¶¶ 81, 84, ROA.9845 - ¶ 30, ROA.9846 - ¶ 33, ROA.9930 - ¶ 6, ROA.9932 - ¶ 8, ROA.9947).

Where issues are preserved, this Court reviews the district court's application of the guidelines *de novo* and its factual findings for clear error.  *Emordi*, 959 F.3d at 651 (applying to U.S.S.G. § 2B1.1(b)(2)(A)(i) issue); *United States v. Kalu*, 936 F.3d 678, 679 (5th Cir. 2019) (applying to U.S.S.G. § 2B1.1(b)(11)(C)(i) complaint).  If error occurred, this Court must determine whether it was harmless.  *Kalu*, 936 F.3d at 680.

## B. PRECEDENT SUPPORTS THE ENHANCEMENT UNDER U.S.S.G. § 2B1.1(b)(2)(A)(i) FOR 10 OR MORE VICTIMS.

Dr. Narang received a two-level enhancement under U.S.S.G. § 2B1.1(b)(2)(A)(i) because the fraud involved 10 or more victims. (ROA.9908 - ¶ 81). *See United States v. Mazkouri*, 945 F.3d 293, 304 (5th Cir. 2019) (fraud involving ten or more victims "requires a two-point increase in offense level"). Application note 4(E) states that, "in a case involving means of identification," a "victim" includes "any individual whose means of identification was used unlawfully or without authority." *Mazkouri*, 945 F.3d at 304; U.S.S.G. § 2B1.1 cmt. n.4(E).

The PSR, which the district court adopted, explained:

> For guideline purposes, Red Oak Hospital used the means of identification of more than 10 victim health care identification numbers to submit fraudulent health care claims by receiving patient personal information, via email, from Narang then used that information to file claims with the healthcare companies. The claims were for tests that were not medically necessary nor performed at Red Oak Hospital. This scheme to defraud resulted in Red Oak Hospital billing the insurance companies in excess of $20 million. The use of each individual's personal information used to file a fraudulent claim is considered a victim. In this case, over 400 claims were filed using patient personal information without authority. See *U.S. v. Roy*, 819 F.3d 998, 1002 (7th Cir. 2016), citing the 'term 'victims' includes 'any individual whose means of identification was used unlawfully or without authority, and names and Medicare numbers are 'means of identification.' The court held the persons whose numbers

were used were victims. Also, *see United States v. Barson*, [845 F.3d 159, 167](#) (5th Cir. 2016), which held "Medicare beneficiaries for whom [fraud] conspirators falsely claimed benefits [are] 'victims' under the guidelines." Since Medicare beneficiaries are akin to health care beneficiaries, the probation office maintains the position that the fraud scheme involved 10 or more victims.

([ROA.9947-48](#), *see* [ROA.9950](#)) (brackets original).

The PSR also stated:

Red Oak Hospital used the means of identification of more than 10 victim health care identification numbers to submit fraudulent health care claims. The health care identification numbers were crucial to the success of the fraud scheme, without which Red Oak Hospital nor the defendant would not have received any money. See *United States v. Barson*, [845 F.3d 159, 167](#) (5th Cir. 2016), which held 'Medicare beneficiaries for whom [fraud] conspirators falsely claimed benefits [are] 'victims' under the guidelines.' Since Medicare beneficiaries are akin to health care beneficiaries, the probation office maintains the position that the fraud scheme involved 10 or more victims.

([ROA.9920](#) - ¶ 30) (brackets original).

Dr. Narang contends that Aetna, BCBS, and Cigna were the only victims here, but recognizes existing precedent supports the enhancement. (*See* Narang Brief, p. 31).

Indeed, this Court "has held [U.S.S.G. § note](#) 4(E) can apply in a Medicare-fraud case and that individuals whose identities are used to file fraudulent claims are 'victims' for purposes of § 2B1.1(b)(2)." *Mazkouri*,

945 F.3d at 304; *see Emordi*, 959 F.3d at 651-52 ("[A]pplication Note 4(E) of U.S.S.G. § 2B1.1 defines 'victim' in a way that encompasses ... Medicare beneficiaries because it includes 'any individual whose means of identification was used unlawfully or without authority.'") (ellipsis original); *United States v. Ainabe*, 938 F.3d 685, 689 (5th Cir. 2019), *cert. denied,* No. 19-1407, 2020 WL 5882339 (U.S. Oct. 5, 2020) (same); *Barson*, 845 F.3d at 167 (same); *see also United States v. Akingbade*, 789 F. App'x 488, 489 (5th Cir. 2020) (unpublished)[28] (*Barson*, *Mazkouri*, *Ainabe*, and *Kalu* "'hold that individuals whose identities are used to fraudulently bill the Government are victims' for purposes of § 2B1.1(b)(2)"); *Kalu*, 936 F.3d at 683 (*Barson* held "Medicare beneficiaries for whom [fraud] conspirators falsely claimed benefits [are] 'victims' under the guidelines") (brackets original)).

Even so, Dr. Narang argues, "It should be noted about Red Oak that even the Government's own response argument was clear: 'All patients testified that they had never been to Red Oak and did not authorize any tests to be billed at Red Oak.'" (Narang Brief, p. 33). "Narang contends

---

[28] Although unpublished opinions issued after January 1, 1996, typically are not precedent, they may be persuasive authority. *See United States v. Rodriguez*, 630 F.3d 377, 382 n.19 (5th Cir. 2011); 5th Cir. Loc. R. 47.5.4.

that the Probation's logic reach as to the *Barson* holding exceeds the grasp of that opinion: if being part of the wrongdoing did not completely impede the victimhood status of the medical beneficiaries in *Barson*, then the complete lack of criminal wrongdoing by the beneficiaries at issue in Narang's case militates in favor of a finding that these people were not victims." (Narang Brief, pp. 34-45).

Dr. Narang adds that this Court recently acknowledged it had not been unanimous in its conclusion. *Emordi*, 959 F.3d at 652 (citing *Barson*, 845 F.3d at 168-69 (Jones, J., concurring in part and dissenting in part) (disagreeing with majority as to meaning of "victim"); *Ainabe*, 938 F.3d at 694-95 (Dennis, J., concurring) (disagreeing with *Barson* as to meaning of "victim")). Dr. Narang noted one of the *Emordi* parties was seeking en banc review. (*See* Narang Brief, pp. 32-33). This Court's docket sheet reflects it subsequently denied the *Emordi* petition for rehearing en banc.

The district court in the instant case did not err in imposing the two-level enhancement under § 2B1.1(b)(2)(A)(i). *See Emordi*, 959 F.3d at 651 ("We have already held that "Medicare beneficiaries for whom the conspirators falsely claimed benefits were 'victims' under the Guidelines"

because "[a]pplication Note 4(E) of U.S.S.G. § 2B1.1 defines 'victim' in a way that encompasses the Medicare beneficiaries because it includes 'any individual whose means of identification was used unlawfully or without authority.').

### C. PRECEDENT SUPPORTS THE ENHANCEMENT UNDER U.S.S.G. § 2B1.1(b)(11)(C)(i) FOR DR. NARANG'S UNAUTHORIZED TRANSFER OR USE OF ANY MEANS OF IDENTIFICATION UNLAWFULLY TO PRODUCE OR OBTAIN ANY OTHER MEANS OF IDENTIFICATION.

Dr. Narang's other contested enhancement was under U.S.S.G. § 2B1.1(b)(11)(C)(i). (ROA.9908 - ¶ 84). This guideline authorizes a two-level increase where an offense involves "the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification." *See id*.

Dr. Narang raises the same argument that this Court rejected in *Kalu*, namely, that his fraud did not involve the use of a means of identification to produce a secondary means of identification. *See Kalu*, 936 F.3d at 680. (*See* Narang Brief, pp. 34-35).

This Court has found "'means of identification' is broadly defined as 'any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual.'" *Kalu*, 936 F.3d at

680; *see also* U.S.S.G. § 2B1.1 cmt. n.1 ("[m]eans of identification" has meaning given in 18 U.S.C. § 1028(d)(7), except it shall be of an actual "individual, other than the defendant or a person for whose conduct the defendant is accountable under § 1B1.3 (Relevant Conduct)"). "The statute lists examples of 'means of identification' as 'including *any* . . . name, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number . . . [and] unique electronic identification number, address, or routing code . . . ." *Kalu*, 936 F.3d at 681 (emphasis original); *see* 18 U.S.C. § 1028(d)(7).

Similar to the instant case where false claims were filed using the patients' names, dates of birth, and social security numbers, the *Kalu* co-conspirators billed Medicare over $3 million for health care services that either were medically unnecessary or not performed, and Medicare reimbursed the billing company for a substantial portion of the claims. *Kalu*, 936 F.3d at 679. (*See* ROA.4165 – GX-80A). The defendant did not dispute that Medicare information is a means of identification. *Id.* at 680. He, nevertheless, argued that the enhancement was inapplicable

because he used the beneficiaries' Medicare information only to obtain payment for falsely claimed medical services, not to produce a Medicare claim number or any other means of identification. *Id.* The fact that the Medicare system administratively created a claim number did not justify the enhancement because it is not a "means of identification" under the sentencing guidelines. *Id.*

This Court disagreed and upheld the enhancement, noting its decision was consistent with other cases that have upheld the application of the enhancement in health care schemes. *Id.* at 683. This Court based its decision on a plain reading of the guidelines; "the broad, non-exhaustive nature of the 'means of identification' definition in 18 U.S.C. § 1028(d)(7); and a consideration of persuasive authority." *Id.* at 681. The *Kalu* defendant "unlawfully used each of the beneficiaries' Medicare information (indisputably a means of identification) to produce fraudulent health care claims to bill Medicare." *Id.* Each fraudulent claim had a unique, Medicare-issued claim number tied to a particular beneficiary (other means of identification), and Medicare reimbursed based on these false claims. *Id.*

This Court also cited with approval the "factually analogous" Sixth Circuit decision in *United States v. Gonzalez*, 644 F. App'x 456 (6th Cir. 2016) (unpublished), which is even closer to the instant case. *See id*. at 682. In *Gonzalez*, the defendant submitted false claims to two private insurance companies seeking reimbursement for medical injections that purportedly were administered to patients. *Id.*; *see Gonzalez*, 644 F. App'x at 458. Affirming the application of the enhancement, the Sixth Circuit reasoned that the "names of the beneficiaries [first means of identification] were used to produce fraudulent health claims to obtain money." *Kalu*, 936 F.3d at 682; *Gonzalez,* 644 F. App'x at 465. "The fraudulent health claims, which bear unique numbers, were the second, or 'other,' means of identification." *Kalu*, 936 F.3d at 682; *Gonzalez,* 644 F. App'x at 465. This Court "s[aw] no reason to disagree" and should do the same here. *See Kalu*, 936 F.3d at 682.

### III. THE DISTRICT COURT CORRECTLY APPLIED A TWO-LEVEL ENHANCEMENT UNDER U.S.S.G. § 3B1.3 BECAUSE MOPARTY ABUSED A POSITION OF TRUST. (Responsive to Moparty's Sixth Issue)

#### A. THIS COURT SHOULD REVIEW FOR CLEAR ERROR.

Moparty challenges the district court's denial of his objection to the two-level enhancement under U.S.S.G. § 3B1.3 for the abuse of a position of trust. (Moparty Brief, pp. 17, 57). (ROA.2551, 4541 - ¶ 81, 4516 - ¶ 21).

A district court's application of § 3B1.3 is a sophisticated factual determination that this Court reviews for clear error. *United States v. Pruett*, 681 F.3d 232, 248 (5th Cir. 2012) (per curiam). This Court will uphold a finding provided it is plausible in light of the entire record. *United States v. Miller*, 607 F.3d 144, 148 (5th Cir. 2010).

#### B. MOPARTY'S SUPERIOR POSITION PROVIDED THE FREEDOM TO COMMIT AND CONCEAL CRIMES.

A two-level enhancement under U.S.S.G. § 3B1.3 applies where a "defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." This Court uses a two-part test to determine if there has been an abuse of trust: (1) whether the defendant occupied a

position of trust, and (2) whether he abused his position in a manner that significantly facilitated the commission or concealment of the offense. *Willett*, 751 F.3d at 344. Here, Moparty appears to challenge only the first prong of the test, but the evidence satisfies both prongs.

"A position of trust is characterized by (1) professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference), and (2) minimal supervision." *United States v. Ollison*, 555 F.3d 152, 166 (5th Cir. 2009). People holding these "positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." *United States v. Robinett*, No. 18-11402, 2020 WL 6053363, at *6 (5th Cir. Oct. 13, 2020) (unpublished); U.S.S.G. § 3B1.3 cmt. n.1. "The primary trait that distinguishes a person in a position of trust from one who is not is the extent to which the position provides the freedom to commit a difficult-to-detect wrong." *Ollison*, 555 F.3d at 166.

Moparty fits this profile. The PSR recommended the enhancement because Moparty was an owner of a hospital in the conspiracy and because he significantly facilitated the commission or concealment of the

offense. (*See* ROA.4541 - ¶ 81). Moparty's general objection denied he was the owner and stated the PSR showed he did not profit from the alleged fraudulent billing. (ROA.4516 - ¶ 21). In an addendum, the probation officer responded:

> U.S.S.G. § 3B1.3 cmt. n.1 refers to a position of public or private trust characterized by professional or managerial discretion. For the adjustment to apply, the position of trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection the offense or the defendant's responsibility for the offense more difficult). As owner of Red Oak Hospital, Moparty occupied a position of trust with the health care insurance companies to bill only for services received and medically necessary. Moparty abused his position in a manner that facilitated the commission of the offense by giving patient health care information to bill for services either not received or for testing not medically necessary. As owner of the hospital, the defendant was able to conceal the offense as he had no direct supervision. Therefore, the probation officer asserts the two-level enhancement for abuse of a position of trust was appropriately applied in the guideline calculation.

(ROA.4554 - ¶ 21). The PSR also provided a detailed summary of the facts. (*See* ROA.4533-40 - ¶¶ 9-72).

A district court may adopt facts contained in the PSR "without further inquiry," as the district court ultimately did here (ROA.4558), if those facts have an "adequate evidentiary basis with sufficient indicia of reliability." *United States v. Sparks*, 941 F.3d 748, 756 (5th Cir. 2019),

*cert. denied,* 140 S. Ct. 1281 (2020). Here, the district court had the added benefit of having heard and observed the numerous witnesses who testified as well as having seen the numerous documents.[29]

The evidence at trial showed that Moparty owned 50% of ROH, as he represented in the hospital's signed licensing application. (*See* ROA.4048-49 – GX-136). His brother Roy owned the other half, but only Moparty's email address was on the application. (*See* ROA.4049, 4048 – GX-136). Further evidencing his interest in and control over ROH, Moparty and his brother Roy signed the signature card for ROH's bank account. (ROA.4174 – GX-13A). Agent Lammons confirmed Moparty's interest and financial control. (*See* ROA.2006-08, 2011). The jury also saw Moparty signing and acting on ROH's behalf in emails, text messages, banking transactions, and other documents.

Moparty's position gave him the "freedom to commit a difficult-to-detect wrong." *See Ollison*, 555 F.3d at 166. He was in charge. He was not subject to supervision. *See United States v. Miller*, 906 F.3d 373, 377

---

[29] Moparty also argues the district court overruled his objection without comment, but the record establishes how well prepared the court was for the sentencing hearing. (*See* Moparty Brief, pp. 57-58). The court invited the parties to look at the PSR because it might make the court's "rulings more understandable." (ROA.2550). Defense counsel also had ample opportunity to address the court.

(5th Cir. 2018) (people holding a position of trust ordinarily have significantly less supervision than employees who have primarily non-discretionary responsibilities). "This Court has repeatedly held that individuals occupying high managerial offices within a company may hold a position of trust." *United States v. Bates*, 796 F. App'x 217, 218-19 (5th Cir.) (unpublished) (collecting cases), *cert. denied sub nom. Bates v. United States* No. 20-5293, 2020 WL 5883669 (U.S. Oct. 5, 2020).

Moreover, this Court has "determine[d] that an abuse of position of trust [enhancement] is imposed if a defendant's job places the defendant in a superior position to commit a crime and the defendant takes advantage of that superior position to facilitate a crime." *United States v. Dahlstrom*, 180 F.3d 677, 685 (5th Cir. 1999); *see also Bates*, 796 F. App'x at 218 (same); *United States v. Kilpatrick*, 51 F. App'x 929 (5th Cir. 2002) (unpublished) (same); *United States v. Reeves*, 255 F.3d 208, 212 (5th Cir. 2001) (same).

Such was the case here. Moparty's position is what enabled him to defraud insurance companies and their patients by engaging in false testing billing, pass-through billing, and double billing. *See Akingbade,* 789 F. App'x at 489 (enhancement upheld because defendant was "a

registered nurse in a supervisory position who fraudulently certified patients for home healthcare services [a]nd . . . Medicare relied on . . . [his] honesty and forthrightness in making certifications"); *Willett*, 751 F.3d at 344 ("a DME provider occupies a position of trust because, in order to provide reimbursements, Medicare relies on the honesty and forthrightness of DME providers in their claim submissions"). Because of his position, Moparty was able to direct and use his billing manager Warren to prepare and bill fraudulent insurance claims on ROH's behalf after receiving key patient information from Dr. Narang's office so that insurance companies would be induced to pay higher rates than if Dr. Narang's office had billed them. When the wrongdoing is fraudulently billing insurance companies, "there is no analogous supervision capable of detecting the completed crime." *See generally United States v. Brown*, 7 F.3d 1155, 1161 (5th Cir. 1993) (smuggling money into a prison).

Because Moparty's "superior position . . . not only provide[d] the opportunity to defraud, but also significantly facilitate[d] its commission or concealment," this Court should uphold the enhancement. *See Ollison*, 555 F.3d at 168 n.14; *see also Bates*, 796 F. App'x at 219 (unrebutted PSR facts warranted abuse of trust adjustment where defendant's position as

majority owner and CEO of company "superlatively situated him to perpetrate and conceal his fraudulent scheme"); *Dahlstrom*, <u>180 F.3d at 685</u> (defendant occupied a position of trust as president and CEO of company; unique position contributed to the commission and concealment of crimes and toward the misallocation of company's investment money). "Given the nature of . . . [Moparty's] involvement in the fraudulent conduct, the district court did not clearly err by finding that he abused a position of trust." *Bates*, 796 F. App'x at 219; *see United States v. Njoku*, <u>737 F.3d 55, 78</u> (5th Cir. 2013) (enhancement upheld where Medicare relied on physicians' and RNs' representations and under defendant nurse's scheme, she "essentially made the determination that specific patients qualified for home health care"); *see also Ollison*, <u>555 F.3d at 168</u> n.12 (collecting cases where enhancement applied when a defendant with substantial discretionary authority abused authority in a manner that significantly facilitated the commission or concealment of the offense).

**IV. MOPARTY HAS FAILED TO ESTABLISH REVERSIBLE PLAIN ERROR THAT LAY WITNESS FBI FORENSIC ACCOUNTANT ANDERSON OPINED ON THE ULTIMATE ISSUE OF CRIMINAL INTENT. (Responsive to Moparty's Third Issue)**

**A. THIS COURT SHOULD REVIEW FOR REVERSIBLE PLAIN ERROR.**

Moparty argues FBI forensic accountant Anderson, a lay witness, improperly opined on the ultimate issue of criminal intent for the money laundering counts. He also complains "the government introduced multiple forms of improper remarks" through Anderson's testimony. (Moparty Brief, p. 44).

Where a defendant objects at trial, this Court reviews the admissibility of evidence for an abuse of discretion, subject to a harmless error analysis. *United States v. Oti*, 872 F.3d 678, 690 (5th Cir. 2017). Because Moparty failed to object, this Court must review his complaints for plain error. *See United States v. Coffman*, 969 F.3d 186, 189 (5th Cir. 2020).

To prevail, Moparty must show a clear or obvious error that affected his substantial rights. *See United States v. Portillo*, 969 F.3d 144, 160 (5th Cir. 2020). If he satisfies his burden, this Court should exercise its discretion to correct the forfeited error if it seriously affects the fairness,

integrity, or public reputation of judicial proceedings. *See Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1905 (2018); *Portillo*, 969 F.3d at 160. "Relief under the plain-error standard will be difficult to get, as it should be." *Daniel*, 933 F.3d at 382.

## B. ANDERSON'S TESTIMONY PRIMARILY WAS BASED ON OBJECTIVE FACTS WITH FEW OPINIONS.

In the instant case, Anderson's testimony and conclusions largely were based on objective, documentary evidence – insurance reimbursements, bank signature cards and account data, checks, and similar information. In fact, on the first day of trial, the district court told the venire panel it was a "paper intensive" case. (ROA.847, *see also* ROA.895).

Using these "paper[s]," Anderson testified about the approximately $3.2 million in reimbursements ROH and other Moparty entities received from the insurance companies they had billed. She also described the deposits and withdrawals as the monies moved into, through, and landed in entities Moparty, Dr. Narang, and/or their wives had interests in or owned. In doing so, Anderson identified the respective entities' and individuals' bank accounts. Because there were numerous entities, people, deposits, and withdrawals, Anderson made charts to help the jury

understand the transactions. (*See* ROA.2126-35, ROA.3742 – GX-1B, ROA.3915 – GX-5, ROA.3693 – GX-27, ROA.4115 – GX-33, ROA.3829 – GX-37, ROA.3856 – GX-39, ROA.4144 – GX-40, ROA.4068 – GX-45, ROA.4140 – GX-46, ROA.4109 – GX-54, ROA.4142 – GX-10A, ROA.4179 – GX-30, *see also* ROA.2126-29, ROA.3693 – GX-27, ROA.4029 – GX-65, ROA.4096 – GX-98, ROA.4150 – GX-83, ROA.4162 – GX-90, ROA.4166 – GX-75, ROA.3521 – GX-106, ROA.4032 – GX-108). Her testimony was based on her training and experience at the FBI and the documentary evidence before her. She just followed the paper trail.

Under FED. R. EVID. 701, a lay witness may offer an opinion provided it "is '(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (3) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.'" *United States v. Churchwell*, 807 F.3d 107, 118 (5th Cir. 2015). Even if the testimony requires some specialized knowledge, it is admissible if the lay witness offers straightforward conclusions from observations informed by her experience. *Sanjar*, 876 F.3d at 738.

Moparty, nevertheless, argues Anderson was presented as someone with 30 years' experience "tracing money in health care fraud cases," but Anderson was simply testifying about her background, as witnesses are entitled to do.  (Moparty Brief, p. 44).  (*See* ROA.2124).

Anderson explained that she "always had been either a financial analyst or a forensic accountant.  We trace money." (ROA.2125).  She added that, "[i]n a case of health care fraud, we trace money from, like, Medicare going through bank accounts and . . . how the money is ultimately utilized." (ROA.2125).  Anderson then discussed her education and stated she had a certified fraud examiner's license. (ROA.2125).

Moparty next complains that the Government and Anderson referred to Counts 19-21 in the indictment as the money laundering counts.  (Moparty Brief, p. 44) (citing ROA.2125, 2129, 2132).  A count under 18 U.S.C. § 1957 or the statute itself frequently is referred to as "money laundering."  *See Cleveland v. United States*, 121 S. Ct. 365, 369 (2000); *Sanders*, 952 F.3d at 280; *United States v. del Carpio Frescas*, 932 F.3d 324, 327 (5th Cir.), *cert. denied,* 140 S. Ct. 620 (2019); *Evans*, 892 F.3d at 697, 708; *United States v. Thomas*, 847 F.3d 193, 198 (5th Cir.

2017); *Alaniz*, <u>726 F.3d at 602</u>; *United States v. Cooks*, <u>589 F.3d 173, 180</u> (5th Cir. 2009). The phrase is a shorthand term used to help the jury understand the facts. *See United States v. Reda*, <u>787 F.3d 625, 629</u> (1st Cir. 2015) (use of term "kickback" "was suited to the task of helping the jury on an issue of fact"); *see also United States v. Auzenne*, No. 2:19-CR-53-KS-MTP, <u>2020 WL 6276173</u>, at *2 (S.D. Miss. Oct. 26, 2020) (First Circuit has noted that a common-sense distinction between "conclusory and descriptive terminology" and the use of colloquial terms, such as "kickback" and "bribes," does not necessarily constitute an opinion regarding defendant's mental state or condition) (citing *Reda*, <u>787 F.3d at 629</u>).

In *Reda*, the First Circuit concluded that the district court had not abused its discretion in allowing an agent to use the term "kickback." <u>787 F.3d at 629</u>. The appellate court rejected the defendant's argument that the testimony went to the ultimate legal question. *Id*. It was lay, not expert, opinion testimony, and was not objectionable just because it embraced an ultimate issue. *Id*. (citing <u>FED. R. EVID. 704(a)</u>, which states that "[a]n opinion is not objectionable just because it embraces an ultimate issue"). Rule 704 "does not countenance 'the admission of

opinions which merely tell the jury what result to reach . . . [b]ut protection against that sort of usurpation is found in the criteria for admitting lay opinion testimony, . . . that it be 'helpful to clearly understanding the witness's testimony or determining a fact in issue.'" *Id.* (second set of brackets original) (citing FED. R. EVID. 701(b), which prohibits expert witnesses in criminal cases from giving an opinion about whether a defendant had a mental state or condition that constitutes an element of the charged crime). The First Circuit stated "[t]he pithy colloquialism was suited to the task of helping the jury on an issue of fact, and the court's common sense in seeing it this way is underscored by its demonstrated care in policing the line between conclusory and descriptive terminology." *Id.*

The same is true here. Indeed, Moparty uses the term "money laundering" in his appellate brief. (*See* Moparty Brief, pp. v, 1, 2, 14, 18, 20, 28, 29).

Although Moparty also complains the Government and Anderson referred to money laundering in a conclusory manner, he cannot prove plain error. (*See* Moparty Brief, pp. 45-47). The district court instructed the jurors at the beginning and at the end of trial that lawyers' questions,

statements, objections, and arguments are not evidence (ROA.465, 866), and this Court presumes juries follow their instructions. *See United States v. Owens*, 683 F.3d 93, 104 (5th Cir. 2012); *see also United States v. Granadeno*, 605 F. App'x 298, 302 (5th Cir. 2015) (unpublished) (presumption not defeated that jury followed court's instruction that lawyers' statements and arguments are not evidence).

Also, Anderson's statements or opinions based on the documentary evidence did not tell the jury what verdict to render. "Money laundering" is not the name of the statute or one of the elements. *See* 18 U.S.C. § 1957. The district court also did not use the term in its jury instructions. (*See* ROA.462-96). Instead, as the court explained, Moparty and Dr. Narang were charged "with violating Title 18 U.S.C. Section 1957, which makes it a crime for a person to knowingly engage in or attempt to engage in a monetary transaction involving criminally derived property in excess of $10,000 that is derived from specified criminal activity." (ROA.490). The court then set forth the statutory elements. (ROA.490).

Moparty's final complaint is that Anderson gave her personal opinion regarding his and others' criminal intent as to the reason certain transactions occurred when she stated, "I would say they were trying to

keep arm's length between Cleveland Imaging, Doctor's Diagnostic, and Spring Klein Hospital." (Moparty Brief, p. 46) (citing ROA.2151). Moparty fails to show how this somewhat vague comment constitutes plain error and interferes with the jury's fact-finding role here, particularly when "lay witnesses may give opinion testimony about a defendant's mental state." *United States v. Diaz*, 637 F.3d 592, 599-600 (5th Cir. 2011). "The opinions are not expert ones but are 'based on the witness's perception and that are helpful in understanding the testimony or in determining a fact'" issue.[30] *Id.*

---

[30] Moparty briefly complains about Agent Lammons' unobjected to description of Spring Klein as a "shell company," claiming it was an impermissible opinion on Moparty's intent in creating the company. (Moparty Brief, p. 46). In fact, Agent Lammons was trying to explain what type of company Spring Klein was because ROH had "transferred . . . large chunks" of money into its account. (*See* ROA.2009). His testimony was not directed at Moparty's intent. Agent Lammons answered, "It's not a hospital. It's a – I don't know, shell company." (ROA.2009-10). "It's just a corporation filed by Mr. Moparty. I mean, it's called Spring Klein Surgical Hospital. It's not a hospital. It seems to be an account that collects money from all sorts of different places." (ROA.2009-10).

Moparty also briefly complains about Dr. Grant's statement that sending medical records to someone offsite for review would be "fraudulent . . . illegal" under "CMS ["the parent body of Medicare"], Medicare, and all private insurance guidelines to not have the test be done and interpreted on site and in real time. Those are terms that are used." (*See* Moparty Brief, p. 47). (*See* ROA.1575, 1583). The district court sustained Moparty's objection and instructed the jury to disregard that it was illegal, but it could consider the fact that it violated CMS guidelines. (ROA.1584). The court's ruling comports with Dr. Grant's statement.

This Court also has recognized that, "[w]hile it is well-settled law in this circuit that lay witness opinions amounting to legal conclusions are inadmissible, the line between an impermissible legal conclusion and 'explanation of a [witness's] analysis of facts' is somewhat blurry." *United States v. Keys*, 747 F. App'x 198, 209 (5th Cir. 2018) (unpublished), *cert. denied,* 139 S. Ct. 847 (2019) (second set of brackets original). "Moreover, the distinction is rarely dealt with in depth in the case law, as these types of challenges are often reviewed following a jury trial for plain error and can be disposed of on the third or fourth prong." *Id.*

Such is the case here. If this Court disagrees Anderson's testimony did not amount to a legal conclusion, it, nevertheless, may dispose of this case on the third prong or fourth prong of plain error review.[31] A defendant ordinarily must show a reasonable probability that, but for the error, the outcome of the proceeding would have been different. *Rosales-Mireles*, 138 S. Ct. at 1904-05. Moparty cannot satisfy his burden.

Putting Anderson's testimony aside, there was ample evidence of Moparty's guilt. Witnesses testified about his role in the fraud and

---

[31] Moparty's authorities support this disposition. (*See* Moparty Brief, pp. 47-48).

money laundering, including how he directed his billing manager Warren to work with Dr. Narang's office so that Moparty could then use pass-through and double billing to defraud the insurance companies. Also, contradicting the insurance claims Moparty's office filed, the Groupon patients and E.L. denied that Dr. Sidhu had treated them; that they had received certain tests that the insurance companies were billed for; and/or that they had been treated at Red Oak or any place outside of Dr. Narang's office. A substantial number of documents, including emails, text messages, insurance claims, and monetary reimbursements and transfers proved the fraud and money laundering could not have occurred without Moparty. *See United States v. Lucas*, 849 F.3d 638, 646 (5th Cir. 2017) ("Given the overwhelming quantum of evidence used to convict, any error did not affect Lucas's substantial rights under the third prong of plain-error review and, in any event, under the fourth prong, the putative error would not "seriously affect[ ] the fairness, integrity, or public reputation of the proceedings.") (brackets original).

V. **MOPARTY HAS FAILED TO PROVE REVERSIBLE PLAIN ERROR OR THAT THE DISTRICT COURT ABUSED ITS DISCRETION IN PERMITTING THE INSURANCE COMPANIES' REPRESENTATIVES TO TESTIFY ABOUT THEIR RESPECTIVE EMPLOYERS' PRACTICES AND POLICIES AND OCCASIONALLY ABOUT BROADER MATTERS IN THE INDUSTRY. (Responsive to Moparty's Fourth Issue)**

A. **THIS COURT SHOULD APPLY BOTH PLAIN ERROR REVIEW AND THE ABUSE OF DISCRETION STANDARD HERE.**

Moparty argues reversible error occurred because insurance representatives from Aetna, BCBS, and Cigna were not designated as expert witnesses, but basically were allowed to testify about their companies' respective policies and occasionally industry practices and standards. (*See generally* Moparty Brief, p. 49).

Rarely did Moparty object to the testimonies. (*See* ROA.1391-92, 1394, 1402-03, 1404, 1405, 1408-09, 1410, 1488-89, 1499, 1655-56). Those complaints should be reviewed for plain error. *See Coffman*, 969 F.3d at 189. To prevail, Moparty must prove an error that was clear or obvious and that affected his substantial rights. *Id.* If he meets his burden, this Court has the discretion to remedy the error if it seriously affected the fairness, integrity or public reputation of judicial proceedings. *Id.*

For the complaints where Moparty did object, this Court should review for an abuse of discretion. *See Oti*, 872 F.3d at 690. (*See* Moparty Brief, pp. 49-52) (citing ROA.1372-73, 1382-83, 1487). Unless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction, this Court will not reverse. *Id*.

**B. THE INSURANCE COMPANIES' REPRESENTATIVES STAYED WITHIN THEIR RESPECTIVE EVIDENTIARY BOUNDARIES.**

Under Rule 701 of the Federal Rules of Evidence, lay witnesses must have personal knowledge of the facts underlying their opinions, and their opinions must have a rational connection to the facts. *Texas A&M Research Found. v. Magna Transp., Inc.*, 338 F.3d 394, 403 (5th Cir. 2003); *see Sanjar*, 876 F.3d at 738 (lay witnesses may offer opinion testimony if it is rationally based on their perception, helpful to determining a fact in issue, and not based on specialized knowledge); FED. R. EVID. 701.

Rule 701 does not preclude business owners or officers from testifying about matters that relate to their business affairs, such as industry practices and pricing. *United States v. Valencia*, 600 F.3d 389, 416 (5th Cir. 2010); *National Hispanic Circus, Inc. v. Rex Trucking, Inc.*, 414 F.3d 546, 551-52 (5th Cir. 2005) (same); *Texas A&M Research*

*Found.,* 338 F.3d at 403 (same); *Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co.*, 320 F.3d 1213, 1223 (11th Cir. 2003) (same). The corporate officer or employee can testify about industry practices and pricing without qualifying as an expert. *Texas A&M Research Found.*, 338 F.3d at 403; *see also United States v. Kerley*, 784 F.3d 327, 337 (6th Cir. 2015) ("In a number of decisions from other circuits, courts have permitted witnesses to give lay opinion testimony about a business's policies, practices, or procedures, based on an after-the-fact review or analysis of documents or facts, if the witness's testimony derived from personal knowledge gained through participation in the business's day-to-day affairs.") (collecting cases).

This type of "opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business." *Kerley*, 784 F.3d at 339 ("other circuits have permitted lay opinion testimony based on particularized knowledge on a variety of topics, when the witness gained such knowledge through employment or involvement in the day-to-day affairs of the business in question") (collecting cases); *see also United*

*States v. Powers*, 578 F. App'x 763, 771 (10th Cir. 2014) (unpublished) (defendant's "argument is undermined by decisions in a number of other circuits explaining that lay witnesses may, consistent with Rule 701(a), testify broadly regarding an employer's practices, policies, and procedures, so long as their testimony is derived from personal knowledge and experience at the business") (citing cases).

This Court rejected a defendant's argument that three fact witnesses – (1) a certified public accountant for an Alabama HMO who one of the defendants later hired to work for the Louisiana HMO at issue, (2) a former Florida insurance regulator who the defendant had hired to investigate possible recoveries from Medicare for the Louisiana HMO, and (3) an auditor the state department of insurance had hired "to conduct a targeted review of" the Louisiana HMO's financial statements – had been allowed to testify about Louisiana accounting laws in relation to the failure of a Louisiana HMO when they were not qualified as experts in Louisiana law. *United States v. McMillan*, 600 F.3d 434, 456-57 (5th Cir. 2010). This Court concluded that, "[t]o the extent that some of the witnesses' testimony may have implicated specialized knowledge by defining certain accounting terms and discussing standardized

accounting guidelines, we conclude that the error in allowing the testimony, if any, was harmless because in the context of the entire trial we see no reasonable basis to find an effect on the jury's verdict." *Id.* at 457.

In the instant case, Moparty targets testimonies primarily related to the insurance representatives' daily activities as they oversaw or dealt with policy terms, procedures, and protections. Each of the representatives had many years of experience in the insurance industry and held a managerial position in her respective company. (*See* ROA.1371-78, 1484-90, 1644-45). At no time did the insurance representatives accuse Moparty of a crime or give a legal conclusion. Instead, the Aetna, BCBS, and Cigna representatives testified about their respective companies' policies and procedures and occasionally industry practices. They explained how one of the major factors affecting reimbursements or payments is whether the claims are in-network or out-of-network. Their testimonies also focused on authorized and unauthorized claims and payments based on their companies' policies and procedures. Their companies would not have paid for tests that were represented to occur in one place and, therefore, eligible for higher

reimbursement rates, but actually occurred somewhere else. Likewise, they would not have paid for incompetent or nonexistent testing.

The representatives' testimonies fell safely within the realm of lay witness testimony. Their testimonies "provided factual information about the circumstances of the case." *McMillan*, 600 F.3d at 456. No error, let alone plain error, occurred here. *See Valencia*, 600 F.3d at 416 (former risk officer was a lay witness, not an expert witness; his knowledge and analysis were derived from his former duties and his opinions were admissible as testimony based upon personal knowledge and experience gained during his employment; the fact that he drew particular opinions and projections for the purposes of the case did not make him an "expert" within the meaning of FED. R. EVID. 702); *DIJO, Inc. v. Hilton Hotels Corp.*, 351 F.3d 679, 685 (5th Cir. 2003) (court previously recognized that FED. R. EVID. 701 "amendment did not place any restrictions on preamendment practice of allowing business *owners or officers* to testify based on *particularized knowledge* derived from their position") (emphasis original); *see also Kerley*, 784 F.3d at 338-40 (concurring "with the Eleventh Circuit's view that 'it does not take any specialized or technical knowledge to realize that lending

institutions would be reluctant to approve a loan application if they knew that it contained false material facts;'" "witnesses had personal knowledge of their respective employers' underwriting and lending guidelines, policies, and procedures plus experience in applying them and then "simply applied that experience and knowledge to their review of the loan documents" in dispute); *Powers*, 578 F. App'x at 772 (where the lender witnesses' testimony was based on personal knowledge and experience with their respective firms' application-assessment policies and procedures, it requires no great stretch of the imagination to see how a court could conclude that this testimony was based on the witnesses' "first-hand knowledge or observation" as required by Rule 701(a)); *United States v. Cuti*, 720 F.3d 453, 460 (2d Cir. 2013) ("When the issue for the fact-finder's determination is reduced to impact—whether a witness would have acted differently if he had been aware of additional information—the witness is engaged in a process of reasoning familiar in everyday life."); *Burlington N. R. Co. v. State of Neb.*, 802 F.2d 994, 1004-05 (8th Cir. 1986) ("Personal knowledge or perception acquired through review of records prepared in the ordinary course of business, or perceptions based on industry experience, is a sufficient foundation for

lay opinion testimony."); *Tampa Bay Shipbuilding & Repair Co.*, 320 F.3d at 1223 (upholding lay witnesses' testimonies about their "particularized knowledge garnered from years of experience with the field" was helpful to the judge and relevant to the issues); *see generally United States v. Staggers*, 961 F.3d 745, 761 (5th Cir.), *cert. denied,* No. 20-5051, 2020 WL 5883456 (U.S. Oct. 5, 2020) ("agents testifying as lay witnesses 'may testify about the significance of particular conduct or methods of operation unique to the drug business'"); *United States v. Espino-Rangel*, 500 F.3d 398, 400 (5th Cir. 2007) (narcotics agent may testify about the significance of particular conduct or methods of operation unique to the drug business provided testimony is helpful and its relevance is not substantially outweighed by the possibility of unfair prejudice or confusion).

Even if this Court disagrees, Moparty cannot satisfy the third prong of plain error review, which ordinarily requires him to "show a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Coffman*, 969 F.3d at 189. Likewise, under the abuse of discretion standard, he cannot demonstrate a reasonable possibility that the allegedly improper evidence contributed to his

conviction. *See Oti*, 872 F.3d at 690. As stated earlier, there was a wealth of independent testimony and documentary evidence establishing Moparty's participation in the health care fraud scheme and in money laundering.

VI. **MOPARTY AND DR. NARANG HAVE FAILED TO SATISFY THEIR HIGH BURDEN OF PROVING THE DISTRICT COURT REVERSIBLY ERRED IN DENYING THEIR MOTION FOR MISTRIAL. (Responsive to Dr. Narang's First Issue and Moparty's Second Issue)**

   A. **THIS COURT MUST DETERMINE WHETHER THE DISTRICT COURT ABUSED ITS DISCRETION AND WHETHER REVERSIBLE PLAIN ERROR OCCURRED.**

Dr. Narang and Moparty argue the district court abused its discretion in denying their joint motion for a mistrial that complained the Government improperly referred to Dr. Sidhu's guilty plea during its opening statement and that Agent Lammons also testified Dr. Sidhu pleaded guilty.[32] (*See* Moparty Brief, p. 30, Narang Brief, p. 27). Moparty raises the additional ground that Dr. Grant testified that he had researched the three physicians who were interpreting the NCV tests for Dr. Narang and learned one was a convicted felon. (Moparty Brief, p. 30). (*See* ROA.1581).

_____

[32] Moparty's issue is framed as a denial of his motion for new trial, but he did not file a motion for new trial. (*See* Moparty Brief, pp. v, 1, 15, 30). The substance of his argument focuses on the denial of the joint motion for a mistrial.

This Court usually reviews the denial of a motion for mistrial for an abuse of discretion. *United States v. Romero-Medrano*, 899 F.3d 356, 361 (5th Cir. 2018). A district court abuses its discretion when its decision is based on an erroneous view of the law or a clearly erroneous assessment of the evidence. *Id*. This standard applies to the Defendants' complaint about Agent Lammons' testimony and Moparty's issue regarding Dr. Grant's testimony.

Because the Defendants did not object to the brief mention of Dr. Sidhu's guilty plea during the Government's opening statement, plain error review applies to that argument. *Sanders*, 952 F.3d at 282 (where counsel fails to object contemporaneously to action that forms the basis for the mistrial motion, plain error review applies). (*See* ROA.870). To establish plain error, the Defendants must show that the error is clear or obvious and that the comments, "taken as a whole in the context of the entire case, substantially prejudiced . . . [their] rights." *See United States v. Harms*, 442 F.3d 367, 378 (5th Cir. 2006). "Plain error may be recognized only if the error is so obvious that the failure to notice it would seriously affect the fairness, integrity, or public reputation of judicial proceedings and result in a miscarriage of justice." *Id*.

Although defendants frequently seek mistrials alleging prosecutorial misconduct, they are rarely granted. *United States v. Bowen*, [799 F.3d 336, 356](799 F.3d 336, 356) (5th Cir. 2015). Even where a district court finds that misconduct occurred, it normally must also find that the misconduct in question actually prejudiced the defense. *Id.* Prejudice depends on the extent to which the particular misconduct contributed to a guilty verdict. *Id.* Here, the district court correctly concluded that the "Defendants' right to a fair trial was not compromised by any of the alleged errors." ([ROA.669](ROA.669)).

## B. THE DISTRICT COURT CORRECTLY DETERMINED THE PROSECUTORS DID NOT ACT IN BAD FAITH AND ANY ERROR WAS HARMLESS.

"Defendants are entitled to have questions of guilt based on the evidence against them, 'not on whether a government witness or a codefendant has plead guilty to the same charges.'" *United States v. Delgado*, [401 F.3d 290, 299](401 F.3d 290, 299) (5th Cir. 2005). The two references to Dr. Sidhu's guilty plea did not compromise this important principle.

The first time Dr. Sidhu's guilty plea was mentioned was during the Government's opening statement. The prosecutor was discussing how Dr. Narang had "tweaked" the "scheme a little" by now putting the

medical tests under Dr. Sidhu's name, rather than his own. (ROA.870). The prosecutor compared their relationship to Batman and Robin, meaning Dr. Sidhu "just follows the orders of Dr. Narang." (ROA.870). Because Dr. Sidhu was paid a salary, he did not have an incentive to order unnecessary tests. (ROA.871). The Government then stated, "You will also hear that Dr. Sidhu is not in this trial because he has already pled guilty." (ROA.870). There was no objection, and the prosecutor moved on to discussing the formation of ROH. (ROA.870).

The second time Dr. Sidhu's plea was referenced was on the sixth day of trial when the other prosecutor was questioning Agent Lammons:

> [GOVERNMENT]: Okay. And we haven't talked a lot about Dr. Sidhu yet. We've heard that he was working with Dr. Narang but haven't seen him in this trial. Why is that?

> A. He's already pled guilty.

> [DR. NARANG'S COUNSEL]: Judge, I'm going to object and ask for the Court to instruct the jury at this time -- this is a 403 issue. His plea of guilty is not before this jury. I don't have a right to cross-examine Dr. Sidhu. This is misconduct. And I object. A limiting instruction for them to disregard.

> THE COURT: Do you have anything to add?

> [MOPARTY'S COUNSEL]: Same objection, Your Honor.

> THE COURT: Dr. Sidhu is not here. He did plead guilty. The fact that he's guilty is not evidence that any other person

is guilty of any wrongdoing. His case was considered separately, and you're not to draw any adverse inference from the fact that Dr. Sidhu may believe he is guilty. It's not relevant to this case. These defendants are presumed to be innocent. The fact that somebody else may be guilty does not in any way affect the presumption of innocence that cloaks them and remains with them until such time, if ever, that the government can prove these defendants guilty of anything.

Is that satisfactory?

[DR. NARANG'S COUNSEL]: Your Honor, I believe there was a confrontation clause problem and we can take it up after his testimony.

THE COURT: Well, tell me about it now so I can fix it, if there's a problem.

[DR. NARANG'S COUNSEL]: We do not have an ability to cross-examine Dr. Sidhu. The government is not going to call Dr. Sidhu.

THE COURT: Can't you subpoena him?

[DR. NARANG'S COUNSEL]: We were told that they were going to bring Dr. Sidhu.

THE COURT: Well, you can issue a subpoena if you think his testimony is relevant. Let's move along.

(ROA.2031-32). No one called Dr. Sidhu to testify, which, as defense counsel noted in their motion, comported with what the Government had told the court two days earlier, that it had changed its mind and was not going to call Dr. Sidhu as a witness. (ROA.1683-84, 5937).

121

The district court told the parties to submit an agreed instruction regarding Dr. Sidhu for the jury charge and then submitted it to the jury in the formal charge:

> You have heard that Dr. Sidhu pled guilty to a crime. Do not consider his plea as any evidence of guilt. It is not. Dr. Sidhu's decision to plead guilty was a personal decision. Disregard Dr. Sidhu's guilty plea completely when considering DR. NARANG or DR. MOPARTY'S guilt or innocence. As I instructed you during the trial, Dr. Sidhu's guilty plea is not to be considered by you in any way as you decide whether the government has met its burden to prove beyond a reasonable doubt that DR. NARANG or DAYAKAR MOPARTY committed the crimes alleged in the indictment.

(ROA.472, 2384-85, *see* ROA.672).

In response to the joint motion for a mistrial, the Government argued the "two passing mentions of Sidhu's plea were not for an improper purpose." (ROA.549). The Government had "correctly anticipated from Defendants' responses to subpoenas and a partial pretrial deposition of Sidhu that Defendants' trial strategy would be (a) to paint Sidhu as a rogue actor, using documents they created for that very purpose; and then (b) to distance themselves from his illegal acts." (ROA.549). Also, the Government "was prepared to call Sidhu to testify. The government's anticipatory reasons for mentioning the plea as a background were not improper." (ROA.549).

The Government also pointed out the district court had given "a forceful limiting instruction" at the time of defense counsels' objections to Agent Lammons' testimony and instructed the jury again in the formal charge. (ROA.549, *see* ROA.472). The Government denied emphasizing or trying to use the plea as substantive evidence. (ROA.549-50). Alternatively, the Government maintained the error was harmless. (ROA.550).

The Government did not mention that it had told the district court two days before Agent Lammons' testimony that it would not be calling Dr. Sidhu, but then asked Agent Lammons the objectionable question. The district court also did not reference the prosecutor's earlier statement in its memorandum opinion denying the motion for mistrial, but the court clearly had knowledge of it and took everything into consideration. The district judge, who knew the prosecutors from eight days of trial and the pre-trial proceedings here, did not believe they were engaging in misconduct. As set forth below, the court specifically found that "there is no indication that either of the challenged statements were made in bad faith." (ROA.677).

Instead, the district court applied the "*King* factors" to resolve "the propriety of the government's introduction of a co-defendant's guilty plea." (*See* ROA.671). *See United States v. King*, 505 F.2d 602, 608 (5th Cir. 1974); *Delgado*, 401 F.3d at 299-300 ("under some circumstances the government might have a legitimate evidentiary reason for bringing out testimony relating to its witnesses' prior convictions, even when those convictions are for charges similar or identical to those upon which the defendant is being charged").

Those factors are: (1) the presence or absence of a limiting instruction; (2) whether there was a proper evidentiary purpose for the introduction of the guilty plea; (3) whether the plea was improperly emphasized or used as substantive evidence of guilt; and (4) whether defense counsel invited the introduction of the plea. *See Delgado*, 401 F.3d at 300; *King*, 505 F.2d at 608. (*See* ROA.671). Because the Government "did not contest that counsel for Defendants did not invite the government's introduction of Dr. Sidhu's plea," the district court focused on the other three factors. (*See* ROA.671).

The district court correctly determined that the first factor weighed in the Government's favor because the court had given a

contemporaneous limiting instruction during Agent Lammons' testimony and subsequently charged the jury with the agreed instruction counsel had tendered. (ROA.671-73). As the district court recognized, this Court has embraced "[t]he 'almost invariable assumption' . . . that jurors follow such instructions." *United States v. Ramos-Cardenas*, 524 F.3d 600, 611 (5th Cir. 2008); *see Richardson v. Marsh*, 107 S. Ct. 1702, 1707 (1987) (citing numerous cases where the Supreme Court has applied the "almost invariable assumption of the law that jurors follow their instructions . . . which . . . [it has] applied in many varying contexts") (collecting case); *see also United States v. Burden*, 964 F.3d 339, 346 n.3 (5th Cir. 2020) (citing *Marsh* for the "almost invariable assumption of the law" rule); *United States v. Gill*, 642 F. App'x 323, 325 (5th Cir. 2016) (unpublished) (same); *United States v. Stalnaker*, 571 F.3d 428, 434 (5th Cir. 2009) (same). Here, the district court concluded that its "two forceful limiting instructions undermine Defendants' argument that the introduction of Dr. Sidhu's guilty plea compromised their right to a fair trial and weigh[ed] against granting Defendants' Motion." (ROA.673).

The district court was correct. "[T]here is no reason to believe that the jury did not obey . . . [its] instruction[s]" here. *See United States v.*

*Gevorgyan*, 886 F.3d 450, 458 (5th Cir. 2018). Dr. Narang and Moparty

have "not overcome that presumption." *See Burden*, 964 F.3d at 346.

The district court also correctly determined that "[t]he government

did not improperly emphasize Dr. Sidhu's guilty plea or attempt to lead

the jury to draw any improper references from it." (ROA.673). The "plea

was mentioned only twice during an eight-day trial." (ROA.673). The

district court found "[b]oth references to Dr. Sidhu's plea were in the

context of explaining why Dr. Sidhu, who played a central role in the

scheme alleged by the government and who was charged in the same

indictment as Defendants, was not present at trial." (ROA.673).

The district court also determined "[t]he plea was not admitted as

substantive evidence." (ROA.674). The Government's "statement"

"during its opening statement [wa]s not evidence, and the jury was

instructed as such before opening statements began." (ROA.674). Also,

after Agent Lammons' testimony, "the court instructed the jury that Dr.

Sidhu's plea 'is not evidence that any other person is guilty of any

wrongdoing.'" (ROA.674). The court concluded "the fact that evidence of

Dr. Sidhu's guilty plea was neither improperly emphasized by the

government nor considered by the jury as substantive evidence of

Defendants' guilt weighs against any argument that Defendants' right to a fair trial was compromised." (ROA.674).

The district court did reject the Government's argument that there was a legitimate purpose for the introduction of Dr. Sidhu's guilty plea, finding that "at least one of the [two] challenged statements weighs slightly in favor of granting Defendants' Motion." (*See* ROA.674-77). The court determined the "Defendants' trial strategy did not rely on Dr. Sidhu's plea." (ROA.675).

Even so, the court found, "There is no evidence that the government did not intend to call Dr. Sidhu as a witness," pointing to the fact that Dr. Sidhu, who was in failing health, had been deposed to ensure his testimony would be preserved for trial. (ROA.676). The court determined the Government's reference during opening statement "arguably had a legitimate purpose: to anticipate and preemptively counter defense counsel's efforts to impeach Dr. Sidhu with his guilty conviction during his eventual cross-examination." (ROA.676). The same was "not true" for Agent Lammons' statement, which was provided near the conclusion of the Government's case-in-chief and it "likely knew at that point that it no longer planned to call Dr. Sidhu as a witness." (ROA.676-77).

Nevertheless, "[t]he court conclude[d] that there [wa]s no indication that either of the challenged statements were made in bad faith." (ROA.677).

Moreover, the court determined that any error "was harmless beyond a reasonable doubt" and denied the motion for mistrial on this basis. (ROA.677-78). "Dr. Sidhu's plea was never admitted or considered by the jury as substantive evidence." (ROA.677). Also, two limiting instructions were given – the first time the Defendants objected and again in the court's jury's instructions. (ROA.677-78).

The court stated the references to Dr. Sidhu's guilty plea could be "quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." (ROA.678) (citing *Arizona v. Fulminante*, 111 S. Ct. 1246, 1264 (1991)). The district court also correctly concluded that, "The admissible evidence presented to the jury 'overwhelmingly eclipses the two [brief] mentions of Sidhu's plea.'" (ROA.678) (brackets original). In doing so, the court cited to "a nonexclusive list of the evidence" that was presented at trial, which the Government had summarized in its response, and was sufficient for the jury to find Defendants guilty beyond a reasonable doubt: "(1) lead medical assistant Kesha Burton's testimony

that she was instructed by Narang and his wife to falsify documents, she was coached by Narang on how to deceive weight-loss patients into submitting to unnecessary tests, and she attended a meeting with Moparty where the staff was coached on how not to get caught for fraud; (2) E.L.'s recording where Narang states that he and Moparty have a deal that none of Narang's patients will be charged any of the cost-sharing required by insurance companies; (3) Moparty accountant Keon Warren's testimony that he personally informed Narang that they could not re-submit claims through multiple entities, and that Moparty instructed Warren to do it anyway and 'see what happens'; (4) testimony from three insurance representatives that the prohibitions on Narang and Moparty's schemes were 'Insurance 101,' and that Narang and Moparty's contracts plainly prohibited their fraudulent practices; (5) the testimony of five credible women that they had never been treated by Sidhu, the physician on their paperwork and claims data; and (6) a cover-up paper trail including bogus real estate and consulting agreements, shell companies with straw owners, and movement of monies entirely inconsistent with the coverup agreements." (ROA.678 & n.21).

The district court also explained the reason it had rejected defense counsels' confrontation challenge was because they had the ability to subpoena Dr. Sidhu. (ROA.670). The exchange shows the experienced district court judge analyzed the question to Agent Lammons, his response, and the attorneys' arguments. The court's statement did not compound the error, shift the burden, or comment on a lack of defensive evidence. The court believed it had correctly dealt with the issue and wanted the testimony to proceed. (*See* ROA.2031-32).

## C. THE DISTRICT COURT'S CONTEMPORANEOUS INSTRUCTION TO THE JURY CURED ANY PROBLEM WITH DR. GRANT'S BRIEF STATEMENT REGARDING A THIRD-PARTY PHYSICIAN'S HEALTH CARE FRAUD CONVICTION.

Moparty also argues the district court abused its discretion in denying his motion for mistrial based on Dr. Grant's testimony that he had "Googled" Dr. Ahmed [a third-party doctor] and "found that he's a convicted felon for health care fraud in January of 2017. Probably in this exact building is where that happened." (*See* Moparty Brief, pp. 30, 33-35). (ROA.1581).

At the time, Dr. Grant had been testifying about the unnecessary NCV testing the patients underwent in Dr. Narang's office, the excessive amounts charged for the tests, and how so many tests were "fraught with

errors and inaccuracies" that they were "useless." (*See* ROA.1575-77).

Dr. Grant also criticized Dr. Narang for sending the NCV test results offsite to three other physicians to interpret when they had never examined the patient and were relying on tests that were 81% inaccurate. (ROA.1577, 1579). In response to whether he had researched the three doctors, Dr. Grant volunteered the doctor convicted of health care fraud. (ROA.1581). The court sustained Dr. Narang's objection, told the prosecutor she should have disclosed the conviction, and instructed the jury to disregard the fact that Dr. Ahmed had a conviction. (ROA.1582, *see* ROA.680). The court also instructed the jury there was no evidence that either Dr. Narang or Moparty knew about the conviction. (ROA.1582, *see* ROA.680).

In ruling on the Defendants' subsequent motion for mistrial, the district court was "not persuaded that Dr. Grant's statement was proper impeachment evidence" or "had any proper evidentiary purpose." (ROA.681). Nevertheless, the error was harmless. (ROA.681).

Citing *United States v. Medina-Arellano*, 569 F.2d 349, 356 (5th Cir. 1978), the district court stated that, "[w]hen an individual has been

convicted of a healthcare fraud conspiracy unrelated to the healthcare fraud conspiracy with which a defendant is currently charged":

> [t]he jury does not learn that the government had a conspiracy case so strong that one of the accused pleaded guilty. Moreover, it cannot infer from this information anything prejudicial to the defense. The jury could infer from the plea to an earlier conspiracy only that the [individual] was the type of person who would conspire illegally if given the chance. Such an inference is not prejudicial to the defense.

 (ROA.681) (brackets original).

The court added that it also had given "the jury firm limiting instructions both to 'disregard the fact that Dr. Ahmed had a conviction' and that 'there's no evidence Dr. Narang knew of the conviction.' (ROA.681). The court then cited "the 'almost invariable assumption' that jurors follow such instructions" and found the error harmless. (ROA.681) (citing *Ramos-Cardenas*, 524 F.3d at 611 (quoting *Marsh*, 107 S. Ct. at 1707)).

The district court's decision was not based on an erroneous view of the law or a clearly erroneous assessment of the evidence. *See Romero-Medrano*, 899 F.3d at 361. This conclusion is strengthened by the fact that, as the district court stated, this Court is to presume the jury followed its instructions. *See Sheppard v. Davis*, 967 F.3d 458, 471 (5th

Cir. 2020) (absent evidence to the contrary, presume jury followed curative instructions) (citing *Weeks v. Angelone*, <u>528 U.S. 225, 234</u> (2000)); *United States v. Sanders*, <u>966 F.3d 397, 403</u> (5th Cir. 2020) (court presumes juries follow instructions when reaching decisions).

Moreover, Moparty has failed to show "substantial prejudice." *See United States v. Barnes*, No. 18-31074, <u>2020 WL 6304699</u>, at *7 (5th Cir. Oct. 28, 2020) (reversal not warranted unless defendant shows district court's ruling caused him substantial prejudice). As stated throughout this brief, a significant amount of the Defendants' fraud was evidenced in objective documentary evidence supporting the jury's guilty verdict.

## VII. THE RARELY USED CUMULATIVE ERROR DOCTRINE HAS NO PLACE HERE. (Responsive to Moparty's Fifth Issue)

Moparty also argues that the totality of the Government's misconduct denied him a fair trial. (Moparty Brief, pp. 42-44).

"[T]he cumulative error doctrine ... provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." *United States v. Delgado*, <u>672 F.3d 320, 343-44</u> (5th Cir. 2012) (brackets and ellipsis original). Reversal is justified "only in the unusual case in which synergistic or repetitive error

violates the defendant's constitutional right to a fair trial." *United States v. Maes*, <u>961 F.3d 366, 380</u> (5th Cir.), *as revised* (June 2, 2020); *Delgado*, <u>672 F.3d at 344</u> (same). "Stated another way, cumulative error necessitates reversal only when errors 'so fatally infect the trial that they violated the trial's fundamental fairness.'" *Delgado*, <u>672 F.3d at 344</u>; *see Derden v. McNeel,* <u>978 F.2d 1453, 1456</u> (5th Cir. 1992) (en banc) (this Court repeatedly has "emphasized that the cumulative error doctrine necessitates reversal only in rare instances and previously stated en banc that 'the possibility of cumulative error is often acknowledged but practically never found persuasive.'").

Moreover, reversal "is especially uncommon where, as here, the government presents substantial evidence of guilt." *See Delgado*, <u>672 F.3d at 344</u>. Based on these rules, the cumulative error doctrine should not apply here. *See United States v. Chikere*, 751 F. App'x 456, 462 (5th Cir. 2018) (unpublished) (purported errors did not so fatally infect the trial they violated the trial's fundamental fairness); *see also Delgado*, <u>672 F.3d at 344</u>.

Moparty cites *Yates v. Evatt,* <u>111 S. Ct. 1884</u> (1991), in support of his position, but to the extent errors occurred here, they are a far cry from

the situation in *Yates*. That case was before the United States Supreme Court for the third time, and the Supreme Court of South Carolina had found that instructions allowing a jury to apply unconstitutional presumptions were harmless error. *See id*. at 1888, 1890-92; *see also United States v. Stanford*, 823 F.3d 814, 831 n.10 (5th Cir. 2016) (*Yates* explained that, when a "trial court has instructed a jury to apply an unconstitutional presumption, a reviewing court can hardly infer that the jurors failed to consider it").

Moparty's reliance on *United States v. Houston,* 481 F. App'x 188 (5th Cir. 2012) (unpublished), also is misplaced. In *Houston*, this Court found that the following errors cumulatively required reversal – an erroneous jury charge on constructive possession, the district court's refusal to give an alibi instruction in the jury charge, the erroneous admission of two misdemeanor convictions, and the erroneous admission of the confession of the deceased alleged accomplice in violation of the Confrontation Clause. *Id*. at 190. This Court held that the combination of errors prejudiced the defendant's ability to argue his case to the jury. *Id.* at 195. This Court also determined "all of the errors. . . caused confusion and prejudice that reached to the heart of the case." *Id*. The

evidence was "not strong enough to overcome the aforementioned cumulative error." *Id.*

In the instant case, any errors did not cause confusion or prejudice. The court's contemporaneous and formal instructions to the jury were clear and accurate. Also, neither Moparty nor Dr. Narang has raised any complaints about the court's formal instructions to the jury, and there is no evidence that the jury failed to follow them. The jury understood both the evidence and the weight of it against the Defendants, as evidenced by the fact that it rendered its verdict on the same day. (*See* ROA.10 – Docket Entries 166, 168). Any alleged errors here warrant this Court refusing to find cumulative error. This result is especially compelling where the district court determined that the "Defendants' right to a fair trial was not compromised by any of the alleged misconduct." (*See* ROA.682).

## <u>CONCLUSION</u>

This Court should affirm the judgments of conviction and sentence.

Respectfully submitted,

RYAN K. PATRICK
United States Attorney

CARMEN CASTILLO MITCHELL
Chief, Appellate Division

s/ *Eileen K. Wilson*
EILEEN K. WILSON
Assistant United States Attorney

U.S. Attorney's Office
1000 Louisiana, Suite 2300
Houston, Texas 77002
Phone: (713) 567-9102

ATTORNEYS FOR APPELLEE

## **CERTIFICATE OF SERVICE**

I certify that, on November 16, 2020, an electronic copy of the Government's brief was served, by notice of electronic filing, via this Court's ecf system, upon opposing counsel, Messrs. Seth Kretzer, Steven J. Lieberman, and Michael McCrum. Upon notification that the electronically-filed brief has been accepted as sufficient and upon the clerk's request, seven paper copies of this brief will be placed in the United States Mail, postage prepaid, addressed to the Clerk. *See* 5TH CIR. R. 25.2.1; 5TH CIR. R. 31.1; 5TH CIR. ecf filing standard E(1).

s/ *Eileen K. Wilson*
EILEEN K. WILSON
Assistant United States Attorney

# CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation requirements of FED. R. APP. P. 32(a)(7)(B) because it contains **26,088** words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f), and a Motion for Leave to File Extra Length Brief is pending.

2.  This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Century Schoolbook, 14 point font for text and 12 point font for footnotes.

3.  This brief complies with the privacy redaction requirement of 5TH CIR. R. 25.2.13 because it has been redacted of any personal data identifiers.

4.  This brief complies with the electronic submission of 5TH CIR. R. 25.2.1, because it is an exact copy of the paper document.

5.  This brief is free of viruses because it has been scanned for viruses with the most recent version of McAfee Endpoint scanning program.

s/ *Eileen K. Wilson*
EILEEN K. WILSON
Assistant United States Attorney
Dated: November 16, 2020