No. 19-20797

---

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

**UNITED STATES OF AMERICA,**
Plaintiff–Appellee

v.

**DAYAKAR MOPARTY; HARCHARAN SINGH NARANG,**
Defendants-Appellants

---

**On Appeal from the United States District Court**
**For the Southern District of Texas**
**Houston Division**
**No. 17-CR-00290**

---

**REPLY BRIEF FOR DEFENDANT-APPELLANT**
**DAYAKAR MOPARTY**

---

**MICHAEL MCCRUM**          **STEVEN J. LIEBERMAN**
**BAR NO. 13493200**        **TBA NO. 12334020**
**404 E RAMSEY RD STE 102** **712 MAIN STREET, SUITE 2400**
**SAN ANTONIO, TX 78216-4665** **HOUSTON, TEXAS 77002**
**(210) 225-2285 (PHONE)**  **(713) 228-8500 (PHONE)**
**(210) 225-7045 (FAX)**    **(713) 228-0034 (FAX)**


**Counsel For Defendant-Appellant,**
**DAYAKAR MOPARTY**

i

# TABLE OF CONTENTS

PAGE

TABLE OF CONTENTS ............................................................ ii

INDEX OF AUTHORITIES ...................................................... iv

ARGUMENTS AND AUTHORITIES .................................... 2

    I. The Evidence is Legally Insufficient to Support Moparty's Conviction .... 2

        A. The Government's Theory Improperly Relies Upon Inferences, Rather than Circumstantial Evidence, that Moparty Knowingly and Willfully Participated in the Fraud Allegedly Committed by Drs. Narang and Sidhu .................................................. 2

        B. The Government's Characterization of Red Oak Hospital's Billing as "Pass-Through" Billing is Not Evidence of Criminal Fraud and Ignores the Evidence that Red Oak Hospital was a Licensed Hospital that Could Bill for Outpatient Services............. 6

    II. The District Court's Denial of the Motion for Mistrial was Reversible Error. .................................................................. 10

        A. Moparty's Motion for Mistrial was Based Upon Trial Objections, therefore the Grounds Raised are Not Subject to Plain Error Review ..................................................... 10

        B. The Government's Repeated References to Dr. Sidhu's Guilty Plea was Calculated and Deliberate. ............................................ 12

        C. The Government's Singular Reliance on the Court's Limiting Instruction Does Not Cure the Government's Misconduct........... 13

D. Sidhu's Guilty Plea was Improperly Emphasized and Served No Legitimate Purpose Other than to Prejudice the Jury. .................. 14

III. Government's Law Enforcement Agent Improperly Opined on the Ultimate Issue of Criminal Intent. .......................................... 15

IV. District Court Erred in Permitting Government to Introduce Expert Opinions from Lay Witnesses. ................................................. 19

V. The Finding that Moparty Occupied a Position of Trust was Clearly Erroneous. ............................................................................. 21

CONCLUSION.................................................................... 23

CERTIFICATE OF SERVICE ............................................. 24

CERTIFICATE OF COMPLIANCE...................................... 25

# INDEX OF AUTHORITIES

**CASES**                                                   **PAGE**

*Holguin-Hernandez v. United States*,
   140 S.Ct. 762, 766 (2020) ................................................................. 10

*Puckett v. United States*,
   556 U.S. 129, 134 (2009) ................................................................. 11

*United States v. Bowen,*
   799 F.3d 336 (5th Cir. 2015) ............................................................ 15

*United States v. Dixon,*
   185 F.3d 393, 401 (5th Cir. 1999) ................................................... 20

*United States v. Fleetwood,*
   528 F.2d 528, 535 (5th Cir. 1976) ................................................... 14

*United States v. Ganji,*
   880 F.3d 760, 767 (5th Cir. 2018) ..................................................... 2

*United States v. Haines*,
   803 F.3d 713, 730-31 (5th Cir. 2015) .............................................. 17

*United States v. Levine,*
   80 F.3d 129, 134 (5th Cir. 1996) ..................................................... 20

*United States v. Minor,*
   459 F.2d 103, 106 (5th Cir. 1972) .............................................. 19, 20

*United States v. Mix,*
   No. 12-171 SECTION "K"(1), 2013 U.S. Dist. LEXIS 156462 (E.D. La. Oct. 23,
   2013) ................................................................................................. 19

*United States v. Moreland*,
   665 F.3d 137, 149 (5th Cir. 2011) ..................................................... 2

*United States v. Morena*,
  547 F.3d 191, 197 (3rd Cir. 2008) .................................................................... 14

*United States v. Nora*,
  988 F.3d 823, 2021 WL 716628, at *5 (5th Cir. Feb. 24, 2021) .................. 2, 4, 5

*United States v. Sanders,*
  952 F.3d 263, 282 (5th Cir. 2020) ...................................................................... 12

## CONSTITUTIONS, STATUTES AND TREATISES

18 U.S.C. § 1957 ...................................................................................... 17, 18

Fed. R. Crim. P. 52(b) ................................................................................... 10

Fed. R. Evid. 403 ........................................................................................... 17

Fed. R. Evid. 701 ........................................................................................... 17

Fed. R. Evid. 702 ........................................................................................... 17

No. 19-20797

---

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

UNITED STATES OF AMERICA,
Plaintiff–Appellee

v.

DAYAKAR MOPARTY; HARCHARAN SINGH NARANG,
Defendants–Appellants

---

On Appeal from the United States District Court
For the Southern District of Texas
Houston Division
No. 17-CR-00290

---

REPLY BRIEF FOR DEFENDANT-APPELLANT
DAYAKAR MOPARTY

---

Dayakar Moparty, Defendant-Appellant, by and through counsel, Michael McCrum and Steven J. Lieberman, files this brief in reply to that of Plaintiff-Appellee, the United States of America.

## **ARGUMENT AND AUTHORITIES**

**I.    The Evidence Is Legally Insufficient to Support Moparty's Convictions.**

A. The Government's Theory Improperly Relies Upon Inferences, Rather than Circumstantial Evidence, that Moparty Knowingly and Willfully Participated in the Fraud Allegedly Committed by Drs. Narang and Sidhu.

Although review is highly deferential to the jury's verdict, "a verdict may not rest on mere suspicion, speculation, or an overly attenuated piling of inference on inference." *United States v. Ganji*, 880 F.3d 760, 767 (5th Cir. 2018). Though the jury may make factually based inferences, "a conviction cannot rest on an unwarranted inference, the determination of which is a matter of law." *Id.* Proof of an agreement to enter a conspiracy is not to be lightly inferred, and mere similarity of conduct among various persons and the fact they have associated with or are related to each other is insufficient to prove an agreement. *See id.*

In addition to evidence that supports the verdict, countervailing evidence is also considered when assessing the sufficiency of the evidence. *See United States v. Moreland*, 665 F.3d 137, 149 (5th Cir. 2011). Ultimately a rational juror must have concluded beyond a reasonable doubt that Moparty acted "willfully" to defraud a health care benefit program. *See United States v. Nora*, 988 F.3d 823, 2021 WL 716628, at *5 (5th Cir. Feb. 24, 2021).

2

At trial, the government sought to prove two basic theories: (1) procedures were conducted by Drs. Narang and Sidhu at the North Cypress medical facility that were medically unnecessary, improperly rendered and/or not rendered at all, and (2) procedures were conducted at an outpatient facility but were billed by a hospital at a much higher rate as if the procedures had been conducted at the hospital. ROA.24, 869. Despite those two theories of fraud, the government conceded that Drs. Narang and Sidhu were engaged in improper billing before they established any relationship with Moparty, and Moparty had no knowledge of, nor role in, the medical services provided by Drs. Narang and Sidhu at the North Cypress Clinic. ROA.2402, 2406. The government had to make these concessions because Moparty was not a doctor or healthcare professional who could order any medical test or assign a billing code, and he had no ownership interest in the North Cypress Clinic.

In its brief, the government pivots away from its expressly stated trial theory of fraud and its concessions about Moparty relative to Narang and Sidhu's medical and billing practices. Instead of acknowledging its trial theory, the government asserts that it does not need to prove a formal agreement and it can rely on circumstantial evidence. However, what the government characterizes as circumstantial evidence is nothing more than unwarranted inferences and speculation.

In direct contravention to its trial theory and the evidence, the government asserts in its brief that Moparty agreed with Narang to defraud insurance companies into reimbursing them for medical tests that were not necessary. The government ignores the complete absence of evidence showing how Moparty, a layperson, would know the tests were unnecessary or the billing codes provided by North Cypress Clinic were not correct. The government's own expert witnesses actually undermine its claim that Moparty agreed to bill for medical tests that he knew were unnecessary. Indeed, one expert offered unrefuted testimony that a lay person cannot evaluate a medical file, cannot critically review a doctor's diagnosis or procedures, and cannot determine whether procedures were medically necessary or otherwise performed properly. ROA.1797-99. Similarly, the government's expert witness testified that it is common for a hospital administrator and billing specialist to rely on the physician's representation that tests and procedures were necessary and performed appropriately. ROA.1800.

Without knowledge of Drs. Narang's and Sidhu's billing practices or medical services rendered prior to Moparty's association with them, the government's evidence falls short of proof beyond a reasonable doubt that Moparty acted "willfully". *Cf. United States v. Nora*, *supra*. at *5. A "willful" act is one undertaken with a "bad purpose", or in other words was done with knowledge that the conduct

4

was unlawful. *See id*. In turn, this required the government to prove that Moparty had the specific intent to do something the law forbids. *See id*.

The evidence showed that Red Oak Hospital operated a hospital outpatient department which was regulated under the laws of the State of Texas. Moparty regularly corresponded with the Texas Department of State Health Services, including its assistant general counsel, so Moparty could ensure that all actions would be in compliance with state law. The government did not dispute this evidence and several of its witnesses agreed that hospital outpatient departments are regulated by state law. Additionally, Moparty consulted with a health-care compliance law firm, Strasburger & Price, to ensure Red Oak Hospital's operations were in compliance with the law. Moparty's actions directly refute any showing that he had the specific intent to do something the law forbid in his association with Narang and Sidhu.

In the same vein as found by this Court in *Nora*, the evidence did not prove Moparty understood the practices or alleged schemes of Drs. Narang and Sidhu, and thus there was insufficient evidence to conclude that Moparty acted with "bad purpose" in his association with the North Cypress Clinic. Additionally, as recognized by the *Nora* court, even if the evidence showed Moparty may have acted negligently, that does not prove he participated "willfully" in their fraud. Moparty

should not be convicted for an alleged scheme that existed prior to and outside the scope of his relationship with Drs. Narang and Sidhu, and for which he had no knowledge.

> B. The Government's Characterization of Red Oak Hospital's Billing as "Pass-Through" Billing is Not Evidence of Criminal Fraud and Ignores the Evidence that Red Oak Hospital was a Licensed Hospital that Could Bill for Outpatient Services.

At trial, and now on appeal, the government relies on a fiction that "pass-through" billing by a hospital for services rendered outpatient is illegal and therefore was proof of a "scheme" to support the health care fraud convictions. The government's evidence provided by the testimony of insurance company representatives (offering conclusory expert opinions "in lay witness sheep's clothing," as addressed in Section IV, below), directly undermines their position.

Each representative acknowledged that (a) a private insurance company has no authority to declare whether an outpatient facility is recognized as an HOPD under Texas law, and (b) the billing forms submitted to the insurance companies by Trinity (the "UB-04s") were all coded in such a manner so as to provide notice to the insurance companies that the services were provided at an outpatient facility. ROA.1440-42, 1444-48, 1480, 1539-43, 1668-69. Additionally, the insurance representatives agreed that a hospital's outpatient department can offer services away from the hospital's licensed premises through an HOPD, and violation of the

company's "fraudulent billing" provisions do not equate to criminal fraud. ROA.1432-33, 1441, 1540.

Trinity did not have a contract with these insurance companies, and therefore no agreement as to the billing rates. ROA.1436, 1500, 1534. The representatives agreed that the UB-04s submitted by Trinity did not indicate where the service was performed, did not define the terms "hospital" or "outpatient department", and only designated whether the service was performed at a hospital or outpatient. ROA.1668-69, 1675. Particularly material on the issue of willfulness, none of the insurance company representatives offered evidence to demonstrate that Moparty had actual knowledge of the insurance company contracts that Dr. Narang had entered with each company nor the policy restrictions of each company relative to the actual place of service. ROA.1424, 1673. Government exhibit 109J was the only contract introduced into evidence which bore Moparty's signature -- a Facility Services Agreement between Aetna and 2920 Open MRI and Digital Imaging. ROA.1492-93. There was no proof, however, that the terms of this contract expressly addressed whether or not any medical facility could operate as an HOPD of a licensed hospital. Aetna's representative offered Aetna's general position that Aetna would not be "okay" with an out-of-network hospital under the concept of an HOPD, but failed to offer any evidence that Moparty was aware of Aetna's policy nor

whether a contract policy that conflicts with Texas law can be the subject of fraud. ROA.1494.

Likewise, the testimony of the billing manager for Trinity, Keon Warren, did not provide any evidence that Moparty was part of the purported scheme described by the government. The billing manager testified that he had completed a degree program and training for his job; he was never instructed by Moparty to hide anything; and he, the billing manager, did not believe any of the billing practices were illegal. ROA.1953-54, 1956. The bills were outsourced to and processed by a third-party billing company (the Kaiser Group) in India, and upon receipt of the bills from the third-party biller, Trinity's billing manager would review, approve and send the bills to the insurance company. ROA.1967-69.

Moparty did extensive research for the legal operation and billing for services rendered by an HOPD. Moparty verified an authorized procedure in the State of Texas by which a hospital could operate off-site outpatient facilities under the authority of the hospital's license and could bill for such outpatient services under rates applicable to the hospital. ROA.1353-54. In order to qualify, the hospital's outpatient department must meet certain criteria, including being situated within 75 miles of the hospital; having signage giving notice of its affiliation with the hospital; as well as other requirements. ROA.2285-86. Moparty's research included (1) verbal

and written email communication with representatives of the Texas Department of State Health Services ("TDSHS"), including its assistant general counsel Charles Homer, who confirmed the legality of an HOPD, and Michelle Harborth regarding hospital mobile services; (2) an analysis of major hospitals in Texas operating off-site satellite outpatient facilities, including Baylor Hospital ROA.1353-54, 2282, 2285-86, 2288; (3) a review of written materials published by the TDSHS; and (4) consultation with a reputable health-care compliance law firm (Strasburger & Price). ROA.1353-54, 2281-84. The government offered no evidence to refute Moparty's state of mind gleaned through these steps of research and analysis.

TDSHS's website indicated that a hospital can provide services at locations not on premises. ROA.2288. Moparty believed that it was proper and legal to operate HOPD facilities within 75 miles of a hospital, and bill for services rendered at such facilities at the same rate as that billed by the hospital. ROA.2282-83.

Moparty was not a medical doctor or healthcare professional. He could not order any medical test or assign any billing code for a test, which the government and its witnesses conceded. Moparty had no contractual relationship with the insurance providers, whose representatives conceded that any noncompliance with their regulations was not criminal fraud, and despite their testimony that billing for outpatient services was not acceptable under their respective contracts, there was no

evidence to support the government's sought-after inference that Moparty would have known this. Finally, as a hospital administrator Moparty corresponded with representatives of the Texas Department of State Health Services and did extensive research to establish and bill for hospital outpatient services. The government is asking this Court to disregard countervailing evidence and affirm the convictions by speculation and piling inference on inference.

## II. The District Court's Denial of the Motion for Mistrial was Reversible Error.

### A. Moparty's Motion for Mistrial was Based Upon Trial Objections, therefore the Grounds Raised are Not Subject to Plain Error Review.

The ground's raised in the motion for mistrial were preserved by trial objections, so plain-error review does not apply. The Supreme Court recently explained that "[t]he question is simply whether the claimed error was 'brought to the court's attention'" -- not whether "particular language" is recited. *Holguin-Hernandez v. United States*, 140 S.Ct. 762, 766 (2020) (quoting Fed. R. Crim. P. 52(b)).

The government asserts that Moparty's singular complaint of the government's reference to a co-defendant's guilty plea should be divided in such a manner to warrant partial review for plain error. The first reference to Dr. Sidhu's guilty plea occurred during the government's opening statement, while the second

10

reference occurred during the testimony of case agent Lammons. In between the government's opening statement and Agent Lammons' testimony, the government was asked by the court whether Dr. Sidhu was going to testify. ROA.1683. The following exchange occurred:

> Prosecutor Pennebaker: *At first we thought he was, your Honor, and now we don't think we are going to call him.*
>
> The Court: *Okay, so he's not coming?*
>
> Prosecutor Pennebaker: *No, your Honor.*

ROA.1683-84. Prior to this exchange the government had represented that Dr. Sidhu would be testifying, therefore, the reference to his guilty plea during opening statement was not ripe for objection.

In its brief, the government did not directly address this intervening event at trial which bridged the two references to Sidhu's guilty plea. Once it was apparent that the government would not be calling Dr. Sidhu as a witness, but deliberately utilized his guilty plea as evidence, Moparty joined both references to the guilty plea into his objection and motion for mistrial. The trial objection sufficiently formed the basis for the legal ground raised in the mistrial motion. Accordingly, the objection provided the district court the chance to fix the mistake and take measures to reduce any prejudicial effect. *See Puckett v. United States*, 556 U.S. 129, 134 (2009).

The government's reliance upon *United States v. Sanders,* 952 F.3d 263, 282 (5th Cir. 2020) is misplaced as it is both factually and procedurally distinguishable. In the instant case, unlike *Sanders,* Moparty made his trial objection contemporaneously when the issue was ripe for objection, and the objection is identical to the theory raised on appeal.

In any event, review of the trial court's ruling necessarily requires assessing the cumulative harm from the entirety of the government's misconduct. The government's attempt to divide this Court's review between abuse of discretion and plain error is simply an attempt to deflect from the harm that infected the entire trial resulting from their deliberate misconduct. As noted below, the degree of harm that resulted from the inappropriate disclosure of Sidhu's guilty plea must be analyzed in the context of the other forms of government's misconduct in this trial (i.e., the government's repetitive introduction of conclusory opinions of Moparty's intent and guilt through the government's forensic accountant, its FBI summary witness, the insurance company representatives, a physician, and the prosecutor's own questions, all as addressed in Sections III and IV, below).

B. The Government's Repeated References to Dr. Sidhu's Guilty Plea was Calculated and Deliberate.

The trial record disputes the government's *post hoc* rationalization that the prosecutors did not act in bad faith. The references to the guilty plea were calculated

and deliberate. The second reference to Sidhu's guilty plea occurred after the government's mid-trial acknowledgment that Sidhu would not be called as a witness. ROA.1683-84. On that basis alone the government deliberately chose to highlight Sidhu's guilty plea through the testimony of Lammons. This served no other purpose than to invite the jury to utilize Sidhu's guilty plea as evidence of Moparty's guilt.

Furthermore, any question about the government's motive was answered when the prosecutor later revealed during sentencing proceedings that Sidhu was never going to be called as a witness at trial because he was "sick." ROA.2539.

This case does not involve an accidental or inadvertent volunteering of prejudicial evidence. Instead, these were deliberate actions of experienced prosecutors and a government agent. An objective review of the government's deliberate and calculated actions can only result in a showing of bad faith. This Court should reject the government's rationalization of its misconduct.

## C. The Government's Singular Reliance on the Court's Limiting Instruction Does Not Cure the Government's Misconduct

The government's actions were deliberate as the record shows Dr. Sidhu was not going to be called as a witness. Deliberate misconduct should not be excused under the umbrella of a limiting instruction. This is precisely what the government is attempting by asserting that Moparty has not overcome the assumption that the jury followed the instruction.

13

As stated, this case does not involve an accidental or inadvertent mention of a co-conspirator's guilty plea. The actions of the government involved the type of aggravating circumstance that created a level of prejudice that could not be cured by a limiting instruction. *See United States v. Fleetwood*, 528 F.2d 528, 535 (5th Cir. 1976); *United States v. Morena*, 547 F.3d 191, 197 (3rd Cir. 2008).

### D. Sidhu's Guilty Plea was Improperly Emphasized and Served No Legitimate Purpose Other than to Prejudice the Jury

The trial record reflects that the government did in fact have no intention to call Dr. Sidhu as a witness, and alternatively, no legitimate purpose existed for the government's reference during the opening statement. The government's opening statement almost immediately addressed the role of Dr. Sidhu as an associate of Dr. Narang, and informed the jury that Sidhu was a co-conspirator who had already pled guilty. ROA.870. Outside of speculation, nothing in the government's opening remarks about Dr. Sidhu can be construed as preemption of any forthcoming effort to impeach Dr. Sidhu with his guilty conviction.

Furthermore, simply because the government was not pressed by the court prior to opening statements to answer whether Dr. Sidhu would be called as a witness, does not provide cover for the government to assert there was no evidence that it did not intend to call Dr. Sidhu. The government's mid-trial admission and volunteered statement at sentencing makes clear that the government never intended

14

to call Dr. Sidhu as a witness. The government emphasized that Dr. Sidhu was a guilty co-conspirator for the illegitimate purpose of prejudicing the jury into a finding of guilt, consistent with its repeated effort to introduce testimony of guilt and intent through the introduction of conclusory opinions of multiple witnesses and prosecutor.

The misconduct of the government was repeated, deliberate and calculated, which in its totality denied Moparty a fair trial. The misconduct actually prejudiced the defense; therefore, a new trial is warranted. *See United States v. Bowen,* 799 F.3d 336 (5th Cir. 2015).

### III.    Government's Law Enforcement Agent Improperly Opined on the Ultimate Issue of Criminal Intent.

Moparty contends that the government presented conclusory statements of Moparty's criminal intent through (a) a forensic accountant (repeated conclusions that transactions constitute "money laundering"), (b) an insurance representative (certain transactions are not "possible" in a "legitimate world"), (c) a physician (the conduct was "fraudulent" and "illegal"), (d) an FBI summary witness (defendant intended to create a "shell company" in order to conduct transactions, and (e) the prosecutor's own words (repeated reference to indictment counts as *"money laundering counts"* and questions *"what is this",* begging for conclusory opinions of the ultimate issues of guilt and intent). Virtually the entire government response on

this issue focuses only on the forensic accountant's testimony, even though the same form of conclusory comments on the ultimate issue were conveyed through at least five different people, including the authoritative voice of two experienced employees of the FBI, a lawyer employed by the U.S. Attorney's office, an insurance representative and a physician.

In response to Appellant's citation to several Fifth Circuit cases which have admonished this form of conclusory testimony of a defendant's state of mind, the government fails to cite any Fifth Circuit which approves it. Rather, it relies on a First Circuit case that found no reversible error by one witness' use of the word "kickback." Distinguishable from this one case, the collective force of the repeated conclusory references and opinions by four authoritative voices espousing the words "money laundering," "fraudulent," "illegal," and "shell company" far exceed the level of harm addressed in the First Circuit case cited by the government. Moreover, the prosecutor's words and answers elicited far exceed an attempt to explain a factual trail of money as would be conveyed by the word "kickback." Rather, the prosecutor repeatedly referred to each of the charged crimes as *"money laundering counts,"* followed by several questions discussing the trail of money, followed then by a question posed by the prosecutor as to each factual scenario, *"what is that,"* to which the accountant repeated the conclusion, *"money laundering."* The repetition of

questions about "money laundering counts," followed by repeated conclusions of "money laundering" left the unmistakable picture that this was more than an interpretation of facts - - it was a repeated conclusory expression of guilt and intent perpetuated by the prosecutor and witness.

The government then seeks to justify the comment by arguing a lay witness may offer an opinion pursuant to Rule 701, and thus the accountant's conclusions were admissible opinions based on her analysis of documents. This Court has observed "there is an increased danger that the expert testimony will stray from applying reliable methodology and convey to the jury the witness's 'sweeping conclusions' about appellants' activities, deviating from the strictures of Rules 403 and 702" and a "failure to clearly distinguish between fact and opinion testimony is likely to confuse the jury." *United States v. Haines,* 803 F.3d 713, 730-31 (5th Cir. 2015). The prosecutor and accountant's back-and-forth dance steps between *"money laundering count"* questions, followed by questions *"what is this,"* followed by conclusory answers of *"money laundering"* fall squarely within the prohibited zone of opinion testimony on the ultimate issue of criminal intent.

Another government response rests on counts charging violations of 18 U.S.C. § 1957 "frequently" being referred to as "money laundering" counts, a "shorthand" term to help the jury understand the facts. The words "money laundering" repeatedly

17

used in this context were not explanatory definitions of code words or clarification of confusing aspects of money transactions. They were words unmistakably pronouncing guilt as to each count which charged a violation of section 1957. The consequential effect on the jury was compounded by (a) the introduction of Sidhu's guilty plea, (b) the words of the FBI summary witness, (c) the unwarranted inferences made by insurance company representatives, and (d) the physician's statement. The government seeks to diminish the effect of the physician's testimony by indicating in a footnote that an instruction was given by the court to disregard the witness' conclusions that Moparty's conduct was "fraudulent" and "illegal." At some point, however, an instruction cannot be said to have effect where a jury will have heard the prosecutor and forensic accountant's repetitive back-and-forth doses of conclusory statements of guilt as to all of the "money laundering" counts.

The government also seeks to justify the "money laundering" references on the basis that the clause is not the name of the charged statute nor one of its elements and was not used in the court's jury instructions. This argument is belied by the fact that the prosecutor carefully preceded the witness' conclusory findings of "money laundering" to indictment counts which the prosecutor also referred to as "money laundering" counts (e.g., *"Starting with a money laundering Count No. 20. Is this a check related to Count 20 for money laundering?"* ROA.2129; *"Now, I would like*

*to move you to 46, moving to Count 19, another money laundering count."* ROA.2133). The witness' answer that the movement of money was "money laundering" unequivocally offers a conclusion that Moparty was guilty of the "money laundering" counts referred to by the prosecutor.

## IV.   District Court Erred in Permitting Government to Introduce Expert Opinions from Lay Witnesses.

The issue is whether the insurance company exceeded the lawful bounds of testimony. On appeal, the government seeks to limit the scope of the insurance representatives' testimony to mere comments about terms and practices. The record reveals, however, that the insurance company representatives went further than explanatory comments about insurance terms and practices. As noted in appellant's initial brief, the insurance company representatives were not presented as expert witnesses. Yet, the prosecutor went beyond testimony that would have explained insurance terms and practices. The prosecutor posed hypothetical questions to the lay "non-expert" insurance company representatives in an effort to create an inference of guilt. Use of hypothetical questions effectively resulted in the transformation of the witness into an "expert witness in lay witness sheep's clothing." *See, e.g., United States v. Mix,* No. 12-171 SECTION "K"(1), 2013 U.S. Dist. LEXIS 156462 (E.D. La. Oct. 23, 2013); *see also United States v. Minor,* 459 F.2d 103, 106

(5th Cir. 1972) (hypothetical questions should not be posed to lay witnesses as is the case with expert witnesses).

Even if a hypothetical question is permitted, the answering testimony cannot contain an inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged. *See United States v. Levine,* 80 F.3d 129, 134 (5th Cir. 1996); *United States v. Dixon,* 185 F.3d 393, 401 (5th Cir. 1999). Here, the questions posed and the answers given created the inference that the failure to designate a certain address would constitute fraud. ROA.1404-05, 1408-09. As questioned by the prosecutor in the second hypothetical, *"Is it ever okay, in Blue Cross/Blue Shield's eyes, for that provider ..."* ROA.1409. This question, and the answer that followed, contained the unmistakable and inappropriate inference that the defendant had the intent to commit a crime.

Perhaps the most glaring example of the prosecutor exceeding the bounds of permissible testimony of insurance terms and practices is the question posed whether certain conduct *"in a legitimate world"* is *"possible."* ROA.1410. Such a question unmistakably casts the lay witness going further than an explanation of insurance terms or practices into that of an expert witness' opinion as to the legitimacy of certain conduct.

**V.    The Finding that Moparty Occupied a Position of Trust was Clearly Erroneous.**

Moparty contends that the mere characterization in the PSR that he was the owner of Red Oak Hospital (ROH) is neither supported by reliable evidence nor is sufficient on its face to warrant a position of trust adjustment under the Sentencing Guidelines. The government ignores the characterization in the PSR (the sole basis for the upward adjustment reflected in the record at sentencing), and instead selectively points to two exhibits and the speculative testimony of a government witness to support the adjustment. On appeal, the government presents three selections from the record to support its argument. It points first to Government Exhibit 136, referred to only during the government's cross-examination of Dayakar Moparty. Exhibit 136 is a 2-page excerpt from larger document, which was purported to part of an initial application for license to operate the Red Oak Hospital. ROA.2327-28. A line in the application indicates that Dayakar Moparty is a 50% owner of Red Oak. ROA.2329. The unrefuted testimony in trial explained that although this is what is referenced in the initial application, it does not reflect the truth - that Dayakar Moparty never owned any percentage of Red Oak Hospital during the time period of the alleged offense. ROA.2327, 2329. Moreover, the unrefuted testimony was that Dayakar Moparty had nothing to do with the day-to-

day operations or billing done by Red Oak, but rather worked for a completely independent company. ROA.2330.

The government next points to Government Exhibit 13A, a Regions Bank signature card. ROA.2128. There is no evidence, however, to prove that Dayakar Moparty conducted any transaction relative to this account, managed it in any way, nor how a signature card offers any proof that Dayakar Moparty had "interest in and control over ROH."

Finally, the government points to 4 pages of testimony of Agent Lammons which purportedly proved "Moparty's interest and financial control" of the hospital. The testimony reflected in these pages do not provide any evidence that Dayakar Moparty had an interest in or controlled Red Oak Hospital. Rather, it reflects the role of a management company that receives monies from a hospital and transfers them to recipients who the hospital instructs is entitled to such monies. ROA.2008. The agent's testimony as to ownership and control is pure speculation.

None of the evidence relied upon by the government provided evidence to support the conclusion indicated in the presentence report - that Moparty was the owner of Red Oak Hospital during the time of the alleged conspiracy. The evidence at trial showed that his brother, Roy Moparty, was the owner of ROH during the time of the relevant conduct in this case. ROA.2329. The government on appeal points to

Moparty "signing emails and text messages, and conducting bank transactions on behalf of ROH," yet offers no substantive explanation of what these documents said nor how this proves ownership of the hospital, as opposed to proof that Dayakar Moparty acted on behalf of a management company at the direction of persons who controlled the hospital. Agent Lammons testimony about Moparty's "ownership" was conclusory and not supported by reliable information.

The issue raised is whether simply assigning Moparty the title of "owner", without reliable evidentiary support, meets the government's burden to prove Moparty in fact occupied a position of trust. The facts asserted in the PSR showed nothing more than Moparty being a participant in the alleged fraud, which is not sufficient for the sentencing adjustment. The PSR attempts to make a leap from participant to position of trust by assigning Moparty the title of "owner". Without sufficiently reliable information the district court clearly erred in finding that Moparty occupied a position of trust.

## **CONCLUSION**

For the aforementioned reasons, the defendant-appellant, DAYAKAR MOPARTY, respectfully prays that the convictions be reversed and a judgment of acquittal entered, a new trial ordered, or the sentence be vacated and the case be

remanded for resentencing.

Respectfully submitted,

*/s/ Michael McCrum*
MICHAEL MCCRUM
Bar No. 13493200
404 E Ramsey Rd Ste 102
San Antonio, TX 78216
Telephone:  (210) 225-2285
Facsimile:  (210) 225-7045

STEVEN J. LIEBERMAN
TBA No. 12334020
JPMorgan Chase Bank Building
712 Main Street, Suite 2400
Houston, Texas 77002
Telephone:  (713) 228-8500
Facsimile:  (713) 228-0034

ATTORNEYS FOR APPELLANT,
DAYAKAR MOPARTY

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 22nd day of March 2021, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system, which will send

notification of such filing to all registered parties.

*/s/ Michael McCrum*

24

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type Style Requirements

1.     This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because:

☒ this brief contains 4,926 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii), *or*

☐ this brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

2.     The brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because:

☒ this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Windows in font Size 14 in Times New Roman type style and 12-point font as to footnotes, *or*

☐ this brief has been prepared in a monospaced typeface using _____ with _____.

*/s/ Michael McCrum*

Attorney for Dayakar Moparty, Appeal No. 19-20797

Date: <u>March 22, 2021</u>