# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 23, 2021

Lyle W. Cayce
Clerk

No. 19-20797

UNITED STATES OF AMERICA,

*Plaintiff—Appellee,*

*versus*

DAYAKAR MOPARTY; HARCHARAN SINGH NARANG,

*Defendants—Appellants.*

---

Appeal from the United States District Court
for the Southern District of Texas
USDC 4:17-CR-290-3

---

Before JONES, SOUTHWICK, and COSTA, *Circuit Judges.*

EDITH H. JONES, *Circuit Judge*:

Dr. Harcharan Singh Narang and Dayakar Moparty were convicted of health care fraud, conspiracy to commit health care fraud, and money laundering. They both assert alleged errors in the trial and sentencing. Moparty further challenges the sufficiency of the evidence supporting his convictions. Some inexcusable trial errors were committed or permitted by the government, which counsel on appeal explained as the reason for an incredibly long (132-page) appellate brief: the government wanted to make abundantly clear that the errors were "harmless." Nonetheless, we AFFIRM.

No. 19-20797

# I. BACKGROUND

This direct criminal appeal stems from various federal health care fraud convictions.   On May 17, 2017, a grand jury indicted Narang, Dr. Gurnaib Singh Sidhu, and Moparty on one count of Conspiracy to Commit Health Care Fraud in violation of 18 U.S.C. § 1349 and seventeen counts of Health Care Fraud in violation of 18 U.S.C. § 1347.   It further indicted Narang and Moparty on three counts of Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity in violation of 18 U.S.C. § 1957.

Narang is an internist who practiced at his self-owned clinic, North Cypress Clinical Associates, P.A. ("North Cypress") in Cypress, Texas. Sidhu also practiced as an internist and was employed by Narang, primarily at the second North Cypress office.[1]  Moparty co-owned Red Oak Hospital ("ROH") and served as an administrator for Spring Klein Surgical Hospital DBA Trinity Health Network ("Trinity" or "Spring Klein").   Trinity provided staffing and administrative services to a number of health care entities including Cleveland Regional Medical Center ("CRMC"), 2920 ER, 2920 Open MRI Digital Imaging, ROH, and Cleveland Imaging and Surgical Hospital DBA Doctor's Diagnostic Hospital ("DDH").

The indictment alleged that Narang, Sidhu, and Moparty conspired to and executed a scheme where Narang and Sidhu ordered unnecessary medical tests for patients and then authorized Moparty to bill for these tests through ROH at the higher hospital rate even though these patients were seen and treated at Narang's North Cypress office.   Further, when insurers denied claims originating from ROH, Moparty would resubmit them from

---

[1] Sidhu is not a party to this appeal.  He entered into a plea agreement with the government prior to trial and later succumbed to cancer.

another entity associated with Trinity. The indictment alleged that this scheme resulted in fraudulent billing of over $20 million to Blue Cross Blue Shield, Aetna, and Cigna. Those companies paid Moparty at least $3.2 million in reimbursement for those claims which he allegedly split with Narang through a series of financial transactions.

An eight-day jury trial began on February 11, 2019.

## A. The Government's Case-in-Chief

At trial, the government introduced extensive testimony to demonstrate how the scheme operated. As the government describes, the scheme had three key parts: (1) a patient intake and testing component; (2) a billing component; and (3) a financial distribution component.

### 1. Patient Testing

In 2013, Forever Fit Wellness Center, PLLC ("Forever Fit"), a "medi-spa"—owned by Narang's wife Ranjit Kaur—that shared office space with North Cypress, began offering coupons for "Lipotropix weight-loss shots" on Groupon. The coupon offered weekly injections but required the purchaser to perform a 30-minute consultation with a medical professional prior to beginning the regimen. At trial, four women who purchased these coupons and Rikesha Burton, Narang's former medical assistant, testified about the process. Upon arrival at Forever Fit, the patients were asked to fill out medical and personal history forms. After completing these forms and undergoing a vitals check, the patients were seen by Narang. During the consultation, Narang would ask wide-ranging questions related to dizziness, headaches, backaches, or other generic ailments. Even though these women indicated they were in relatively good health and that the weight loss shot was the primary reason for the visit, Narang's open-ended questioning elicited affirmative answers from the patients.

No. 19-20797

Narang then persuaded the patients to undergo brief testing at North Cypress and explained that their insurance would cover any costs and they would not pay anything.[2]  Narang would then typically order cardiac and/or abdominal ultrasounds, ENGs, nerve conduction tests, electromyography tests, allergy tests, and artery and/or vein doppler tests.  Approximately 80–90% of Groupon patients with insurance received this battery of additional tests—all patients getting the injections were required to have an EKG performed.  Burton testified that she and other medical assistants sometimes warned Groupon patients that they were not obligated to undergo additional testing.  Burton also testified she was later reprimanded for doing this.  After Narang ordered the tests, the testing orders were typically approved under Sidhu's name although he did not see the patients.  The tests were then performed at the North Cypress location.

This same pattern also occurred with patients who visited Narang for medical treatment unrelated to the Groupon injections.  One patient in acute pain sought medication for an ulcer.  She saw Narang and received an echocardiogram and nerve conduction velocity test despite a lack of underlying symptoms that would warrant those tests.

The government presented four expert witnesses who testified regarding the medical necessity of the testing ordered by Narang.  First, Dr. Richard Gans, a vestibular and balance disorder specialist, reviewed a sample of 29 patient files.  He found that key data were often missing, such as calibrations results and the actual test recordings, rendering the test results useless.

Second, Dr. Rubina Wahid, an allergy and immunology specialist, examined 33 patient charts and found no conclusive indicators that would

---

[2] Patients without insurance were not encouraged to do any additional testing.

warrant allergy testing.  Further, Dr. Wahid noted that tests had been improperly performed and recorded, and the files were missing detailed patient histories, assessments, plans, discussions of results, and follow-ups. Finally, Dr. Wahid testified that the patients presenting for weight loss injections were documented to have a variety of maladies and received a "battery of tests."

Next, Dr. Peter Grant, an internist with an expertise in electrodiagnostic medicine, reviewed tests for 68 patients and determined that 83–94% of the tests were not medically necessary.  Further, Dr. Grant found the tests were "fraught with errors and inaccuracies" and approximately 80% of the tests were "worthless."

Finally, Dr. Michael Bungo, a cardiologist, reviewed 40 patient files. The majority of the files he reviewed were 30–68-year-old females with low statistical probability of cardiovascular disease.  He disparaged the idea that many patients would exhibit the very same array of symptoms[3] as "so medically improbable that it bordered on impossible" and that he didn't "have 40 people in thousands of patients that all present with the constellation of symptoms that are identical."  Further, Dr. Bungo observed that analysis of the patients by Narang was lacking, appropriate tests were not ordered, doctor's notes were missing or contradictory when present, and testing was unrelated to patient symptoms.

Additionally, the government called Dr. Aditya Samal, a board-certified cardiologist, as a fact witness.  Narang had hired Dr. Samal to read echocardiograms and vascular studies.  Narang sent Samal approximately 800 studies in one year, a number that Samal noted was unusually high.

---

[3] Symptoms included chest pain, swelling of the ankles, dizziness, runny nose, calf cramping, and palpitations.

Further, Dr. Samal explained that the quality of the tests fell below appropriate medical standards—some had been done months earlier and most were medically unnecessary based on the patient's symptoms, age, and sex. This reflected a pattern of "low quality, inappropriate studies" and caused Samal to end the arrangement.

### 2. Billing Practices

The crux of the government's argument was that Narang and Moparty executed a "pass-through billing scheme" where services are rendered at one location, but the bills are submitted from a different place at a higher rate. Central to this theory was the testimony of Keon Warren, Moparty's billing director.[4] Warren testified that in 2012 he met with Moparty, Narang, and Kaur—Moparty explained that they were going to be billing for Narang's office which would function as "an extension of the hospital, part of the HOPD [hospital outpatient department]." Pursuant to this arrangement, Warren "would get directions . . . as to what we were going to bill" and "receive the emails, what's going to be on them, what we're going to be billed, and so forth." These emails included the patients' demographics, their forms and signatures, insurance information, tests, and billing codes—all the information needed to generate the bills. Warren would then prepare the claims to bill the patients' insurance companies.

Moparty was copied on these emails and provided Warren instruction. Initially, the tests were billed through DDH, beginning during the summer of 2012. Then in late 2012, billing shifted over to 2920 ER (or Trinity Healthcare as it was also known) after it received a freestanding emergency center license. Finally, in March 2013 billing shifted again to ROH. Moparty

---

[4] Warren's signature line indicates that he worked for Trinity Healthcare, ROH, and 2920 ER LLC.

No. 19-20797

informed Warren that Narang's office was going to be an extension of ROH and showed him an email representing this. Thereafter, all billing flowed through ROH. Warren would generate billing amounts based off the Medicare rates and "what [he] knew about markup." These were all billed at a hospital rate.

Occasionally, insurance companies would deny ROH claims. When this occurred, Warren would consult Moparty and then rebill the claim through CRMC. On one occasion, after the rebilled claim was rejected again, Moparty instructed Warren to submit it a third time through 2920 MRI. This practice of "rebilling" started happening in 2013 when initial billing was shifted to ROH.

After receiving a claim from ROH or similar entity, the insurance companies typically prepare an explanation of benefits ("EOB") for the patient which details the services received, the entity that performed them, and the amount billed to the insurance company. Upon receiving EOBs after visits to North Cypress, patients saw exorbitant prices billed from entities they had no recollection visiting. One patient's EOB reflected thousands of dollars of billing from CRMC and ROH, but the patient had no knowledge of those entities' involvement. That patient was certain that no paperwork had indicated ROH and there was nothing at the North Cypress office to demonstrate affiliation with ROH or CRMC. Other patients also expressed surprise at seeing Sidhu's name listed on their EOB after only seeing Narang. The patients uniformly discovered that their insurance companies had been billed for tests they never received, and their medical files noted symptoms they denied having.

Three fact witnesses representing the major insurance companies testified for the government. These individuals provided context on general insurance billing practices. Generally, when a physician submits a claim, the

location of the place of service must be disclosed. However, when a facility, such as ROH, submits a claim, a different form is used which does not indicate the location—that information would only be available if the insurance company requested the patient files. These witnesses testified that their respective insurance companies would not pay claims that erroneously indicated that they were performed at a hospital or were medically unnecessary. The amount the insurance company will pay for a given service is typically dependent on who provided it, where it was provided, and whether the provider is inside or outside of the company's provider network. Though Narang and North Cypress were in-network for these insurers, ROH was not. This resulted in drastically higher billing rates.

For example, on one set of claims, ROH was eligible to receive $34,359.50 compared to $3164.32 that Narang could have submitted under his network agreement. Similarly, another patient's claims were billed at nearly $37,000 compared to the Narang's rate of $1400. By billing these claims through ROH, rates were inflated up to 25x higher than if Narang had billed directly for the tests. One patient's hour-long visit to Narang resulted in a bill of $800,000 from ROH to Blue Cross Blue Shield.[5] In total, ROH and other Moparty entities[6] billed over $20 million to Aetna, Cigna, and Blue Cross Blue Shield and received approximately $3.2 million.

### 3. Financial Distribution

The final aspect of the scheme was described by Agent Lammons, who had 14 years of experience investigating health care fraud. Lammons testified that the insurance and billing records corroborated the pass-through billing

---

[5] ROH later claimed that a "billing error" was the cause.

[6] These entities included: CRMC, ROH, 2920 MRI, DDH, 2920 ER, and Spring Klein/Trinity.

No. 19-20797

testimony of the other witnesses. Similarly, the data reflected instances of "rebilling" as described by Warren. Lammons explained that the common thread through this scheme was Moparty's ownership in these various entities.[7] Money that flowed in from Moparty's various entities ended up with Trinity. Lammons described it as "an account that collects money from all sorts of places"—a shell company. From there, money was transferred to a series of entities related to Narang and his wife. Roughly 85% of the money received by ROH for Narang's patients was represented in payments from Trinity to those entities.

Kathleen Anderson, an FBI forensic accountant, testified and explained how specific sums of money moved through the accounts from Moparty's entities to those controlled by Narang and Kaur. Anderson specifically traced the transactions related to the three money laundering counts: funds moved from 2920 ER and Cleveland Imaging through Spring Klein to an LLC owned by Narang (Count 19); funds moved from 2920 ER through Spring Klein to a corporation owned by Narang (Count 20); and funds moved from 2920 ER through Spring Klein to another LLC owned by Narang (Count 21).

At the close of the government's case, both defendants moved for judgments of acquittal. Further, they both moved for mistrials based on two references to Sidhu's guilty plea. The district court denied the motion for acquittal but took the motion for mistrial under advisement.

---

[7] Moparty did not own DDH but "he exerted a lot of control in the operation of that facility" and DDH had paid Moparty over $17 million between 2011 and 2012. Lammons testified, supported by documentary evidence, that Moparty did have ownership interests in CRMC, ROH, 2920 MRI, 2920 ER, and Spring Klein/Trinity.

No. 19-20797

## B. Defense Case

For his defense, Narang called four witnesses.  First, Sean Coffey, a medical equipment distributor, rebutted testimony by Dr. Gans that Narang lacked sufficient equipment to perform certain tests.  Second, Kershaw Kumbatta, a certified public account, testified that it was good business practice to have separate accounts associated with different business entities and he had advised Narang and Kaur to set up different accounts for their various entities.  Next, Narang called his long-time medical technician Edward Castillo.  Castillo testified that North Cypress had a sign about "Red Oak or Trinity" and that "we're working together."  He thought the arrangement lasted six months and the sign was present most of that time.  He further testified that he "perform[ed] tests as a technician for Red Oak."  Finally, Neena Satia, Narang's receptionist since 2003, testified that North Cypress was clearly associated with ROH and denied that anybody had manipulated patient forms.

For his part, Moparty called one witness and then testified himself.  First, Dilip Amin, Moparty's real estate attorney, testified as to the validity of three one-page contracts documenting real estate transactions between Moparty's entities and Narang's totaling over $9 million.  According to Amin, it was "not unusual" for the "Old British India" community "to not rely on lawyers for the initial buying and selling of property."  He further dismissed the misspelling of Moparty's name (spelled Moparti) as a "not uncommon" translation error.

Next Moparty testified and explained that Spring Klein functioned as a staffing company, which provided CRMC, 2920 ER, and ROH with employees and management.  Further, he testified that ROH included the clinic supposedly associated with Narang at North Cypress.  Pursuant to this structure, Moparty stated that Spring Klein would collect and distribute

No. 19-20797

money as appropriate. Moparty denied any ownership interest in ROH, CRMC, and 2920 ER. Moparty explained the real estate transactions as efforts by ROH and 2920 ER to expand into the Spring, Texas area to coincide with Exxon's move to that location. He said he had researched how he could open an outpatient facility in Narang's office (which he claims was Narang's or Kaur's idea); the research entailed reading the Texas Department of Health and Human Services website and emailing the Texas Department of State Health Services.[8]

Moparty testified that ROH had leased office space from North Cypress to perform ambulatory testing and he emailed North Cypress to put up signage and have the staff wear badges identifying ROH. Moparty claimed he hired Kaur to help with business development and she purportedly signed a program management agreement which placed her in charge of the ROH outpatient clinic.[9] He alleges that Kaur hired and employed all technicians, but no ROH employees worked at North Cypress. Moparty flatly denied that he intended to violate the law, conspire with Narang, or launder money.[10] At the close of the defense case, Moparty renewed his motion for a judgment of acquittal and the court again denied it.

The jury convicted Narang and Moparty on all counts.

---

[8] Moparty insists that he received "authorization from the Department of Health" through a series of emails. But instead those emails "very strongly recommend[ed]" that Moparty obtain legal counsel and refused to provide a legal opinion on the validity of the proposed agreement. Moparty further denied that he needed a separate license to operate the HOPD.

[9] Lammons noted that the "flow of money" to Kaur was not consistent with the agreed upon amount in her contract.

[10] The government contends that Moparty was frequently evasive or nonresponsive to its questions.

No. 19-20797

## C. Post-verdict Proceedings

The defendants' joint motion for mistrial principally argued that the government's two references to Sidhu's guilty plea prejudicially affected their right to a fair trial. The first reference was deliberately voiced during the opening statement when the government counsel said that Sidhu "is a co-conspirator in this case" but he "is not in this trial because he already pled guilty." The second came during the questioning of Lammons.[11] There, the government's counsel inquired, "we haven't talked a lot about Dr. Sidhu yet. . . . Why is that?" Lammons answered: "He's already pled guilty." Further, they argued that Dr. Grant impermissibly referenced a conviction of one of the specialists used by Narang to evaluate diagnostic tests and that the government misled them about Grant's prior experience as an expert witness.[12]

The district court noted that the defendants did not object to the first reference but did object to the second, and the court sustained the objection and immediately issued a limiting instruction.[13] Further, the court noted that it had rejected the confrontation clause challenge because the defendants had the ability to subpoena Sidhu if the government didn't call him. The court

---

[11] The government had previously represented to the court that Sidhu was not going to be called as a witness.

[12] When asked about the doctors supervising Narang's technicians, Grant responded: "Dr. Ahmed, as I googled his name, I found that he's a convicted felon for health care fraud in January of 2017."

[13] "Dr. Sidhu is not here. He plead [sic] guilty. The fact that he's guilty it not evidence that any other person is guilty of wrongdoing. His case was considered separately, and you're not to draw any adverse inference from the fact that Dr. Sidhu may believe he is guilty. It's not relevant to this case. These defendants are presumed to be innocent. The fact that somebody else may be guilty does not in any way affect the presumption of innocence that cloaks them and remains with them until such time, if ever, that the government can prove these defendants guilty of anything."

No. 19-20797

then considered the introduction of Sidhu's plea under the factors articulated in *United States v. King*, 505 F.2d 602, 608 (5th Cir. 1974) (explaining that four factors are relevant: (1) the presence or absence of a limiting instruction; (2) whether there was a proper evidentiary purpose for the introduction of the plea; (3) whether the plea was improperly emphasized or used as substantive evidence of guilt; and (4) whether introduction of the plea was invited by defense counsel).

The court acknowledged that neither party contested that the plea had not been invited, and then proceeded to weigh the remaining factors. The court noted that while there was not a proper evidentiary purpose for the second reference,[14] the first two factors weighed strongly in favor of the government and any error was "harmless beyond a reasonable doubt." The court found that "[t]he admissible evidence presented to the jury 'overwhelmingly eclipses the two [brief] mentions of Sidhu's plea.'"

Finally, the court found no error relating to Dr. Grant's testimony. The court noted that the defendants were in possession of Dr. Grant's expert report which stated that he had previously testified for the government as an expert.[15] Second, the court determined that while Grant's statement was not proper impeachment evidence and lacked any proper evidentiary purpose, it

---

[14] "The court concludes that there is no indication that either of the challenged statements were made in bad faith. While the government arguably had a legitimate purpose for referencing Dr. Sidhu's plea in its opening statement, the government can point to no proper purpose for Agent Lammons' testimony. The dubious purpose of at least one of the challenged statements weighs slightly in favor of granting Defendants' Motion."

[15] The court also agreed with the government that there was no prejudice because neither Dr. Grant nor the government were in possession of any transcripts of that prior testimony.

No. 19-20797

was harmless, nonetheless. Accordingly, the district court denied the motion on all grounds.

## D. Sentencing

The Presentence Report (PSR) for Moparty calculated a total offense level of 38 and a guideline range of 235–293 months. Moparty prevailed on his objections to the total loss amount and Government health care program enhancement. The court denied Moparty's objection to the abuse of trust enhancement, U.S.S.G. § 3B1.3. These rulings resulted in a new total offense level of 31 and a guideline range of 108–135 months. The court sentenced Moparty to 108 months imprisonment, three years of supervised release, and joint and several liability with Narang for $2,621,999.04 in restitution.

Narang's PSR calculated his total offense level at 39 with a guideline range 262–327 months. Like Moparty, Narang prevailed on his loss amount and Government health care program objections. However, the court overruled Narang's objection to the "10 or more victims" enhancement, U.S.S.G. § 2B1.1(b)(2)(A)(i), and the "use of any means of identification to produce or obtain another means of identification" enhancement, U.S.S.G. § 2B1.1(b)(11)(C)(i). Based on these rulings, the new offense level was 32 and the guideline range was 121–151 months. After discussing the 18 U.S.C. § 3553(a) sentencing factors, the court sentenced Narang to 121 months in custody and $2,621,999.04 in restitution. Both defendants timely appealed.

## II. DISCUSSION

The defendants raise a litany of issues on appeal. Specifically: (1) Moparty and Narang challenge the district court's denial of their mistrial motion; (2) Moparty claims Anderson impermissibly testified on the ultimate issue of criminal intent; (3) Moparty claims the district court erred in allowing the insurance company representatives to testify as experts; (4) Moparty challenges the sufficiency of the evidence supporting his

convictions; (5) Moparty claims that cumulative government errors violated his right to a fair trial; (6) Moparty challenges one sentencing enhancement; and (7) Narang challenges two sentencing enhancements.

## A. Mistrial

Both Narang and Moparty argue that the district court erred in denying their motion for a mistrial. Specifically, they claim that the government's two references to Sidhu's guilty plea and Dr. Grant's testimony relating to Dr. Ahmed's prior conviction substantially prejudiced their right to a fair trial, warranting a mistrial. Both defendants objected to Agent Lammons's testimony on Sidhu's guilty plea. They both also objected to Grant's testimony. However, neither objected to the government's opening statement reference to Sidhu's plea.

This court reviews a denial of a motion for mistrial for abuse of discretion.[16] *United States v. Velasquez*, 881 F.3d 314, 343 (5th Cir. 2018). "If a defendant moves for a mistrial on the grounds that the jury heard prejudicial testimony, 'a new trial is required only if there is a significant possibility that the prejudicial evidence has a substantial impact upon the jury verdict, viewed in light of the entire record.'" *United States v. Zamora*, 661 F.3d 200, 211 (5th Cir. 2011) (quoting *United States v. Paul*, 142 F.3d 836, 844 (5th Cir. 1998)). This court gives "great weight to the trial court's assessment of the

---

[16] The government argues that since neither party objected to the opening statement, that statement should be reviewed for plain error only. *See United States v. Sanders*, 952 F.3d 263, 281 (5th Cir. 2020) ("[W]here counsel does not object contemporaneously to the actions that form the basis for the mistrial motion, plain error review follows."). It is not clear that *Sanders* squarely applies to the present situation where the government made the same error twice and one occasion was properly objected to. Further, had the government called Sidhu to testify, referencing his plea in the opening statement would have been a permissible action. Ultimately, the standard of review is not determinative because this claim falters under either standard.

No. 19-20797

prejudicial effect of the evidence" and "prejudice may be rendered harmless by a curative instruction." *United States v. Valles*, 484 F.3d 745, 756 (5th Cir. 2007).

### 1. Dr. Sidhu's Guilty Plea

"Defendants are entitled to have questions of guilt based on the evidence against them, not on whether a government witness or a codefendant has plead guilty to the same charge." *United States v. Delgado*, 401 F.3d 290, 299 (5th Cir. 2005) (citations and quotations omitted). But, in "some circumstances the government might have a legitimate evidentiary reason for bringing out testimony relating to its witnesses' prior convictions, even when those convictions are for charges similar or identical to those upon which the defendant is being charged." *United States v. Fleetwood*, 528 F.2d 528, 532 (5th Cir. 1976). When considering the effect of a co-conspirator's guilty plea, the court looks to four factors: "1) the presence or absence of a limiting instruction; 2) whether there was a proper evidentiary purpose for introduction of the guilty plea; 3) whether the plea was improperly emphasized or used as substantive evidence of guilt; and 4) whether the introduction of the plea was invited by defense counsel." *United States v. Murray*, 988 F.2d 518, 523 (5th Cir. 1993). As noted, the introduction of the plea was not invited by defense counsel, so the focus is on the remaining three factors.

The court provided its first limiting instruction relating to Sidhu's guilty plea immediately after the defendants objected to Lammons's testimony. The second instruction was agreed on by the parties and given at the close of evidence.[17] "The 'almost invariable assumption' is that jurors

---

[17] "You have heard that Dr. Sidhu pled guilty to a crime. Do not consider his plea as any evidence of guilt. It is not. Dr. Sidhu's decision to plead guilty was a personal decision. Disregard Dr. Sidhu's guilty plea completely when considering DR. NARANG

No. 19-20797

follow such instructions." *United States v. Ramos-Cardenas*, 524 F.3d 600, 611 (5th Cir. 2008) (quoting *Richardson v. Marsh*, 481 U.S. 200, 206, 107 S. Ct. 1702, 1707 (1987)). To overcome this presumption, there must be an "'overwhelming probability' that the jury will be unable to follow the court's instruction . . . and a strong likelihood that the effect of the evidence would be 'devastating' to the defendant." *Greer v. Miller*, 483 U.S. 756, 766 n.8, 107 S. Ct. 3102, 3109 n.8 (1987) (citations omitted).

Narang and Moparty argue that this case presents "aggravating circumstances" such that the court's limiting instructions were unable to cure the prejudice. *See United States v. Baete*, 414 F.2d 782, 783–84 (5th Cir. 1969) ("There may be aggravated circumstances in which the strongest corrective instruction would be insufficient, as, for example, when the guilty plea of one codefendant necessarily implicates another or others."). They premise this argument entirely on the fact that the government mentioned Sidhu not once, but twice. Standing alone, this is insufficient to upset the "general rule." *See Ramos-Cardenas*, 524 F.3d at 611–12 ("If we are to assume that the jury . . . was able to follow the district court's instructions and disregard the fact that three defendants had already admitted their guilt in one form or another, we see no reason not to assume that the jury was also able to disregard the fact that a fourth defendant had pleaded guilty.").

Next, the district court correctly concluded that the second introduction of Sidhu's plea lacked a proper evidentiary purpose. While the government could preemptively introduce the plea to thwart a defense strategy of painting Sidhu as the primary culprit, *see United States v. Valley*,

---

or DR. MOPARTY'S guilt or innocence. As I instructed you during the trial, Dr. Sidhu's guilty plea is not to be considered by you in any way as you decide whether the government has met its burden to prove beyond a reasonable doubt that DR. NARANG or DAYAKAR MOPARTY committed the crimes alleged in the indictment."

No. 19-20797

928 F.2d 130, 133 (5th Cir. 1991), or to negate expected impeachment efforts, *see United States v. Borchardt*, 698 F.2d 697, 701 (5th Cir. 1983), by the time of Lammons's testimony, it was clear that the government did not intend to call Sidhu nor did the defense strategy rely on his plea. This factor leans toward the defendants.

Finally, the district court determined that neither reference was improperly emphasized or offered as substantive evidence. Both statements were made in the course of explaining why Sidhu, a frequently discussed participant in the scheme, was not present at the trial. Further, the jury was instructed that an opening statement is only a preview, not evidence. The second reference to Sidhu's guilty plea was immediately followed by a limiting instruction. The district court, in light of its eight-day trial, found no bad faith by the government. This factor weighs in favor of the government.

In sum, the first and third factors favor the government while the second and fourth favor the defendants. On balance, given the strength of the curative instructions, the factors lean toward denying the motion for mistrial. In addition, the district court assessed the prejudicial effect of statements "in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." *Arizona v. Fulminante*, 499 U.S. 279, 308, 111 S. Ct. 1246, 1264 (1991). Here, the court found that the admissible evidence "overwhelming eclipse[d]" the two references to Sidhu's plea. The district court did not abuse its discretion in denying the motion for mistrial as to Sidhu's pleas.[18]

---

[18] Additionally, Narang argues that referencing Sidhu's plea violated the Confrontation Clause. "This court reviews claims of Sixth Amendment Confrontation Clause violations de novo and subject to a harmless-error analysis." *United States v. Gentry*, 941 F.3d 767, 781 (5th Cir. 2019). To establish a Confrontation Clause violation, "the defendant need only show that 'a reasonable jury might have received a significantly different impression of the witness's credibility had defense counsel been permitted to

No. 19-20797

### 2. Dr. Ahmed's Health Care Fraud Conviction

Dr. Grant, after being asked if he knew the doctor who supervised Narang's technicians for Narang, stated: "Dr. Ahmed, as I Googled his name, I found that he's a convicted felon for health care fraud in January of 2017. Probably in this exact building is where that happened." The court sustained the objection and immediately issued two curative instructions, stating first "[t]he jury will disregard the fact that Dr. Ahmed had a conviction" and also "[t]he jury is instructed there's no evidence Dr. Narang [or Moparty] knew of the conviction."

Considering the motion for mistrial, the district court concluded that Grant's statement lacked any proper evidentiary or impeachment purpose. We agree. But the error was harmless because introduction of an unrelated conviction did not prejudice the defense—especially in light of the curative instructions. *See United States v. Williams*, 620 F.3d 483, 492 (5th Cir. 2010) ("[R]eversal is not required unless there is a 'reasonable possibility that the improperly admitted evidence contributed to the conviction.'" (citation omitted)); *see also United States v. Medina-Arellano*, 569 F.2d 349, 357 (5th Cir. 1978) ("Knowledge by the jury of a [conviction] to unrelated crimes did not hurt the defense's position.").

---

pursue his proposed line of cross-examination.'" *United States v. Templeton*, 624 F.3d 215, 223 (5th Cir. 2010). Because Lammons's testimony referencing the guilty plea was excluded, the right to cross-examination was not implicated. *See Davis v. Alaska*, 415 U.S. 308, 315–16, 94 S. Ct. 1105, 1110 (1974) (explaining that the "primary interest" the Confrontation Clause secures is "the right of cross-examination").

Narang further claims that the court impermissibly shifted the burden to him when it stated that he had the power to subpoena Sidhu. He seeks support in *United States v. Bennett*, 874 F.3d 236, 251 (5th Cir. 2017). That case involved comments reflecting a defendant's failure to offer exculpatory evidence. It is irrelevant to a Confrontation Clause claim. Here, the court, not the prosecution, merely noted that Narang could call Sidhu if he wished.

No. 19-20797

## B. Testimony by Anderson

Moparty argues that Anderson impermissibly testified on the ultimate issue of criminal intent when she labeled various transactions by Moparty as "money laundering."[19] He describes this as a "calculated effort" by the government "to extract opinion testimony from an agent." Further, he argues that Anderson was not presented as an expert witness and challenges the government's repeated references to the "money laundering counts." Moparty, however, did not object at trial to this testimony.

This court reviews unobjected-to testimony for plain error. *United States v. Coffman*, 969 F.3d 186, 189 (5th Cir. 2020). "There are four steps to [the] plain-error analysis: whether (1) an error that was (2) clear or obvious (3) affects the defendant's substantial rights, and if there was such an error, [the court has] discretion to remedy (4) if the error 'seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings.'" *Id.* (quoting *United States v. Olano*, 507 U.S. 725, 732, 734, 113 S. Ct. 1770, 1777–79 (1993)).

While portions of Anderson's testimony may have approached the line of permissible statements,[20] this claim can be resolved on the third and fourth prongs of plain error. The challenged statements represent three

---

[19] He also challenges Lammons's testimony describing Trinity as a "shell company" and Grant's description of a particular factual scenario as "fraudulent."

[20] Particularly troubling are Anderson's describing certain transactions as "money laundering" and opining on the motivation for structuring the transactions in that manner. *See United States v. Setser*, 568 F.3d 482, 494–95 (5th Cir. 2009) (acknowledging error in allowing a witness to testify that certain activities constituted "security fraud" or a "Ponzi scheme" but finding it harmless). *But see United States v. Evans*, 892 F.3d 692, 715 (5th Cir. 2018) ("[U]nder Rule 701, a lay witness may state his ultimate opinion, provided that opinion is 'based on personal perception,' 'one that a normal person would form from those perceptions,' and 'helpful to the jury.'" (citation omitted)).

No. 19-20797

snippets of testimony among a substantial number of documents and testimony from multiple witnesses. As this court stated in *United States v. Lucas*, "[g]iven the overwhelming quantum of evidence used to convict, any error did not affect [the defendant's] substantial rights under the third prong of plain-error review and, in any event, under the fourth prong, the putative error would not 'seriously affect[] the fairness, integrity, or public reputation of the proceedings.'" (citation omitted)). *Lucas,* 849 F.3d 638, 646 (5th Cir. 2017).

## C. Expert Testimony from Insurance Representatives

Moparty objects to aspects of the three insurance representatives' testimony, as he insists that the government elicited expert opinions without qualifying the witnesses or providing notice that they would offer expert testimony.[21]

If, after a timely trial objection, "a district court's determination as to the admissibility of evidence is questioned on appeal, [the] applicable standard of review is abuse of discretion." *United States v. O'Keefe*, 426 F.3d 274, 280 (5th Cir. 2005). But under the harmless error standard, the court will not reverse "[u]nless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction." *United States v. Mendoza-Medina*, 346 F.3d 121, 127 (5th Cir. 2003). If there was no objection, review is for plain error. *See Coffman*, 969 F.3d at 189. Moparty preserved at trial his objections to certain statements by the Aetna and Blue Cross Blue Shield witnesses, but he objected to none of the Cigna representative's testimony.

---

[21] He objected to statements made by the Aetna and Blue Cross Blue Shield representatives. But as the government notes, much of the testimony went unobjected—including all testimony from the Cigna representative.

No. 19-20797

However, it is unnecessary to parse the record statement by statement because Moparty's argument fails under the abuse of discretion standard.

"Rule 701 does not exclude testimony by corporate officers or business owners on matters that relate to their business affairs, such as industry practices and pricing." *Nat'l Hispanic Circus, Inc. v. Rex Trucking, Inc.*, 414 F.3d 546, 551–52 (5th Cir. 2005); *see also United States v. Kerley*, 784 F.3d 327, 337 (6th Cir. 2015) ("In a number of decisions from other circuits, courts have permitted witnesses to give lay opinion testimony about a business's policies, practices, or procedures, based on an after-the-fact review or analysis of documents or facts, if the witness's testimony derived from personal knowledge gained through participation in the business's day-to-day affairs." (collecting cases)).

Here, the challenged testimony largely related to the procedures, policy terms, and fraud prevention protections at each insurance company. For example, the Blue Cross Blue Shield witness addressed how the company would handle various situations, how it interpreted terms and policies, and how their policies compared to those of the industry. Similarly, the Aetna representative's testimony focused on Aetna's policies and practices. These witnesses' admissible testimony "provided factual information about the circumstances of the case." *United States v. McMillan*, 600 F.3d 434, 456 (5th Cir. 2010). To whatever small extent limited aspects of this testimony crept beyond the permissible bounds for a lay witness, there is no reasonable basis to find, in the context of the entire trial, that such testimony affected the verdict. *Id.*

## D. Sufficiency of the Evidence

Moparty challenges the sufficiency of evidence supporting all twenty-one of his convictions. Specifically, he claims that the government failed to establish the prerequisite agreement on the conspiracy charge; failed to

No. 19-20797

establish that he had knowledge that the medical testing was unnecessary and inadequate; and failed to refute that Moparty attempted to legally set up an HOPD. According to Moparty, this means the government failed to establish that he knowingly or willingly participated in a conspiracy to commit health care fraud. Further, Moparty argues that since the government failed to prove his intent relevant to the conspiracy count, it failed to prove his intent to commit the counts of substantive health care fraud. Finally, he claims the money-laundering counts fail because they depend on the substantive fraud counts. Moparty timely moved for a judgment of acquittal, preserving these challenges.

This court reviews "challenges to the sufficiency of the evidence de novo, applying the same standard as applied by the district court: could a rational jury find that all elements of the crime were proved beyond a reasonable doubt?" *United States v. Chapman*, 851 F.3d 363, 376 (5th Cir. 2017). Review is "highly deferential to the verdict." *United States v. Beacham*, 774 F.3d 267, 272 (5th Cir. 2014). The court "'search[es] the record for evidence . . . support[ing] the convictions beyond a reasonable doubt' and review[s] the evidence 'in the light most favorable to the verdict, accepting all credibility choices and reasonable inferences made by the jury.'" *Chapman*, 851 F.3d at 376 (citations omitted).

"[A] defendant seeking reversal on the basis of insufficient evidence swims upstream." *United States v. Mulderig*, 120 F.3d 534, 546 (5th Cir. 1997). The "conviction will be affirmed if 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Gonzalez*, 907 F.3d 869, 873 (5th Cir. 2018) (citation omitted and emphasis in original). "Though the government cannot obtain a conviction by piling 'inference upon inference,' the defendants cannot obtain an acquittal simply by ignoring inferences that can logically be drawn from

No. 19-20797

the totality of the evidence." *United States v. Martinez*, 921 F.3d 452, 466 (5th Cir. 2019) (citation omitted).

### 1. Conspiracy Conviction

"The elements of healthcare-fraud conspiracy are (1) the existence of an agreement between two or more people to pursue the offense of fraud; (2) knowledge of the agreement; and (3) voluntary participation." *United States v. Emordi*, 959 F.3d 644, 650 (5th Cir. 2020). "'An agreement may be inferred from concert of action, voluntary participation may be inferred from a collocation of circumstances, and knowledge may be inferred from surrounding circumstances.'" *United States v. Daniel*, 933 F.3d 370, 377 (5th Cir. 2019) (quoting *United States v. Bieganowski*, 313 F.3d 264, 277 (5th Cir. 2002)). The agreement may be silent and informal, and the government can use either direct or circumstantial evidence to prove it. *United States v. Barson*, 845 F.3d 159, 163–64 (5th Cir. 2016).

Moparty doesn't disagree that he and Narang had an agreement to process patient bills through ROH. Thus, this case boils down to whether that agreement had a fraudulent purpose or was a legitimate business arrangement in which Moparty innocently benefitted from Narang's fraud. The government presented two theories of fraud: one relating to the medical necessity and adequacy of the procedures performed, and another focused on how the procedures were billed. Moparty argues that Dr. Bungo's testimony demonstrates that Moparty lacked the necessary training to determine whether any particular test was necessary. He misconstrues the inquiry, however, because the government could bear its burden against him with evidence on the fraudulent billing practices alone.

There was substantial evidence that Moparty and Narang agreed to process insurance reimbursement claims through ROH instead of North Cypress; that rejected claims were resubmitted through other entities

No. 19-20797

controlled by Moparty; and that millions of dollars flowed out of Trinity, in the form of rent and suspect real estate deals, and landed in the accounts of various entities owned by Narang and his wife. The government demonstrated that Moparty had specific knowledge of all of the billing through emails sent by Warren.

In contrast, Moparty asserts that he was attempting to run a legitimate HOPD and any payments to Narang represent "mere association," the evidence of legitimate transactions. Ultimately, the jury was left largely with a credibility determination. That Moparty was aware of the ROH's billing practices is beyond dispute. As to whether he had the requisite intent to conspire to commit fraud, part of the answer turns on whether the jury believed Moparty's efforts to establish an HOPD in the North Cypress office. The emails submitted by the government demonstrate that Moparty did not receive authorization, and he was instead advised repeatedly to obtain counsel. This, coupled with Moparty's authorization of "rebilling" rejected claims and his suspicious explanations for the large sums of money transferred to Narang's entities, could lead a rational jury to conclude that he failed to organize a legitimate HOPD, and he and Narang conspired to commit health care fraud.

## 2. Substantive Health Care Fraud

Principally, Moparty repeats his arguments on the conspiracy count that the evidence also fails to establish his criminal intent to commit substantive health care fraud. To establish health care fraud, the government must prove that Moparty "'knowingly and willfully execute[d], or attempt[ed] to execute, a scheme or artifice—(1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in

No. 19-20797

connection with the delivery of or payment for health care benefits, items, or services.'" *United States v. Willett*, 751 F.3d 335, 339 (5th Cir. 2014) (citation omitted). "It is enough for criminal liability if a defendant 'associates with the criminal activity, participates in it, and acts to help it succeed.'"[22] *Martinez*, 921 F.3d at 472 (quoting *United States v. Delagarza-Villarreal*, 141 F.3d 133, 140 (5th Cir. 1997)).

As detailed above, Moparty's actions were the key to the second aspect of the scheme, billing Narang's services and tests at the higher hospital or out-of-network rates. The government presented seventeen submitted claims, all of which reflected these grounds for overbilling. Whether Moparty "knowingly and willingly" defrauded the insurance companies was a quintessential jury question. Based on the evidence presented, a rational fact finder could conclude that Moparty knew he was not operating a legal HOPD and otherwise knew the amounts billed were contrived to be illegally high.

### 3. Money Laundering

To sustain a conviction under 18 U.S.C. § 1957, the government must prove three elements: "(1) property valued at more than $10,000 that was derived from a specified unlawful activity, (2) the defendant's engagement in a financial transaction with the property, and (3) the defendant's knowledge that the property was derived from unlawful activity." *United States v. Fuchs*, 467 F.3d 889, 907 (5th Cir. 2006). Health care fraud is a qualifying unlawful activity. *See Martinez*, 921 F.3d at 476–77. Moparty argues that "since the evidence was legally insufficient to prove [his] participation in the . . .

---

[22] The "[g]overnment must first 'prove that someone committed the underlying substantive offense.'" *United States v. Rufai*, 732 F.3d 1175, 1190 (10th Cir. 2013). Here, the government proved that Narang committed substantive health care fraud—he does not challenge the sufficiency of his conviction on appeal.

conspiracy and . . . [the] scheme to defraud a health care benefit program, the convictions for money laundering should be reversed" because he lacked the requisite knowledge of the underlying illegality. Because his predicate arguments fail, so does this one.

## E. Cumulative Error

Moparty argues that the government violated his right to a fair trial through repeated misconduct including: (1) references to health care convictions of two people who didn't testify; (2) impermissible witness testimony; (3) prejudicial comments referencing the "dark web," "kickbacks," and the transmission of confidential patient information to a third-party billing company in India. According to Moparty, "[t]he cumulative prejudicial effect of these repeated acts of misconduct by prosecutors and government witnesses rendered impossible the jury's ability to fairly review the evidence and return a just verdict."

"[T]he cumulative error doctrine . . . provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." *United States v. Delgado*, 672 F.3d 320, 343–44 (5th Cir. 2012) (en banc) (alteration in original and citation omitted). Reversal under the doctrine is rarely necessary—"'the possibility of cumulative error is often acknowledged but practically never found persuasive.'" *Id.* at 344 (quoting *Derden v. McNeel*, 978 F.2d 1453, 1456 (5th Cir. 1992) (en banc)). Instead, reversal is only justified "in the unusual case in which synergistic or repetitive error violates the defendant's constitutional right to a fair trial." *Id.* "[A]pplication is especially uncommon where . . . the government presents substantial evidence of guilt." *Id.*

No. 19-20797

Moparty relies on *Yates v. Evatt*, 500 U.S. 391, 111 S. Ct. 1884 (1991), and *United States v. Riddle*, 103 F.3d 423 (5th Cir. 1997),[23] neither of which is directly applicable. *Yates* involved jury instructions that applied an unconstitutional presumption, and the Court reversed the Supreme Court of South Carolina on its application of harmless error review. *Yates*, 500 U.S. at 402–07, 111 S. Ct. at 1892–95. That case says nothing about cumulative error which is premised on the repetition of individually harmless errors. *Riddle* involved testimony and evidence far outside the scope of the trial, prejudicial documents admitted into evidence, and the erroneous exclusion of the defendant's expert. *Riddle*, 103 F.3d at 428–35. The court reasoned that, had those rulings come out differently, it would have been "a very different trial." *Id.* at 434.

The same cannot be said here. Any mistakes must be measured against the weight of the evidence presented. *See United States v. Neal*, 27 F.3d 1035, 1051–52 (5th Cir. 1994) (sometimes "the cumulative effect of several incidents of improper argument or misconduct may require reversal, even though no single one of the incidents, considered alone, would warrant such a result," but here, "we are not persuaded, in light of the substantial evidence of guilt adduced at trial, that the Defendants are entitled to reversal on the basis of cumulative error"). Moparty never objected to the jury instructions and there is no evidence the jury failed to follow them. The government offered hundreds of pages of documentary evidence and testimony from patients, employees, medical experts, industry representatives, and investigating agents. Moparty's claimed errors lack the

---

[23] Moparty also relies on an unpublished, nonprecedential opinion of this court. *United States v. Houston,* 481 F. App'x 188 (5th Cir. 2012). We allude to such opinions at most as persuasive, but *Houston* fails even that low bar because it involved more numerous and serious trial errors, which led to "confusion and prejudice that reached to the heart of the case—the identity of the perpetrator." *Id.* at 195.

"synergistic" nature such that if none had occurred, he would have had "a very different trial." *Riddle*, 103 F.3d at 434.

## F. Moparty's Sentencing

On appeal, Moparty argues that the district court erred in applying a two-level enhancement under U.S.S.G. § 3B1.3. That section applies "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. Moparty preserved the issue. For preserved challenges, this court reviews the district courts application of the Guidelines de novo and its factual findings for clear error. *United States v. Suchowolski*, 838 F.3d 530, 532 (5th Cir. 2016). If the district court erred, the analysis shifts to whether the error was harmless. *United States v. Halverson*, 897 F.3d 645, 652 (5th Cir. 2018).

The abuse of trust enhancement is "a sophisticated factual determination" that this court reviews for clear error. *United States v. Miller*, 607 F.3d 144, 148 (5th Cir. 2010). The enhancement is appropriate if (1) "the defendant occupies a position of trust" and (2) "the defendant abused her position in a manner that significantly facilitated the commission or concealment of the offense." *United States v. Kay*, 513 F.3d 432, 459 (5th Cir. 2007). "A position of trust is characterized by (1) professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference), and (2) minimal supervision." *United States v. Ollison*, 555 F.3d 152, 166 (5th Cir. 2009). This court will uphold the district court's finding "as long as it is plausible in light of the record as a whole." *United States v. Ekanem*, 555 F.3d 172, 175 (5th Cir. 2009).

Moparty rests his argument on the first prong—that he did not occupy a position of trust because he is not the owner of a hospital and the

No. 19-20797

government failed to meet its burden to prove the enhancement. He claims that according to trial testimony, his brother Roy Moparty was the sole owner. But, as the government points out, Moparty represented that he owned 50% in the signed licensing application and only his email address was listed. In fact, they were both signatories on ROH's bank account. And Lammons testified that Moparty had a financial interest in and significant control over ROH. Moparty's ownership position is a plausible view of the record.

Moparty's management position was thus excluded from close supervision, and it enabled him to direct Warren to bill for testing performed at North Cypress and "rebill" denied claims through other Moparty entities. Moparty's managerial authority placed him in "a superior position . . . to commit the offense." *Kay*, 513 F.3d at 459. The district court did not err in applying the enhancement.

## G. Narang's Sentencing

Narang argues that the district court erred in applying two sentencing enhancements. Section § 2B1.1(b)(2)(A)(i) adds two levels to the base offense level if the offense involved ten or more victims. U.S.S.G. § 2B1.1(b)(2)(A)(i). Section 2B1.1(b)(11)(C)(i) adds another two levels if the offense involved "the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification." U.S.S.G. § 2B1.1(b)(11)(C)(i). Narang filed written objections to both enhancements.

### 1. Ten or More Victims—§ 2B1.1(b)(2)(A)(i)

Narang argues that this enhancement is inapplicable because the only "victims" are the three insurance companies—Aetna, Blue Cross Blue Shield, and Cigna. Narang's argument runs headlong into this circuit's precedent. In *United States v. Barson*, this court concluded that the

enhancement applied because Medicare beneficiaries with falsely claimed benefits counted as "victims" since Application Note 4(E) defines a "victim" as "any individual whose means of identification was used unlawfully or without authority." 845 F.3d 159, 167 (5th Cir. 2016) (quoting U.S.S.G. § 2B1.1 cmt. n.4(E)).[24] The only meaningful distinction here is that the benefits were paid by private insurance companies rather than Medicare. Application Note 4(E) applies to all cases, not just government health care programs, "involving means of identification."[25] U.S.S.G. § 2B1.1 cmt. n.4(E). Since Narang used the patient's "means of identification" to generate the fraudulent claims, precedent forecloses this argument.

### 2. Means of Identification—§ 2B1.1(b)(11)(C)(i)

Narang argues that "[t]he enhancement's language does not call for a two-level increase merely because the offense involves a 'means of identification' from which another 'means of identification' is unintentionally or tangentially created." Again, this argument is foreclosed by circuit precedent. In *United States v. Kalu*, this court held that using a beneficiary's Medicare information to generate a fraudulent health care claim satisfied the enhancement because the initial "means of identification" usage (the Medicare information) produced another means of identification—the Medicare claim number which "is unique and inextricably tied to a particular Medicare beneficiary." 936 F.3d 678, 681–82 (5th Cir. 2020). Here, each

---

[24] *But see Barson*, 845 F.3d at 168–170 (Jones, J., concurring in part and dissenting in part) (arguing that this enhancement and Application Note 4(E) are not applicable in these circumstances under the plain meaning of "victims" and the purpose of the 2009 update to the Guidelines).

[25] "Means of identification" is defined as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual." *See* U.S.S.G. § 2B1.1 cmt. n.1 (incorporating the quoted definition by cross-reference to 18 U.S.C. § 1028).

No. 19-20797

patient's personal information was used to generate a unique health care claim.[26] Accordingly, *Kalu*'s reasoning extends to the facts presented here.

## III. CONCLUSION

Though we find no *reversible* error under the *King* factors or otherwise, we do not condone the government's conduct in this case. Throughout the course of the trial, the government, at best, was careless in the testimony it elicited from its witnesses, its missteps salvaged only by the district court's repeated and forceful curative instructions. Even though the trial court found no bad faith, such heedless behavior is unacceptable. With this said, we find no reversible error of fact or law.

AFFIRMED.

---

[26] Though *Kalu* involved Medicare rather than private insurance, *Kalu* approvingly discussed *United States v. Gonzalez*, 644 F. App'x 456 (6th Cir. 2016) (unpublished), which did involve private insurance. *See Kalu*, 936 F.3d at 682 (reciting the *Gonzalez* analysis and stating "[w]e see no reason to disagree").